**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SAMUEL GUZMÁN,
County of Residence: *Anne Arundel*
c/o CASA, Inc. dba We Are CASA
8151 15th Ave
Langley Park, MD

A.G.P.,
County of Residence: *Prince George's*
c/o CASA, Inc. dba We Are CASA
8151 15th Ave
Langley Park, MD

K.M.,
County of Residence: *Wicomico*
c/o CASA, Inc. dba We Are CASA
8151 15th Ave
Langley Park, MD

J.M.R.,
County of Residence: *Montgomery*
c/o CASA, Inc. dba We Are CASA
8151 15th Ave
Langley Park, MD

CASA, Inc. dba We Are CASA,
County or Residence: *Prince George's*
8151 15th Ave
Langley Park, MD

*individually and on behalf others similarly situated*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY.
245 Murray Lane SW
Washington, D.C. 20528

**CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND VACATUR**

MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*
245 Murray Lane SW
Washington, D.C. 20528

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
500 12th Street SW
Washington, D.C. 20024

DAVID VENTURELLA, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, D.C. 20530

TODD BLANCHE, *in his official capacity as Attorney General of the United States,*
950 Pennsylvania Avenue NW
Washington, D.C. 20530

*Defendants.*

## INTRODUCTION

1. Every day, as Maryland residents go about their daily lives, traveling to and from work, school, church, and other essential activities, federal immigration agents roam the state's roadways and parking lots hunting for people to arrest to fill their unattainable quotas. The federal agents—most of whom are from Immigration and Customs Enforcement ("ICE")—adhere to a consistent policy: aggressively stop people who they perceive to be Brown or Black immigrants and immediately arrest them without a warrant and without making the individual assessments required for such warrantless arrests.

2. Under 8 U.S.C. § 1357(a)(2), which incorporates the probable cause standard of the U.S. Constitution's Fourth Amendment, immigration agents seeking to arrest someone without a

warrant must establish probable cause that the person is in the United States unlawfully *and* that the person is likely to escape before a warrant can be obtained. Both requirements serve as crucial safeguards, yet Defendants are abiding by neither.

3. Defendants' "arrest first, ask questions later" policy, adopted at the beginning of the second Trump administration in service of its goal of deporting as many immigrants as possible, has sown terror and torn apart families across the country. At least three federal courts have determined that it is unlawful. *See M-J-M-A v. Lyons*, 822 F. Supp. 3d 1147, 1178 (D. Or. 2026) ("The record is replete with examples demonstrating Defendants' pattern and practice of conducting warrantless arrests without first making the required individualized probable cause determinations."); *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 49 (D.D.C. 2025) (finding that "plaintiffs have established a substantial likelihood of an unlawful policy and practice by defendants of conducting warrantless civil immigration arrests without probable cause"); *Ramirez Ovando v. Noem,* 810 F. Supp. 3d 1209, 1234 (D. Colo. 2025) ("[D]efendants likely have a pattern or practice of ignoring the individualized flight risk determinations mandated by [law]" and "have successfully shown that their cases are not isolated incidents, but part of a larger policy, pattern, or practice by ICE in this state.") (bold omitted).

4. Despite repeatedly being ordered to end this illegal policy and practice, Defendants defiantly continue to implement it. Defendants employ uniquely disturbing tactics to carry out their policy and practice here in Maryland. Agents drive around in unmarked cars, often early in the morning as people are heading to work or taking their children to school, tailing work trucks and other vehicles. Agents then stop vehicles based on limited information and dubious assumptions, often recklessly using their own vehicles to box in drivers, violently smashing car windows, and drawing their weapons. During these frightening encounters, ICE routinely arrests everyone they

find in the vicinity, regardless of who they intended to stop. ICE makes these arrests without probable cause—in many cases, without asking any questions *at all*—contrary to clearly established law.

5. Defendants' unlawful street arrests are causing deep harm in Maryland communities. Long-time residents of Maryland—including, in some instances, U.S. citizens—are accosted by masked and armed ICE agents and shackled in front of their loved ones. Frequently, they are forced to spend several days in a crowded cell in Maryland before ICE whisks them away to remote detention facilities across the country. Some are released weeks or months later after a federal habeas court determines their detention was unlawful. Others are quickly deported to countries where they fear persecution or in which they have not lived for decades. Many are coerced into agreeing to their own deportation. Their families and communities—including U.S. citizen children and spouses—are left to pick up the pieces.

6. Defendants' policy and practice of arresting people without conducting an individualized assessment establishing probable cause that the person being arrested is unlawfully present in the country and is likely to escape before a warrant can be obtained violates the Immigration and Nationality Act (INA), 8 U.S.C. § 1357(a)(2), and the Fourth Amendment to the U.S. Constitution.

7. Plaintiffs Samuel Guzmán, A.G.P., K.M., and J.M.R. ("Individual Plaintiffs")[1] bring this lawsuit on behalf of themselves and others similarly situated, and Plaintiff CASA, Inc. dba We Are CASA ("We Are CASA") brings this lawsuit on behalf of itself and its members, to put an end to this unlawful policy and practice in Maryland. Individual Plaintiffs were each arrested in Maryland pursuant to Defendants' unlawful policy, and they each face substantial risk of re-

[1] Plaintiffs have concurrently filed a motion to proceed pseudonymously for Plaintiffs A.G.P., K.M., and J.M.R.

arrest as they continue to go about their daily routines in the same targeted regions of Maryland in which they were arrested. Further, Individual Plaintiffs experience other ongoing harms as a direct result of Defendants' illegal practices, such as being subjected to intrusive ankle monitors, reporting requirements, and restrictions on movement imposed by ICE following their illegal arrests. They have also significantly restricted their movements and activities in efforts to avoid re-arrest. Plaintiff We Are CASA's members similarly have sought to restrict their activities to avoid arrest and are at substantial risk of arrest as Defendants continue to ramp up the implementation of their policy in Maryland to meet their ever-increasing quotas.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (right of review). It has remedial authority pursuant to 5 U.S.C. §§ 702, 705, and 706 (Administrative Procedure Act), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), and the inherent equitable powers of this Court.

9. Plaintiffs have standing to pursue this action because they are at substantial risk of re-arrest pursuant to Defendants' ongoing policy and practice and are "'suffering [ ] direct and current' injuries as a result of their unlawful arrests and detention, i.e., bond, ankle monitors, and adherence to strict reporting requirements." *Ramirez Ovando*, 810 F. Supp. 3d at 1227 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991)). They also have been forced to limit their activities to mitigate the risk of re-arrest.

10. Venue is proper in this District pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1) because Plaintiffs reside in Maryland, Defendants are officers or employees of the United States, and a substantial part of the unlawful acts and omissions giving rise to the claims occurred in this District.

## PARTIES

11. **Plaintiff Samuel Guzmán** is a 24-year-old Latino U.S. citizen and member of We Are CASA who was born in Maryland and graduated from high school in Annapolis. On June 7, 2026, Mr. Guzmán was returning to his car in a 7-Eleven parking lot in Annapolis when ICE agents ran up to him, ordered him to put his hands up, and restrained him as they removed his personal items from his pockets. Despite looking at the ID in his wallet and hearing Mr. Guzmán plead with them that he is a U.S. citizen, the agents immediately handcuffed Mr. Guzmán, put him in their truck, and drove him to a nearby parking lot where they were holding other recently arrested Latine[2] individuals. The agents arrested Mr. Guzmán without a warrant and without meaningfully investigating his immigration status or ties to the community. After finally reviewing Mr. Guzmán's identity documents a second time, the agents returned him to the 7-Eleven parking lot and released him with no explanation. Mr. Guzmán continues to take the same route to work on which he was arrested in June, and he faces substantial risk of re-arrest. He fears he or his Latine family members in the Annapolis area will be arrested in the future.

12. **Plaintiff A.G.P.** is a 56-year-old Latino man and member of We Are CASA who has lived in Maryland for nearly 20 years, residing with and financially supporting his daughter and grandchildren before his arrest. On February 15, 2026, A.G.P. was driving to his long-held job in Silver Spring, when ICE agents suddenly surrounded him in unmarked vehicles, ordered him out of his car, and handcuffed him *before* asking him any questions, seeking neither his name nor his ID. The agents arrested A.G.P. without a warrant and without meaningfully investigating his immigration status or ties to the community. A.G.P. was held at the then-egregiously overcrowded Baltimore ICE office for six days. He then spent three months being shunted between detention

[2] "Latine" is a gender-neutral term referring to individuals of Latin American descent.

centers across the country, where his health deteriorated and his diabetes was exacerbated, before a federal court in California found his detention unlawful and ordered him released in May 2026. A.G.P.'s three-month detention has had lasting effects: his family lost their home due to the loss of his financial support, and he is still to this day subject to burdensome conditions of release imposed by ICE, including an intrusive ankle monitor that exacerbates his diabetic neuropathy, reporting requirements, and restrictions on movement outside of the tri-state area. Despite trying to limit his activities to avoid re-arrest, he is at substantial risk of re-arrest every day as he travels through the same parts of Maryland where he and others have been arrested.

13. **Plaintiff K.M.** is a 38-year-old Latina woman and member of We Are CASA who has lived in Maryland for 20 years and has two young U.S. citizen children, one of whom has a serious medical condition requiring constant care. On January 12, 2026, K.M. was parking her car near a friend's house in Salisbury, on Maryland's Eastern Shore, when six unmarked cars full of ICE agents surrounded her. After K.M. handed the agents her Maryland driver's license, they ordered her out of the car, threatened to shoot her, and handcuffed her despite her explaining that she is the sole caregiver for her two children. The agents arrested K.M. without a warrant and without meaningfully investigating her immigration status or ties to the community. ICE held K.M. for several hours at the Salisbury ICE office, during which various agents interrogated her about her children and her husband, who is deceased. Ultimately, she was released with an ankle monitor. K.M. continues to wear the monitor, which causes her significant discomfort and shame at work and in public, and she must attend monthly ICE appointments. K.M. has experienced frequent panic attacks in the wake of her arrest, and she started attending therapy to cope with her trauma and fear of being re-arrested. Despite trying to limit her activities to avoid re-arrest, she remains at substantial risk of re-arrest in her community, where ICE activity is widespread.

14. **Plaintiff J.M.R.** is a 40-year-old Latino man and member of We Are CASA who has lived in Maryland for more than a decade. Upon his entry into the United States in 2014, he was briefly held in immigration detention and released on bond. He settled in Maryland near his family members, where he dutifully complied with the conditions of his bond and the removal proceedings against him were dismissed. But on July 7, 2026, J.M.R. was driving his boss's truck to work in Silver Spring when ICE agents surrounded him in unmarked cars. The agents dragged him out of his car, threw him to the ground, and handcuffed him before even asking for his name or ID. The agents arrested J.M.R. without a warrant and without meaningfully investigating his immigration status or ties to the community. While he was already handcuffed, the agents shot him with a Taser gun, forcing him to go to hospital. J.M.R. remained in ICE custody in Virginia for two grueling weeks, without medical attention for the wounds ICE inflicted on him, before a federal habeas court ordered his release. Plaintiff J.M.R. has tried to limit activities outside of his home to avoid another encounter. Yet he has no choice but to continue driving the same routes to work to make a living for himself and his partner, and he is at substantial risk of re-arrest. He is terrified that he will be subjected to the same or worse violence he experienced in July.

15. **Plaintiff CASA, Inc. dba "We Are CASA" ("We Are CASA")** is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. We Are CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendant, Indigenous, and immigrant communities. It provides a variety of social, health, employment, and legal services to immigrant communities, with a particular focus in Maryland, Virginia, D.C., Pennsylvania, and Georgia. Due to the surge in warrantless immigration arrests without probable cause in Maryland, We Are CASA's resources have been diverted to focus on

providing emergency response services for people arrested in Maryland rather than spending those resources on the core social and legal services it has traditionally provided to non-detained people, thereby interfering with We Are CASA's core activities. We Are CASA's members include individuals, and families of individuals, who recently have been arrested in Maryland without a warrant and without probable cause as to immigration status and/or escape risk and who are likely to face such stops and arrests in the future.

16. **Defendant U.S. Department of Homeland Security ("DHS")** is the federal agency responsible for administering and enforcing the nation's immigration laws pursuant to 8 U.S.C. § 1103(a).

17. **Defendant Markwayne Mullin** is the Secretary of Homeland Security and is sued in his official capacity. As the head of DHS, he oversees component agencies such as ICE and U.S. Customs and Border Protection ("CBP").

18. **Defendant U.S. Immigration and Customs Enforcement ("ICE")** is a component agency of DHS and is tasked with managing enforcement of laws related to immigration. Among other functions, ICE carries out stops and arrests of individuals believed to be in violation of civil immigration law, assumes custody over individuals in immigration detention, and is responsible for management and oversight of the civil immigration detention system.

19. **Defendant David Venturella** is the Acting Director of ICE and is sued in his official capacity. As Acting Director of ICE, he oversees its functions, including managing enforcement of laws related to immigration, carrying out stops and arrests of individuals believed to be in violation of civil immigration law, and managing the civil immigration detention system.

20. **Defendant U.S. Department of Justice ("DOJ")** is the federal agency responsible for enforcing federal law and overseeing many of the federal government's law enforcement agencies.

21. **Defendant Todd Blanche** is the U.S. Attorney General and is sued in his official capacity. As Attorney General of the U.S., he leads the U.S. Department of Justice and oversees its component agencies.

## FACTUAL ALLEGATIONS

### A. The Administration's Campaign to Deport Millions of Immigrants Leads to Quotas and Mass Arrests Across the Country Without Regard for the Law.

22. Beginning in January 2025, DHS commenced a program intended to deport one million immigrants from the United States in the first year of the new administration.[3] Then-acting director of ICE Todd Lyons later explained that "'[w]e need to get better at treating this like a business," like '[Amazon] Prime, but with human beings.'"[4]

23. To effectuate this, the administration imposed daily arrest quotas on ICE field offices across the country. In January 2025, ICE leadership was "directed by Trump officials to aggressively ramp up the number of people they arrest, from a few hundred per day to at least 1,200 to 1,500, because the president has been disappointed with the results of his mass deportation campaign so far . . ."[5] "The quotas were outlined … in a call with senior ICE officials, who were

---

[3] Maria Sacchetti & Jacob Bogage, *'One Million,' The private goal driving Trump's push for mass deportations*, Wash. Post (April 12, 2025), https://www.washingtonpost.com/immigration/2025/04/12/one-million-deportations-goal/.

[4] Graig Graziosi, *ICE Chief Thinks Deportation System Should Be Run Like Amazon Prime "but with Human Beings*, The Independent (Apr. 9, 2025), https://www.independent.co.uk/news/world/americas/us-politics/ice-deportations-amazon-prime-b2730464.html.

[5] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, Wash. Post (Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota/.

told that each of the agency's field offices should make 75 arrests per day and managers would be held accountable for missing those targets."[6]

24. Homeland Security Advisor Stephen Miller "made clear that not hitting" the goal of one million deportations "is not an option."[7] In a May 2025 "emergency" meeting, convening top ICE officials from Maryland and every office in the country, he and then-DHS Secretary Kristi Noem "eviscerated" officials for not arresting more immigrants.[8] As recited by one attendee, "'Stephen Miller wants everybody arrested. "Why aren't you at Home Depot? Why aren't you at 7-Eleven?"'"[9] In the wake of this meeting, Stephen Miller stated publicly that "we are looking to set a goal of a minimum of 3,000 arrests for ICE every day, and President Trump is going to keep pushing to get that number up higher each and every single day."[10] According to Adam Boyd, an attorney who resigned from ICE's legal department, "[i]t became a contest of how many deportations could be reported to Stephen Miller by December. … [W]e are now focusing on numbers over all else."[11]

25. To meet the quotas, ICE officers across the country were "told to 'do what you need to do' to make more arrests."[12] Senior ICE officials directed agents to "'turn the creative knob up to 11' when it comes to enforcement, including by interviewing and potentially arresting people

---

[6] Id.
[7] Nick Miroff, *Trump Loves ICE. Its Workforce Has Never Been So Miserable,* The Atlantic, (July 10 https://www.theatlantic.com/politics/archive/2025/07/trump-ice-morale-immigration/683477/.
[8] Anna Giaritelli, *Stephen Miller 'Eviscerated' ICE Officials in Private Meeting for Low Deportation Numbers*, Wash. Examiner (May 30, 2025), https://www.washingtonexaminer.com/news/3425297/stephen-miller-eviscerated-ice-officials-deportation-numbers/.
[9] *Id.*
[10] *Id.*
[11] Nick Miroff, *Trump Loves ICE. Its Workforce Has Never Been So Miserable,* The Atlantic, (July 10 https://www.theatlantic.com/politics/archive/2025/07/trump-ice-morale-immigration/683477/.
[12] Elizabeth Findell et al., *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, Wall St. J., (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877?msockid=3ad81355742f6f8f0f4f04cd75216e29.

they called 'collaterals.'"[13] "Officers were also urged to increase apprehension and think up tactics to 'push the envelope' one email said. … 'If it involves handcuffs on wrists, it's probably worth pursuing."[14] Unsurprisingly, the relentless focus on a massive increase in arrest numbers by any means has led ICE agents to flout the law in carrying out arrests.

26. As Defendants have shifted "from targeted enforcement to broad street sweeps," they have eliminated the requirement that ICE officers obtain approval from a supervisor prior to making arrests.[15] Commenting on this change, one former ICE official stated, "it's hard to fill out a worksheet that just says 'Meet in the Home Depot parking lot.'"[16]

27. After widely publicized enforcement campaigns in several major cities, the killing of two U.S. citizens by ICE agents in Minnesota, and the subsequent replacement of DHS Secretary Kristi Noem with Defendant Markwayne Mullin, Secretary Mullin indicated that ICE would pursue less public strategies. This strategy "aimed to get the department out of the headlines" while still effectuating mass arrests.[17] In May 2026, the administration quietly deployed a new wave of ICE officers across the country, including sending additional officers to Baltimore.[18] By June, ICE

---

[13] José Olivares, *US Immigration Officers Ordered to Arrest More People Even Without Warrants*, The Guardian (June 4, 2025), https://www.theguardian.com/us-news/2025/jun/04/immigration-officials-increased-detentions-collateral-arrests.

[14] *Id.*

[15] Julia Ainsely, Didi Martinez and Laura Strickler, *Under Trump Administration, ICE Scraps Paperwork Officers Once Had to Do Before Immigration Arrests*, NBC News (Sept. 9, 2025), https://www.nbcnews.com/politics/national-security/trump-administration-ice-scraps-paperwork-officers-immigration-arrests-rcna229407.

[16] *Id.*

[17] Rebecca Santana, *ICE Arrests 10,000 in 5 Days, A Sharp Late-June Surge In Trump's Deportation Push*. AP News (July 2, 2026), https://apnews.com/article/immigration-arrests-border-ice-trump-a748345d743ebc84b5a20b71abea17f1.

[18] Trevor Hughes, *New Wave of ICE Deployments Could Impact More Than 40 States*, USA Today (May 7, 2026), https://www.yahoo.com/news/articles/wave-ice-deployments-could-impact-164608135.html?guccounter=2.

had grown to 29,000 employees, 8000 more than when President Trump took office in January 2025.[19]

28. At the beginning of June 2026, Congress gave DHS an astounding 70 billion dollars for immigration enforcement, including 38 billion for ICE.[20] Shortly afterward, the White House again demanded an increase in arrests, this time telling ICE that "2,000 arrests a day was the new standard for enforcement."[21] Following the new order, daily arrests doubled.[22] In July 2026, ICE arrested nearly 50,000 people nationally—the highest monthly total since the beginning of Trump's second administration.[23] This recent spike is part of an overall increase in enforcement in 2026: "through July 12, ICE had arrested more than 200,000 people in 2026, a more than 40 percent increase compared with the same period last year."[24]

29. In the wake of two deadly ICE shootings over the course of one week in July, ICE leadership directed its agents to pause all enforcement through traffic stops.[25] But less than 48 hours later, President Trump reversed that directive through a contradictory Tweet, stating that

---

[19] Albert Sun & Allison McCann, *ICE Arrests Soar as People With No Criminal Record Are Increasingly Targeted*, N.Y. Times (Aug. 27, 2026), https://www.nytimes.com/interactive/2026/08/27/us/ice-immigrant-arrests-trump-deportation-dhs.html.

[20] Ximena Bustillo & Sam Gringles, *ICE is Now Funded Through End of Trump's Term, Raising Worries About Oversight*, NPR (June 10, 2026), https://www.npr.org/2026/06/09/nx-s1-5851664/house-reconciliation-vote-immigration-enforcement-ice-border-patrol.

[21] Hamed Aleaziz, *Immigrant Arrests Surge to 10,000 in 5 Days as ICE Clamps Down,* N.Y. Times (July 1, 2026), https://www.nytimes.com/2026/07/01/us/politics/ice-immigrant-arrests-surge.html.

[22] *Id.*

[23] Rebecca Santana, *ICE arrests jumped to nearly 50,000 in July, the highest monthly total of Trump's second term*, ABC News, (Aug. 25, 2026), https://abcnews.com/US/wireStory/ice-arrests-jumped-50000-july-highest-monthly-total-135941401.

[24] David Nakamura et al., *DHS Chief Faces Crisis Moment Amid Mounting Arrests, Fatal Shootings*, Wash. Post, (July 16, 2026), https://www.washingtonpost.com/immigration/2026/07/16/dhs-chief-faces-crisis-moment-amid-mounting-arrests-fatal-shootings/.

[25] Isaac Arnsdorf & Ted Hesson, *ICE Lifts Pause on Vehicle Stops After Trump Criticism*, Wash. Post, July 15, 2026, https://www.washingtonpost.com/politics/2026/07/15/trump-deportation-push-falters-after-fatal-ice-encounters/.

"We CANNOT give up one of I.C.E. 's most important and effective Crime Fighting tools, THE TRAFFIC STOP!" Since then, ICE traffic stops have resumed in full force.[26]

**B. ICE Aggressively Pursues its Mass Arrest and Deportation Campaign in Maryland, Resulting in Thousands More Arrests of Marylanders.**

30. Maryland is home to a diverse population, with more than one million people born outside the United States.[27] Immigrants make up nearly 17% of Maryland's population, and the majority of Maryland's immigrants are naturalized citizens or lawful permanent residents.[28] Since the beginning of the administration's deportation campaign, Defendants have targeted Maryland's immigrant communities, most recently sweeping up large numbers of Haitian residents following the end of Temporary Protected Status and initiating a state-wide enforcement operation last month.

31. The first notable example of ICE's campaign of terror in Maryland was the illegal arrest and deportation of Kilmar Abrego Garcia in March 2025. Mr. Abrego Garcia had lived in Maryland for years, where he worked as a sheetworker apprentice and resided with his U.S. citizen wife and child. On March 12, 2025, he was pulled over by ICE as he drove home from work with his young son in the car. The agents unlawfully arrested him without a warrant, held him briefly at the Baltimore ICE office, and then quickly and illegally deported him to the CECOT prison in El Salvador.[29] Only through persistent advocacy and multiple orders from this Court did Mr. Abrego Garcia return to his family in Maryland months later.[30]

---

[26] *Id.*
[27] Migration Policy Institute, *State Immigration Data Profiles 2024 (Maryland)*, https://www.migrationpolicy.org/data-tool/state-profiles/md (last visited Sept. 9, 2026).
[28] Comptroller of Maryland, State of the Economy Series: Immigration and the Economy, (Apr. 2024), https://www.marylandcomptroller.gov/content/dam/mdcomp/md/reports/research/immigration-economy.pdf.
[29] *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 507 (D. Md. Apr. 6, 2025) ("As Defendants acknowledge, they had no legal authority to arrest him, no justification to detain him, and no grounds to send him to El Salvador….").
[30] Laura Romero et al., *Timeline: Wrongful Deportation of Kilmar Abrego Garcia to El Salvador*, ABC News (Aug. 18, 2026), https://abcnews.com/US/timeline-wrongful-deportation-kilmar-abrego-garcia-elsalvador/story?id=120803843.

32. Defendants have gradually built up capacity to arrest, detain, and deport as many Maryland residents as possible. On January 30, 2025, the Deputy Field Office Director of the Baltimore ICE Field Office requested a waiver to hold individuals in temporary hold rooms beyond 12 hours—citing the lack of long-term detention facilities and the administration's directives to increase deportation numbers. *D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 561–62 (D. Md. 2026). In February 2025, ICE accelerated plans to move into a new office in Howard County,[31] which was recently cleared to open and where ICE intends to detain people on a short-term basis.[32] In January 2026, ICE purchased a mega warehouse in Hagerstown,[33] in which it planned to detain as many as 2,000 people at a time.[34] With detentions at the warehouse purportedly expected to last less than a week before the detained person would be shipped to another facility, the "mega warehouse" purchased by ICE "would host and transfer between 78,000 and 180,000 people per year."[35] Though this Court preliminarily enjoined continued development and use of the property pending an adequate environmental review, *Mullin*, 831 F. Supp. 3d at 376, Defendants apparently still

[31] Lillian Reed, *How Did the Elkridge ICE facility Go Largely Unnoticed?*, The Banner (Mar. 5, 2026), https://www.thebanner.com/politics-power/local-government/ice-immigration-detention-facility-baltimore-elkridge-YFAYYEDEU5BRRMM2L4P2PINUMI/.

[32] Lillian Reed, *Federal Judge Reinstates Building Permits for Elkridge ICE Facility*, The Banner (Aug. 10, 2026), https://www.thebanner.com/community/local-news/ice-facility-elkridge-maryland-YVF3T4GR5ZDYBEBVA5AOFNW4RU/.

[33] Scott Maucione, *DHS Buys Warehouse in Maryland to Possibly Hold Detained Immigrants*, WYPR (Jan. 27, 2026), https://www.wypr.org/wypr-news/2026-01-27/dhs-buys-warehouse-in-maryland-to-possibly-hold-detained-immigrants.

[34] *Maryland v. Mullin,* 831 F. Supp. 3d 325, 343 (D. Md. 2026) ("[T]he property is a 'mega warehouse' covering 53.74 acres and including an above-grade area of 825,620 square feet. Public statements made by ICE suggest that facilities of this scale will be used to `house[] an average daily population of 1,000 to 1,500 detainees for average stays of 3-7 days."); *id.* at 346 ("Although the project description … states that the facility would be `designed to accommodate up to 542 detainees,' under the `Comments' section of the Precision Support Document, a comment from Gabriel Fernandez [a DHS environmental protection specialist] made on [February 6, 2026] states that the 'facility will be designed to accommodate 500 to 1,000 detainees, with scalability to accommodate up to 2,000 individuals.").

[35] Plaintiff's Reply in Support of its Motion for a Preliminary Injunction at 13, *Maryland v. Mullin,* No. 1:26-cv-00733-BAH, (Apr. 9, 2026), Dkt. No. 37.

plan to move forward with their plan to jail huge numbers of Marylanders in the warehouse evidently unsuitable for housing human beings.[36]

33. ICE's ever-expanding presence in Maryland, along with arrest quotas set at the highest levels of government, has led to dramatic increases in immigration arrests. Between January and July 2025, ICE arrested twice as many Marylanders as it did in all of 2024.[37] These arrests increased throughout 2025, spiking around September during a massive enforcement surge in neighboring District of Columbia.[38] While arrests in D.C. decreased sharply in December after a federal injunction curtailing illegal warrantless arrests in that district,[39] arrests in Maryland have continued to tick up, spiking again at the beginning of 2026.[40] ICE is now arresting Marylanders at more than *four times* the arrest rate during the final year of the Biden administration.[41]

34. In the last month, ICE activity in Maryland has ramped up even further. Through an enforcement surge labeled "Operation Safe Community," ICE made more than 1300 arrests across Maryland and Virginia in just a two-week span from August 1 to August 14.[42] That surge has continued. On August 21, ICE agents in unmarked cars struck the vehicle of a 21-year-old Latino man, violently pulled him from his car, and handcuffed him on the ground in Kent Island

---

[36] Luke Parker, *Western Maryland Not Included in ICE Plan to Sell Warehouses* (June 19, 2026), Baltimore Sun, https://www.baltimoresun.com/2026/06/19/ice-plan-sell-warehouses-not-western-maryland/.

[37] Sam Gauntt, *In Rush For Immigration Arrests, A Shift by ICE to 'Incredibly Aggressive' Tactics, Advocates Say*, Maryland Matters, (July 26, 2025), https://marylandmatters.org/2025/07/26/in-rush-for-immigration-arrests-a-shift-by-ice-to-incredibly-aggressive-tactics-advocates-say/.

[38] Joe Heim & Emmanuel Martinez, *ICE Arrests in DC Region Amount to Nearly 20,000 During Trump's Second Term*, Wash. Post, (Apr. 6, 2026), https://www.washingtonpost.com/dc-md-va/2026/04/06/ice-arrests-dc-maryland-virginia-surge/.

[39] *Id.*

[40] John-John Williams IV & Sahana Jayaraman, *Analysis: ICE Arrests Have Slowed Down — But Not In Maryland*, The Banner (March 31, 2026), https://www.thebanner.com/community/local-news/ice-arrests-increase-maryland-trump-JFFDZFUMIVG3DAO4MJHZO36ZYE/.

[41] Max Schaeffer & Clay Ludwig, *Maryland ICE Arrests Are Increasing as Trump Crackdown Intensifies,* CNS Maryland (Apr. 30, 2026), https://cnsmaryland.org/2026/04/30/maryland-ice-arrests-are-increasing-as-trump-crackdown-intensifies/.

[42] Brenda Wintrode et al., *Maryland Scrambles for Answers After Surge in Immigrant Arrests*, The Banner (Aug. 26, 2026), https://www.thebanner.com/politics-power/state-government/ice-enforcement-surge-maryland-S3JHH5WUINHKJHBBPJQFGKLNNU/.

on Maryland's Eastern Shore. The young man suffered a broken neck from the incident and remains hospitalized as of August 25.[43]

35. Contrary to Defendants' claims that they are going after "the worst of the worst," the percentage of people arrested in Maryland who have no criminal record has climbed alongside the overall increase in arrests. Approximately 80 percent of people ICE has arrested in Maryland since 2025 had no criminal convictions.[44] And of the 1300 arrests ICE made through so-called "Operation Safe Community," less than a third had criminal convictions.[45]

36. ICE has overwhelmingly targeted Latine individuals in Maryland. Of the nearly 7,000 street arrests conducted in Maryland communities since January 20, 2025,[46] 93% of those arrested are citizens of Latin American and Caribbean countries.

37. The sharp increase in Maryland arrests has led to severe overcrowding and deplorable conditions at the Baltimore ICE office—the only location in Maryland where ICE presently detains people, despite the office building not being designed or previously utilized for long-term detention.[47] A video taken inside one of the cells and circulated on social media in late January 2026 showed a large group of men lying shoulder to shoulder in the cell.[48] In early March 2026, this Court decried these "myriad deplorable conditions" and preliminarily enjoined Defendants from detaining too many people at the Baltimore ICE office, in addition to mandating medical screenings, proper treatment and medication, and access to adequate hygiene items.

---

[43] Darreonna Davis & Shayla Colon, *ICE Pursuit Ends in Kent Island Crash, Leaving Family Seeking Answers*, The Banner (Aug. 25, 2026), https://www.thebanner.com/community/local-news/ice-pursuit-kent-island-crash-oscar-jose-araujo-mejia-NPEYDOVMUVFU3L2FFOUM6WJJ7Q/.
[44] Williams & Jayaraman, *Analysis: ICE Arrests Have Slowed Down — But Not in Maryland*.
[45] Wintrode et al., *Maryland Scrambles for Answers After Surge in Immigrant Arrests*.
[46] *See infra* paragraph 108 (defining "non-custodial" arrests)
[47] Dan Munro & Erin Cox, *Lawmakers Visit Baltimore ICE Site Accused of 'Inhumane' Conditions,* Wash. Post (Aug. 14, 2025), https://www.washingtonpost.com/dc-md-va/2025/08/14/baltimore-ice-holding-area/.
[48] Dennis Valera, *ICE Blames Weather After Viral Video Allegedly Shows Dozens Packed Inside Baltimore Holding Rooms*, CBS News (Jan. 30, 2026), https://www.cbsnews.com/baltimore/news/ice-weather-video-holding-room-immigration/.

*D.N.N.*, 822 F. Supp. 3d at 596-98. Still, plaintiffs in that case recently filed a motion to enforce in which they allege systemic violations of the court's injunction. *D.N.N. v. Liggins*, 1:25-cv-1613, Dkt. No. 197 (D. Md. Aug. 13, 2026). To this day, the majority of people arrested by ICE in Maryland are held for some period of time at the Baltimore ICE office, before transfer to facilities across the country.

38. ICE's skyrocketing arrest rate is further evidenced by a corresponding explosion of immigration habeas petitions filed in this District. Before 2025, immigration habeas petitions were quite rare in Maryland. Habeas filings increased gradually throughout the second half of 2025 before peaking at the beginning of 2026.[49] A stunning 123 habeas petitions challenging unlawful immigration detention were filed in this Court in February 2026 alone.[50] While monthly filings decreased following the preliminary injunction in *D.N.N.*, they have continued at a steady clip, with more than 70 filed in August 2026. Many of these petitions specifically challenge warrantless arrests without probable cause, *see, e.g., Araujo Mejia v. Guadian*, 1:26-cv-03358 (D. Md. Aug. 24, 2026), Dkt. No. 1, and several have won relief based on those claims. *See, e.g., Santos Gomez v. Guadian*, 1:26-cv-3078 (D. Md. Aug. 28, 2026), Dkt. No. 13 (holding that petitioner's warrantless arrest lacked probable cause and ordering immediate release).

**C. Since January 2025, ICE has Implemented its "Arrest First, Ask Questions Later" Policy in Maryland, Unlawfully Arresting People without Probable Cause and with Devastating Consequences for Maryland Families and Communities.**

39. By statute, immigration arrests must be conducted with a warrant, except for certain narrow exceptions. Under 8 U.S.C. § 1357(a)(2), two conditions must be met before an agent may conduct a warrantless arrest: the agent must have "reason to believe" both that (1) the individual

---

[49] All Tracked Cases - Habeas Dockets. To determine these trends and numbers, undersigned counsel searched "All Tracked Cases" and filtered by "District of Maryland," "All Cases" and "Date Filed (Oldest)."
[50] *Id.*

"is in the United States in violation of immigration laws or related regulations," and (2) the individual "is likely to escape before a warrant can be obtained [for his arrest]." "In evaluating this warrantless arrest provision, courts have found that the phrase 'reason to believe' is equivalent to constitutionally required probable cause." *Lopez v. Noem*, 1:25-cv-3662, 2025 WL 3496195, at *5 (D. Md. Dec. 5, 2025) (citations omitted); *see also Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971). Probable cause findings "must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

40. Defendants have a policy and practice of making warrantless immigration arrests in Maryland without an individualized assessment establishing probable cause that the person being arrested is unlawfully present in the country and is likely to escape before a warrant can be obtained, in violation of 8 U.S.C. § 1357(a)(2) and the Fourth Amendment to the U.S. Constitution.

41. As numerous federal courts have found, Defendants have implemented this unlawful policy in various forms across the country since the beginning of the second Trump administration, fueled by the administration's relentless focus on unattainable arrest numbers. This policy is evidenced by statements from senior administration officials,[51] as well as voluminous evidence demonstrating Defendant's practices on the ground. Federal courts from Colorado,[52] to

---

[51] *See, e.g., Escobar Molina*, 811 F. Supp. 3d at 44-45 ("Finding that defendants have implemented such a policy and practice does not require a far leap of logic: defendants *themselves* have repeatedly emphasized an abandonment of the probable cause standard.") (citing numerous examples of public statements by DHS officials); *M-J-M-A*, 822 F. Supp. 3d at 1181 ("Public statements from Defendants' officials further demonstrate a commitment to conducting unlawful warrantless arrests.").

[52] *Ramirez Ovando*, 810 F. Supp. at 1234-35 ("In concluding that there likely exists a policy, pattern and/or practice of disregarding flight risk, this Court, as in *UFW*, `harmoniz[es]' the plaintiffs' 'undisputed' anecdotal experience with the many media statements from top immigration officials, the nature of ICE's ongoing enforcement operations, and the agency's own statistics regarding the criminal histories of those it has arrested.").

D.C.,[53] to Oregon,[54] have determined that this policy violates established law. Yet the policy persists in Maryland.

**1. Defendants' unlawful policy and practice manifests in an all-too-common pattern in Maryland.**

42. ***First***, federal agents travel to places in Maryland where they believe they are most likely to encounter non-citizens. *See U.S. v. Santamaria-Orellana*, 1:26-cr-129-TJS (D. Md. Apr. 9, 2026), Dkt. No. 1-1 at 2 ("Officers know that there are a large number of illegal aliens in this area."). This may include residential communities or workplaces in which agents have previously encountered or believe they will encounter undocumented people, or general regions with significant populations of Brown and Black immigrants.

43. ***Second***, federal agents drive around those areas in unmarked cars looking for vehicles to stop, especially during early morning hours when people are taking their children to school or traveling to work. Agents commonly target trucks and vans that they see or assume contain Brown or Black immigrants headed to work. Agents make tenuous assumptions about the vehicle's occupants based on limited information about the vehicle's driver or registered owner, such as assuming that the occupants lack lawful immigration status because the agents perceive the driver or registered owner to be a Brown or Black immigrant.

44. ***Third***, without warning, federal agents surround and box in the targeted vehicle with multiple unmarked cars, sometimes purposefully striking the vehicle with their own cars. The agents, who are often masked, armed, and wearing civilian clothing that does not identify them as immigration officers, demand that the driver and any other occupants exit the vehicle, at times

[53] *Escobar Molina*, 811 F. Supp. 3d at 33 & 42.

[54] *M-J-M-A.*, 822 F. Supp. 3d at 1158 ("Sworn testimony and substantial evidence before this Court shows that ICE officers ask few questions and allow little time before shattering windows, handcuffing people, and detaining them at an ICE facility in another state.").

smashing the windows and removing the occupants by force. The agents immediately handcuff the vehicle's occupants and take them away in their unmarked cars, leaving the targeted vehicle at the scene.[55] When agents target pedestrians who are not in vehicles, they approach, restrain, and handcuff them in a similar manner.

45. What is most notable is what federal agents *do not do* in the course of making arrests pursuant to Defendants' policy. ***First*****,** they do not secure any warrant before making the arrest. *See* 8 C.F.R. § 287.5(e) (describing process for issuing administrative warrants).

46. ***Second***, the federal agents do not conduct an investigation sufficient to establish probable cause that the person "is in the United States in violation of any [immigration] law or regulation." 8 U.S.C. § 1357(a)(2). On many occasions, ICE arrests people without knowing *any* information about them, not even their names. The only steps, if any, that agents take to establish immigration status when arresting someone pursuant to Defendants' policy are: (1) looking at the person's identification and/or (2) searching the person's name in federal immigration and criminal databases.[56] But setting aside the fact that agents often do not do either of these tasks until *after* they have already handcuffed the person, neither action necessarily provides sufficient information to establish probable cause that a person lacks immigration status.[57]

47. ***Third***, before making arrests pursuant to their policy, federal agents do not make an individualized assessment of probable cause that the person is "likely to escape before a warrant

---

[55] Haley Parsley, *When ICE Arrests You, What Happens to Your Car?* Maryland Matters (June 1, 2026), https://marylandmatters.org/2026/06/01/when-ice-arrests-you-what-happens-to-your-car/.

[56] ICE typically searches a person's name in five different federal databases: DHS's Central Index System (CIS), ICE's ENFORCE Alien Removal Module (EARM), CBP's TECS (formerly Treasury Enforcement Communications System), and the FBI's Integrated Automated Fingerprint Identification System (IAFIS) and National Crime Information Center (NCIC). ICE often does not conduct such searches until after the person has been arrested.

[57] *See Acevedo Sanchez v. Liggins*, 1:26-cv-2345(D. Md. July 23, 2026), Dkt. No. 18 (transcript of Judge Rubin's oral decision on habeas petition challenging arrest without probable cause, stating "[i]t is unclear to me how a negative result, i.e. no hit, on each of these searches leads one to believe a person is in this country unlawfully. I, too, would have a negative hit for each of these database checks.").

can be obtained." 8 U.S.C. § 1357(a)(2). They do not ask the person any questions about their life circumstances, such as where they live, how long they have lived in the United States, whether they have family in the United States, what they do for work, or anything else about their ties to the community. Sometimes ICE does not even know the name of the person they are arresting.

48. Defendants' reckless policy of arresting people without probable cause of unlawful status has forced U.S. citizens and others to affirmatively prove their lawful presence to ICE agents and has even resulted in the arrests of U.S. citizens like Plaintiff Samuel Guzmán.

49. For example, in January 2026, teenage U.S. citizen Bryan Avila was driving to work with his cousin when they found themselves suddenly boxed in by three cars and surrounded by nine shouting men who smashed the windows and dragged them each out. ICE agents aggressively pressed Bryan, who was only 17 years old at the time, against the side of the car, restraining him physically while he kept yelling that he is a U.S. citizen.

50. In December 2025, ICE conducted a traffic stop in Baltimore and, without any warrant, arrested Dulce Diaz Morales, a Latina woman born in the United States who is a dual citizen of the U.S. and Mexico. ICE held her in detention for 25 days and did not drop the deportation proceedings against her until six months later.[58] Ms. Diaz Morales was forced to affirmatively prove her citizenship by providing a birth certificate and other documentation to ICE, because Defendants failed to sufficiently investigate her status before depriving her of her liberty and attempting to deport her.

51. Defendants have publicly admitted that they do not utilize a probable cause standard for arrests, but rather a lower "reasonable suspicion" standard inconsistent with 8 U.S.C.

---

[58] Joe Heim, *Woman Held By ICE For 25 Days, Despite U.S. Citizenship Claim, Gets a U.S. Passport*, Wash. Post (June 2. 2026), https://www.washingtonpost.com/dc-md-va/2026/06/02/woman-held-by-ice-25-days-despite-us-citizenship-claim-gets-passport/.

§ 1357(a)(2). On January 31, 2026, a DHS spokesperson said that "[l]aw enforcement uses 'reasonable suspicion' to make arrests, as allowed under the Fourth Amendment to the U.S. Constitution." Even more blatantly, former Border Patrol Chief Gregory Bovino stated in a press interview, "We need reasonable suspicion to make an immigration arrest . . . You notice I did not say probable cause, nor did I say I need a warrant. We need reasonable suspicion of illegal alienage . . .".[59] That these statements "were made repeatedly, and publicly, to reach a broad audience, which includes law enforcement officers under DHS's command" illustrates that they constitute Defendants' policy. *Escobar Molina*, 811 F. Supp. at 46.

52. With respect to the second prong of 8 U.S.C. § 1357(a)(2), insofar as ICE is conducting *any* analysis of escape risk before making warrantless arrests in Maryland, such analysis is systemically inadequate and not sufficiently individualized. In 2021, through a settlement agreement in the Northern District of Illinois, ICE established a set of factors that officers should analyze to determine "escape risk," including "knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof," and clarifying that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a non-citizen] is likely to escape before a warrant for arrest can be obtained.[60] But ICE has since terminated this policy outside of a few states in the Midwest, replacing it with a nationally-applicable memorandum erroneously re-defining "escape risk" in an attempt to justify ICE's illegal arrest practices during this administration.

---

[59] Hanna Park, et al., *October 7, 2025: National Guard Deployments*, CNN (Oct. 8, 2025), https://www.cnn.com/us/live-news/national-guard-chicago-portland-trump-10-07-25?post-id=cmgh33k7200053b6nkxi1fl97.

[60] ICE Broadcast Statement of Policy, *Castañon Nava v. Dep't of Homeland Sec.*, No. 1:18-cv- 03757 (N.D. Ill. Nov. 2021), Appendix A to Settlement Agreement at 17-18, available at https://www.ice.gov/doclib/legalNotice/220527castanonSettlement_attA.pdf

53. The internal memorandum ("the Lyons Memorandum"), issued by then-ICE Director Todd Lyons and addressed to "[a]ll ICE Personnel" on January 28, 2026, purports to acknowledge that § 1357(a)(2) requires probable cause of "escape risk" but then reinforces a flawed list of "[p]ossible factors" for ICE agents to consider in making the "probable cause" determination. Indeed, when the memo was issued, DHS Assistant Secretary Tricia McLaughlin stated the memo was "nothing new" and reiterated reasonable suspicion, not probable cause, as the standard: "This is just a reminder to officers to be [keeping] detailed records on their arrests," she said, adding that "authorities under USC 1357 and, of course, reasonable suspicion are protected by the U.S. Constitution."[61]

54. Some factors in the Lyons Memorandum, such as whether the person "was encountered in a vehicle and continues to have control over the vehicle," sweep in large swaths of people who are simply going about daily business; indeed, virtually everyone ICE stops in Maryland is in or near a vehicle.[62] Other factors improperly conflate probable cause to believe someone has violated immigration laws with probable cause to believe someone is an escape risk, such as "[w]hether the officer has probable cause to arrest the subject for improper entry by an alien . . . ." Mem. at 3–4 (emphases added).

---

[61] Ashley Oliver, *ICE Reveals Legal Theory Behind Warrantless Immigration Arrests,* Fox News (Feb. 3, 2026), https://www.foxnews.com/politics/ice-reveals-legal-theory-behind-warrantless-immigration-arrests.

[62] The Lyons Memorandum is internally inconsistent with respect to the weight agents should give to the vehicle factor. At one point, the memo correctly defines "escape risk" as whether the person "is unlikely to be located at the scene of the encounter *or another clearly identifiable location* once an administrative warrant is obtained," Memorandum from Todd Lyons to All ICE Personnel re Civil Immigration Arrest Authority: Administrative Arrest Warrants & Warrantless Arrests at 4, (Jan. 28, 2026), https://immpolicytracking.org/policies/ice-issues-guidance-on-arrest-warrants-and-warrantless-arrests/#/tab-policy-documents. (emphasis added). But it later states that agents "should closely consider whether the [person] is *likely to remain at the scene of the encounter* while a warrant for his or her arrest is issued," Mem. at 5 (emphasis added). In granting plaintiffs' motion to enforce the preliminary injunction, the *Escobar Molina* court held that agents must not give the latter factor disproportionate weight, as the memorandum suggests. *Escobar Molina v. DHS*, No. 832 F. Supp. 3d 22, 43 (D.D.C. 2026) ("Immigration officers must consider not only an individual's likelihood of remaining at the scene of the encounter, but also . . . the individual's likelihood of being found at another clearly identifiable location.").

55. Most importantly, entirely missing from the enumerated list of factors in the Lyons Memorandum is the person's ties to the community. Nowhere does the memorandum instruct agents to consider how long the person has lived in the United States, their family ties, or their work history in making the probable cause determination as to escape risk. *See Escobar Molina*, 811 F. Supp. 3d at 31 ("Courts have also made the self-evident finding that likelihood of escape is lower when the individual has resided in the country for a lengthy period of time and has strong community ties."). The fact that, in many cases, an immigration judge later determines that a person ICE arrests without a warrant is *not* a flight risk and releases them on bond further demonstrates ICE's flawed analysis. These systemic flaws in the Lyons Memorandum led the *Escobar Molina* court to enjoin Defendants from relying on it to carry out warrantless arrests in the District of Columbia. *Molina*, 832 F. Supp. 3d at 39 (D.D.C. May 7, 2026).

**2. The Arrests of Plaintiffs and Class Members Exemplify Defendants' Unlawful Policy and Practice in Maryland.**

56. In conjunction with Defendants' public statements and the Lyons Memorandum, the circumstances of Plaintiffs' and putative class members' arrests in Maryland illustrate Defendants' policy and practice of conducting warrantless arrests without an individualized assessment of probable cause that the person both is unlawfully present in the United States and is an escape risk.

57. ICE's policy of arresting Brown and Black individuals in Maryland without meaningfully investigating their circumstances led to the recent arrest of Plaintiff and We Are CASA member Samuel Guzmán—a Latino U.S.-born citizen. Mr. Guzmán was born in Annapolis, moved to Mexico with his family at the age of three, and then returned to Annapolis at age 13, where he graduated high school in 2020 and began working at various restaurants in Annapolis. He speaks English with an accent. On Sunday, June 7, 2026, Mr. Guzmán stopped at a 7-Eleven

to buy a coffee on his way to work in the morning. Upon returning to his car in the parking lot, an ICE agent suddenly ran up to him and ordered him to put his hands up. Another agent approached shortly after, and the agents searched Mr. Guzmán's pockets as they restrained him against his car. Mr. Guzmán repeatedly told the agents that he is a U.S. citizen, and the agents pulled Mr. Guzmán's Maryland driver's license out of his wallet and looked at it, yet they still proceeded to handcuff Mr. Guzmán. The agents put him in one of their cars and drove him to a nearby parking lot.

58. The nearby parking lot contained numerous ICE vehicles and people ICE had recently arrested that day in Annapolis—all of whom were Latine. The agents kept Mr. Guzmán inside the car in the parking lot for approximately one hour before speaking to him again. When Mr. Guzmán reiterated to the agents that he is a U.S. citizen born in the United States, one of the agents asked him, "if you are a U.S. citizen, why don't you speak better English?" The agents reviewed the contents of Mr. Guzmán's wallet again, seeing his old learner's permit, his old Maryland ID, and his current driver's license. Shortly thereafter, the agents drove Mr. Guzmán back to the 7-Eleven parking lot, took off his handcuffs, and drove away, without any explanation for why they had arrested him and detained him for nearly two hours.

59. Defendants brutally assaulted and arrested Plaintiff and We Are CASA member J.M.R. in Silver Spring on July 7, 2026. J.M.R., a Latino man who has lived in the United States for more than a decade with his partner and has a large extended family here, was driving his boss's work truck to a job when he noticed a car was following him. He quickly found himself surrounded by three unmarked cars. As soon as J.M.R. stopped his car, a group of men wearing ICE vests ran out of the unmarked cars shouting in English—a language J.M.R. does not understand well. The agents immediately opened J.M.R.'s unlocked driver side door, dragged him

out of the car, and threw him on the ground. After the agents handcuffed him, J.M.R. attempted to stand up, but the agents shot him with a Taser gun and threw him back on the ground. Only after this brutality did the agents retrieve J.M.R.'s ID from his pocket and determine who they were arresting. The agents did not have a warrant for his arrest, nor did they meaningfully investigate his immigration status or ask where he lives, how long he has lived there, or anything else about his ties to the community. If they had, they would have learned that J.M.R was released from immigration custody on bond more than a decade ago, and that the removal proceedings against him had been dismissed.

60. J.M.R. vomited twice from the pain of being beat up and tased. The ICE agents then callously dumped J.M.R. at a nearby fire station, forcing Montgomery County paramedics to take care of him. Unable to remove the Taser barb still stuck to his chest and seeing him in immense pain, the paramedics took J.M.R. to Holy Cross Hospital, where he remained chained to his bed and accompanied by an ICE officer. After several hours at the hospital, J.M.R. was discharged with instructions to clean his wounds. But he was whisked away to ICE detention in Virginia, first at the Chantilly ICE office and then the Farmville Detention Center, where he was not given any equipment to clean his wounds despite his persistent requests. J.M.R. spent two terrible weeks in detention before a federal judge granted his habeas petition and ordered him released on the bond with which he had been complying before his unlawful arrest.

61. Defendants arrested another Plaintiff in the same area a few months earlier. On the morning of February 15, 2026, three unmarked vehicles suddenly surrounded Plaintiff A.G.P.—a Latino We Are CASA member who has lived in Maryland for nearly 20 years—as he drove his car to work in Silver Spring. After A.G.P. pulled over, three agents with the word "ICE" on the backs of their clothing demanded he exit his vehicle and handcuffed him before even asking his

name, let alone any questions about his immigration status, where he lived, his family or work obligations, or his ties to the community. ICE did not have a warrant for A.G.P.'s arrest. Only after he was physically restrained did agents demand to see A.G.P.'s I.D., reaching into his pocket to retrieve his wallet since his hands were cuffed.

62. Agents then drove A.G.P. to the Baltimore ICE office, where he was held in overcrowded conditions for six days and denied access to necessary medication, including insulin for his diabetes. While A.G.P. was at the Baltimore ICE office, ICE fingerprinted, interviewed him, and created a record of his arrest. These records indicate that ICE at some point searched for A.G.P. in five federal databases containing non-citizen data, none of which returned any results. A.G.P. was not released from detention until three months later, when a federal habeas court determined his detention was unlawful.

63. Plaintiff K.M., a Latina We Are CASA member who has lived in Maryland for 20 years, experienced a very similar arrest in Salisbury on January 12, 2026. She was driving with a passenger in the front seat when she noticed two unmarked cars following her. Believing the cars to belong to ICE based on recent arrests in her community, K.M. safely parked her car on a quiet residential street so that she could speak to the agents with minimal impact on those around her. As soon as she parked, six unmarked cars boxed her in and several agents exited the vehicles and surrounded her car. The agents demanded that K.M. roll down her window and that she and her passenger show them their IDs. As soon as K.M showed the agents her driver's license, they ordered her out of the car, said they would shoot her if she tried to run away, and put handcuffs on her. As this was happening, K.M. tried to explain that she is the sole caregiver for her two, young U.S. citizen children, but the agents told her this "didn't matter."

64. Agents then drove K.M. to the Salisbury ICE office, where she was held for several hours while various ICE officers demanded information about her children and her husband, who died years ago. After K.M. provided detailed information about her husband's death, an agent took her out of the room, admitted that she should not have been arrested, and told her she would be released—but with an ankle monitor per ICE policy. To this day, K.M. continues to wear the monitor and attend monthly ICE appointments as instructed.

65. Plaintiffs' experiences reflect a sweeping pattern of warrantless arrests targeting Brown and Black Marylanders. Every day, putative class members experience strikingly similar arrests. For example, E.B.P.—a Latino We Are CASA member—was arrested on Sunday, June 7, 2026, while on his way to a predominantly Latine church in Annapolis where he volunteers as an usher. As E.B.P. stopped his car outside his friend's house to pick him up for the Sunday service, three unmarked cars surrounded his car. Agents with the word "ICE" on their clothing exited the unmarked cars and pointed their guns at E.B.P. and a passenger in his car, threatening to shoot if they resisted. Without saying anything else, the agents pulled E.B.P. from the car, handcuffed him, and put him into one of the unmarked cars. They did not have a warrant for E.B.P.'s arrest, nor did they meaningfully investigate his immigration status or ask where he lives, how long he has lived there, his family or work responsibilities, or anything else about his ties to the community.

66. After his arrest, E.B.P. was forced to watch from the backseat of the ICE vehicle as the agents stopped and arrested other Latine people in the Annapolis area. He personally witnessed the arrest of U.S. citizen Samuel Guzmán in a parking lot outside of a 7-Eleven.[63] When E.B.P. arrived at the Baltimore ICE office, ICE fingerprinted him, interviewed him, and created a record of his arrest. These records indicate that ICE at some point searched for E.B.P. in five federal

[63] *See supra* paragraph 39.

databases containing non-citizen data, none of which returned any results. E.B.P. was in ICE custody for about one month before an immigration judge determined that he did not present a danger to the community or flight risk and ordered his release on a monetary bond.

67. Candido Garcia, a Latino man who has lived in the U.S. for 20 years, was arrested while driving in Silver Spring on May 21, 2026. Around 8:00 am, Mr. Garcia and three co-workers stopped at a 7-Eleven frequented by the working-class Latine community. Soon after leaving 7-Eleven, Mr. Garcia noticed flashing lights in the rearview mirror of his truck. The federal agents had apparently first focused on Mr. Garcia based on his perceived ethnic identity. After four unmarked cars surrounded his car, an agent wearing an ICE vest and helmet approached Mr. Garcia and asked him, in English, for his ID. After the agent looked at his driver's license, he ordered Mr. Garcia out of the car. As soon as Mr. Garcia exited the vehicle, agents handcuffed him. The agents did not have a warrant for Mr. Garcia's arrest, nor did they meaningfully investigate his immigration status or ask where he lives, how long he has lived there, his family or work responsibilities, or anything else about his ties to the community. After detaining Mr. Garcia at the Baltimore ICE office for three days, Defendants transferred Mr. Garcia to a facility in Texas. He remains detained and separated from his family and community.

68. L.C.P., a 22-year-old Latino man who has lived in Maryland for several years with his wife, parents, and siblings, was arrested while he was a passenger in his parents' car, driving to work with his father and a co-worker on May 18, 2026. As L.C.P.'s father drove through Glen Burnie, their car was surrounded by four or five unmarked vehicles. The federal agents had apparently been targeting L.C.P's father and followed the car from L.C.P.'s house. One vehicle sounded a siren, and L.C.P.'s father pulled over. Masked agents ordered L.C.P.'s father out of the car, handcuffed him, and only then asked for his ID. Moments later, the agents demanded L.C.P.'s

ID as well. After the agents briefly looked at L.C.P.'s consular ID card from his country of birth, agents ordered him out of the vehicle and handcuffed him. The agents did not have a warrant for L.C.P.'s arrest, nor did they meaningfully investigate his immigration status or ask where he lives, how long he has lived there, his family or work responsibilities, or anything else about his ties to the community. L.C.P. was in ICE custody for more than two months before an immigration judge determined that he did not present a danger to the community or flight risk and ordered his release on a monetary bond.

69. S.B.R., an elderly Latino man, has lived in the United States for 25 years with his wife and three children. He was simply sitting in a stationary vehicle in a parking lot in Gaithersburg on April 29, 2026, when ICE agents approached his window and ordered him out of the car. Agents asked for his name and ID, and S.B.R. handed them his Maryland driver's license. S.B.R. observed the agents searching for his name on a list; when they did not find it, he heard one agent tell the others that they should let him go. However, without asking S.B.R. any further questions, they handcuffed him. Agents did not have a warrant for S.B.R.'s arrest, nor did they meaningfully investigate his immigration status or ask where he lives, how long he has lived there, his family or work responsibilities, or anything else about his ties to the community. The agents transported S.B.R. to the Baltimore ICE office, where he was held for approximately four days. ICE then transferred S.B.R. to a facility in Louisiana, where he remains detained and separated from his wife, children, and community.

70. C.G., a Latino We Are CASA member who has resided in the U.S. for approximately 20 years, was driving home from work in Brooklyn Park, Maryland on April 4, 2026, when he found himself suddenly surrounded by three or four vehicles. Because the vehicles were unmarked, C.G. feared that the drivers were trying to harm or rob him. When C.G. stopped

his car, a group of masked agents wearing vests marked "ICE" and "ERO" approached his window and ordered him to show his ID. Without saying anything, C.G. handed the agents his Maryland driver's license. An agent briefly looked at C.G.'s license, told him he "was not allowed in the country," and ordered him to exit his vehicle. Agents pushed C.G. against his vehicle and handcuffed him. They did not have a warrant for C.G.'s arrest, nor did they meaningfully investigate his immigration status or ask where he lives, how long he has lived there, his family or work responsibilities, or anything else about his ties to the community.

71. After C.G. was arrested, he witnessed ICE agents searching for more Latine drivers to arrest. He saw agents taking photos of vehicle license plates with their cell phones, inputting those numbers into a computer, and asking one another, "Spanish?" as they searched. C.G. was in ICE custody for about one month before an immigration judge determined that he did not present a danger to the community or flight risk and ordered his release on a monetary bond.

72. E.C.V., a Latino We Are CASA member who has lived in the United States for 15 years with his wife and four children, was driving his friend's car in Baltimore on February 24, 2026, when two unmarked cars pulled him over. The agents, who were wearing jackets with "ICE" on the back, asked E.C.V. if he was "Cesar." E.C.V. answered no, yet the agents smashed the window glass, wrenched E.C.V. from the car, and aggressively handcuffed him, without even asking for his ID. The agents did not have a warrant for E.C.V.'s arrest, nor did they meaningfully investigate his immigration status or ask where he lives, how long he has lived there, his family or work responsibilities, or anything else about his ties to the community. E.C.V. spent four days at the Baltimore ICE office, in a cell with 60 other people, before being transferred to a detention center in Louisiana, where he remains separated from his wife and four children.

73. J.H.A., a Latino man who has lived in the United States since he was a teenager and resides with his partner and her son, was driving to work on the morning of February 7, 2026, in Hyattsville, when about six unmarked vehicles and fifteen federal agents surrounded him. An agent knocked on J.H.A.'s car window and demanded his ID; when J.H.A. asked why the agent needed to see his identification, another agent pulled out a gun and pointed it at J.H.A. After he handed the agents his Maryland driver's license, the agents pulled him from his vehicle, hurting his shoulder, and immediately handcuffed him. The agents did not have a warrant for J.H.A.'s arrest, nor did they ask him any questions about his immigration status, where he lived, his family or work responsibilities, or any other information about his ties to the community.

74. As the agents transported J.H.A. to the Baltimore ICE office, he observed them checking license plate numbers and arresting two other Latine individuals in a similar manner. At the Baltimore ICE office, J.H.A. was held in crowded and unsanitary conditions for ten days before being transferred across the country to a detention center in California. Defendants created a record of J.H.A.'s arrest, which reflects that ICE at some point searched for his name in an FBI biometrics database, yielding no results. J.H.A. remains detained in California, far away from his family and community in Maryland.

75. David Aguirre—a young Latino man—was driving to work with his 17-year-old U.S. citizen cousin on the morning of January 24, 2026, when they were surrounded on three sides by unmarked vehicles near Columbia. One vehicle braked sharply in front of them, and another vehicle hit their back bumper. Mr. Aguirre slammed on his brakes in the middle of the highway, unable to pull over because he was surrounded by vehicles on three sides. Agents in civilian clothing and vests then surrounded the men's vehicle and began to yell at them in English—a language Mr. Aguirre does not understand well—exacerbating the men's fear and confusion about

their own safety and the agents' intent. When Mr. Aguirre understandably did not immediately lower his window, agents smashed the glass and dragged him and his U.S. citizen cousin from the car. One agent asked Mr. Aguirre in Spanish whether he had any identification; when Mr. Aguirre exercised his right not to answer their questions, the agents handcuffed him. The agents did not have a warrant for Mr. Aguirre's arrest, nor did they ask him any questions about his immigration status, where he lived, his family or work responsibilities, or any other information about his ties to the community.

76. Meanwhile, agents pinned Mr. Aguirre's 17-year-old cousin, Bryan Avila, to the vehicle while he shouted in English that he is a U.S. citizen. The agents ultimately let Mr. Avila go after looking at his learner's permit and left him and the damaged vehicle in the middle of the highway as they took Mr. Aguirre away. Mr. Aguirre spent 12 days at the Baltimore ICE office, in a cell that at one point held up to 100 people, until an immigration judge determined that he did not present a danger to the community or flight risk and ordered his release on a monetary bond.

77. ICE also unlawfully arrested A.L.P., a 52-year-old Latino man who has lived in Maryland for 15 years and is closely involved with his church. On January 21, 2026, A.L.P. was driving to work in the morning when three black vehicles surrounded his car in Hyattsville. The vehicles turned on flashing lights, which A.L.P. took as a signal to stop, despite the fact that the vehicles were unmarked and did not clearly belong to law enforcement. An agent in a green vest approached A.L.P. and, without identifying himself, asked A.L.P. for his ID. After A.L.P. presented his Maryland driver's license, the agent ordered A.L.P. to get out of the car and handcuffed him. The agents did not have a warrant for A.L.P.'s arrest, nor did they meaningfully investigate his immigration status or ask where he lives, how long he has lived there, his family or work responsibilities, or anything else about his ties to the community.

78. As agents drove A.L.P. to the Baltimore ICE office, A.L.P. witnessed the arrest of another Latine driver in the same manner that he had been arrested moments earlier. While A.L.P. was at the Baltimore ICE office, ICE fingerprinted him, interviewed him, and created a record of his arrest. These records indicate that ICE at some point searched for A.L.P. in five federal databases containing non-citizen data, none of which returned any results. A.L.P. was not released from detention until four months later, when a federal habeas court determined his detention was unlawful.

79. C.N.M., a Latino We Are CASA member who resides in Maryland with his wife and two young children, was standing outside his stationary vehicle in a 7-Eleven parking lot in Mount Rainier, Maryland, on October 28, 2025, when several cars drove up and blocked his exit. Masked agents with ICE vests approached C.N.M. and demanded his ID. After C.N.M. handed the agents his Maryland driver's license and other identity documents, the agents handcuffed him. The agents did not have a warrant for C.N.M.'s arrest, nor did they ask where he lives, how long he has lived there, his family or work obligations, or anything else about his ties to the community.

80. C.N.M. was shuffled between several detention facilities in Virginia; at one jail, officials humiliated him by forcing him to strip down and get into the fetal position. At another facility, he and others had to organize protests to convince officials to provide basic medical attention. After one and a half difficult months, C.N.M. was released on bond by an immigration judge, who determined that he did not pose a flight risk or danger to the community.

### 3. Defendants' Policy and Practice has Devastated Maryland Communities.

81. Defendants' unlawful "arrest first, ask questions later" policy has had a devastating impact on Maryland's residents, faith communities, and schools. As explained by one faith leader

in a targeted area of Prince George's County, "People are no longer scared. They're terrified. Our community feels vulnerable, they feel like they're being hunted."[64]

82. Community members are indeed being hunted. On July 21, 2025, Pastor Daniel Fuentes Espinal had just purchased supplies at Lowe's in Easton on Maryland's Eastern Shore and was on his way to work when he was approached by ICE agents. Moments later, in the absence of any inquiry into his longstanding community ties, the Pastor was arrested and detained. Pastor Fuentes Espinal has lived in the U.S. for 25 years and has two US citizen children. He owns his own construction company and has been a beloved pastor at Iglesia Del Nazareno Jesus Te Ama for more than a decade.[65] His arrest palpably increased community fear, so much so that his parishioners ceased convening for services out of fear that the same would happen to them.[66]

83. This fear has most recently gripped Maryland's Haitian community, in the wake of the Trump administration terminating Temporary Protected Status (TPS) for Haiti at the end of July 2026. By early August, attendance at a predominantly Haitian church in Salisbury had dropped by more than half.[67] Their fear was unfortunately well-founded: arrests of Haitians in Maryland have skyrocketed in the last month, particularly on Maryland's Eastern Shore.[68] ICE has targeted Haitians leaving their apartment buildings or heading to their jobs—especially poultry plants like Perdue and Mountaire Farms.[69]

---

[64] Leslie Moreno, *Immigrant Communities Brace Amid ICE Enforcement Rumors This Week* (May 5, 2025), https://www.wusa9.com/article/news/dmv-immigration/immigrant-communities-brace-ice-enforcement-rumors/65-62717539-cf49-4c84-92fc-2e553ffe212b.

[65] Rosanne Skirble, *Beloved Talbot County Pastor Picked up in Dragnet of ICE arrests*, Marlyand Matters (July 23, 2025), https://marylandmatters.org/2025/07/23/beloved-talbot-county-pastor-picked-up-in-dragnet-of-ice-arrests/.

[66] Lily Tierney, *ICE Arrest of Pastor Stops Church Services*, The Star (July 29, 2025), https://www.stardem.com/news/local_news/ice-arrest-of-pastor-stops-church-services/article_715486fc-960a-40d5-a7d9-604956e898d2.html.

[67] Associated Press, *Empty Pews and Fear of ICE on Maryland's Eastern Shore after TPS Ends for Haitians*, NBC News (Aug. 5, 2026), https://www.nbcnews.com/news/us-news/empty-pews-fear-ice-marylands-eastern-shore-tps-ends-haitians-rcna590940

[68] *Id*.

[69] Josh Davis, *Maryland ICE Arrests Alarm Haitian Poultry Workers*, Baltimore Sun (Aug. 15, 2026), https://www.baltimoresun.com/2026/08/15/maryland-ice-arrests-haitian-poultry-workers-tps/

84. For example, ICE arrested W.J.—a Haitian TPS holder who has lived in Maryland for several years—in Salisbury on August 13, 2026. Early in the morning, W.J. was driving his van with four coworkers as passengers when five unmarked cars surrounded them. Agents wearing ICE vests demanded W.J.'s ID, speaking to him in English—a language W.J. does not understand well as a Haitian Creole speaker. After W.J. presented his Maryland driver's license and other identity documents, the agent ordered W.J. to get out of the car, took his personal items from his pockets, and handcuffed him. The agents did not have a warrant for W.J.'s arrest, nor did they meaningfully investigate his immigration status or ask where he lives, how long he has lived there, his family or work responsibilities, or anything else about his ties to the community. W.J. was held overnight in a crowded cell in Virginia with many other Haitian people who had been arrested that day. ICE then flew him to California, where he remains detained.

85. Across Maryland, many immigrant students have stopped going to school, contributing to a decline in high school graduation rates for Latine students.[70] Responding to widespread fear about ICE coming onto campuses, school systems have established policies for how to interact with ICE,[71] and the Maryland government has taken several measures to prevent ICE activity on school grounds.[72] But ICE remains undeterred.

86. On the morning of June 11, 2026, a group of ICE officers aggressively arrested a mother and father outside of Commodore John Rodgers Elementary and Middle School in East Baltimore, after ICE's vehicle struck the family's vehicle with their young children in the

---

[70] Liz Bowie, *Maryland Sees Drop in Hispanic Graduations as Immigration Raids Ramp Up*, The Banner (Jan. 27, 2026), https://www.thebanner.com/education/k-12-schools/maryland-hispanic-graduation-rate-immigration-HFDHM6PHLJEYDC7LAKAQRZYDUI/.

[71] Maya Lora, How Maryland Schools Will Respond to Rumored ICE Ramp-Ups, The Banner (Feb. 13, 2026), https://www.thebanner.com/education/k-12-schools/maryland-schools-ice-immigration-5XW4WP2BTZFMXIAYSWQNOD5XQI/.

[72] Liz Bowie & Maya Lora, *Why Maryland Law Can't Always Keep ICE Off School Grounds*, The Banner (June 16, 2026), https://www.thebanner.com/education/k-12-schools/maryland-ice-legal-restrictions-explainer-HQ6X3XMPJVBSPOTJQMQ4GEMDQ4/.

backseat.[73] A video taken from the steps of the school depicts the couple's distraught daughter screaming from the backseat of the car while her father is pinned to the ground by ICE officers and children walk by the scene on their way to school.[74] These warrantless arrests, each of which this Court later determined was unlawful,[75] traumatized school children and "overshadowed what should have been a joyful day of pre-K graduation and end-of-year events."[76]

87. Indeed, community members across Maryland report significantly limiting their activities outside their homes to try to avoid violent and unpredictable ICE street encounters, in some instances even foregoing medical care and involvement in their children's educational activities.

### D. Plaintiffs and Class Members Have Suffered Physically and Emotionally from their Unlawful Arrests and Are At Substantial Risk of Arrest in the Future.

88. Defendants' unlawful policy and practice has profoundly impacted Plaintiffs and class members. Not only do they face a substantial risk of unlawful warrantless arrests in the near future, but their previous arrests have caused ongoing restrictions on their liberty and forced them to change their daily behaviors to try to avoid subsequent ICE encounters.

89. Plaintiffs have tried to limit their activities to avoid ICE encounters, but they cannot simply cease all activities outside their homes. They are at substantial risk of arrest because they must continue the same daily activities in the same places where they were targeted in the first instance—such as driving the same routes to work and taking their children to school. Plaintiffs

---

[73] Liz Bowie et al., *ICE Vehicles Hit Baltimore Father's Car as He Took His Children to School, Attorney Says*, The Banner (Jun 12, 2025), https://www.thebanner.com/education/k-12-schools/ice-baltimore-school-father-detained-R32PMEIVZVH7XJJWDJ2CZGJJNA/?utm_content=bc_inline.
[74] *Id*.
[75] *See Acevedo Sanchez*, 1:26-cv-2345, Dkt. No. 13; *Gavilan Sanchez v. Liggins*, 1:26-cv-2346, (D. Md. July 15, 2026), Dkt. No. 15.
[76] Moriah Balingit, *ICE Arrest Outside Baltimore Elementary School Draws Rebukes from State and Local Officials,* AP News (June 12, 2026), https://apnews.com/article/baltimore-elementary-school-ice-arrest-1974500b107a91eca47f11c9f215ba59.

have witnessed or heard about continued ICE arrests in these same places. Moreover, even after securing release, Plaintiffs A.G.P. and K.M. and many putative class members are required to wear ankle monitors, a continuing restraint that "imposes … a considerable human toll on the participants and their family members" and has been described as "punitive in nature" and "detention by another name."[77] In this way, each Plaintiff experiences ongoing and direct harms resulting from Defendants' illegal policy and practice.

90. Plaintiff A.G.P. now takes a different route to his job in Silver Spring, but since his release he has personally witnessed several people being arrested right outside of his workplace. He has also heard about several ICE arrests in Langley Park, which is close to where he lives and where he sometimes runs errands. All the while, A.G.P. is still forced to wear an ankle monitor, which causes pain, numbness, and swelling in his leg due to his diabetic neuropathy and recently prompted him to trip and fall at work.

91. Plaintiff K.M. stopped working for several months following her arrest in January, and has since gotten a new job at a restaurant north of Salibury, to avoid spending too much time in the downtown area of Salisbury where she was arrested. But she still sometimes must go to the downtown area for appointments or essential shopping, and she observes ICE activity in other parts of Salisbury through which she frequently travels. Recently seeing many ICE arrests in her community and grappling with the trauma of what happened to her, she is at substantial risk and deeply fears being arrested and separated from her young children again. K.M. furthermore still has an ankle monitor, which frequently malfunctions and prompts others to be suspicious of her,

[77] M. Momin, A. Min & N. Marcich, report prepared for ABA Commission on Immigration, *Electronic Monitoring of Migrants: Punitive not Prudent* at 3, 14, 15 (Feb. 2024), https://www.americanbar.org/content/dam/aba/administrative/immigration/electronic-monitoring-report-2024-02-21.pdf.

and she has to attend monthly ICE appointments. K.M. also attends therapy and takes medication for the anxiety she has suffered since her traumatic arrest.

92. Plaintiff J.M.R., who was viciously thrown to the ground and tased by ICE officers during his arrest in July, is now constantly nervous while driving, suspicious of any car that could belong to ICE. He and his partner have tried to limit activities outside of their home to avoid any possible ICE encounter. But to provide for his household, J.M.R. has no choice but to continue driving on the same roads, including New Hampshire Avenue where ICE started following him in July, to get to job sites throughout Maryland, D.C., and Virginia. He frequently sees people sharing information about arrests in his community on social media—a constant reminder of the trauma he experienced.

93. Plaintiff Samuel Guzmán fears and is at substantial risk of being arrested again due to the way he looks and speaks, as he drives the same route to work past the 7-Eleven where he was arrested and the house where declarant E.B.P. was arrested. Living in an area where ICE continues to carry out street arrests, he also worries about the substantial risk of arrest faced by his loved ones and his community. He worries about his mother, who is a green-card holder but not yet a citizen, and his coworkers, who have various forms of legal status or lack thereof.

94. Declarants similarly continue to be impacted by their unlawful arrests. They fear and are at substantial risk of re-arrest as they go about their inevitable daily routines. For example, the financial impact of A.L.P.'s four-month detention continues to harm him and his family, who were forced to sell his car and take on debt while he was detained. A.L.P. is at substantial risk of arrest in his own community, and he is terrified not only of his re-arrest but of the potential arrest of his adult son and close friends from church. Many members of A.L.P.'s church community have

been arrested in a similar manner, and A.L.P. has personally witnessed ICE arrests in his community since his release.

95. Class members have been forced to alter their routines to try to avoid re-arrest. C.G., who was arrested in April and released in May, changed the route he takes to work, and he rarely leaves the house except when absolutely necessary. But he continues to see people arrested in his community almost daily, including someone recently arrested five minutes from his house. He cannot completely avoid leaving the house or being in areas where ICE is continuing street enforcement. He is deeply afraid not only of his re-arrest, but also of the arrest of his wife or even his U.S. citizen granddaughters.

96. E.B.P.'s whole family has changed their routine since his arrest in June and release from detention in July. E.B.P. goes to work even earlier in the morning when the streets are less busy. His family, including his wife and children, does not leave the house for recreational activities anymore, and they only do essential activities like grocery shopping late at night. Yet E.B.P. remains at substantial risk of arrest because ICE continues to carry out enforcement activities in his neighborhood.

97. Plaintiffs and Maryland residents fear the worst: that federal agents will seriously injure or kill them in the course of enforcement operations. This fear is unfortunately born out of the reality of ICE's dangerous tactics, like ramming into vehicles to effectuate stops and firing into moving cars in Maryland and across the country.[78] At least 23 people have been shot by ICE officers since the beginning of the second Trump administration.[79] On Christmas Eve in 2025, for

[78] Jon Schuppe & Erik Ortiz, *Trump's DHS Immigration Enforcement Offices Shot 14 People From September 2025 to February 2026. Here's What to Know*, NBC News (Mar. 4, 2026), https://www.nbcnews.com/news/us-news/ice-shootings-list-border-patrol-trump-immigration-operations-rcna254202.

[79] Allison McCann, *At Least 23 People Have Been Shot at by Federal Immigration Agents Since Last Year*, N.Y. Times (July 8, 2026), https://www.nytimes.com/2026/07/08/us/immigration-agent-shootings-vehicles.html?eafs_enabled=false.

example, ICE agents in Maryland fired 13 shots at the car of a man they sought to arrest, hitting him twice and seriously injuring him.[80] In April 2026, ICE agents seeking to arrest a Maryland man in Baltimore rammed their vehicle into his, causing "'significant injuries to his head, chest, back and hands.'"[81] On July 7, ICE agents shot and killed Lorenzo Salgado Araujo—a Mexican man with three sons and no criminal history who had lived in the United States for 35 years—after surrounding his work van with unmarked cars in a predominantly Latine neighborhood of Houston.[82] Days later, ICE agents shot and killed another man, Johan Sebastian Guerrero—who was authorized to work in the U.S. and was not ICE's target—during a vehicle stop in Maine.[83] The events leading up to these injuries and deaths are eerily similar to the experiences of Plaintiffs and declarants here, and many fear that it is only a matter of time until a Maryland resident dies as a result of Defendants' unlawful policy.

98. Defendants' policy of warrantless arrests without probable cause has also significantly harmed Plaintiff We Are CASA. We Are CASA offers a wide range of social, health, job training, employment, and legal services to immigrant communities in Maryland (and in other states) in furtherance of its mission. In Maryland in particular, We Are CASA's legal services have historically focused on securing and stabilizing immigration status—both temporary and permanent status—for non-detained community members, and We Are CASA's Health and Human Services ("HHS") program in Maryland has focused on increasing community members'

---

[80] Katie Leslie et al., *Man Shot by ICE in Maryland Takes Plea Deal, Faces Deportation*, NBC Wash. (Apr. 29, 2026), https://www.nbcwashington.com/investigations/man-shot-by-ice-in-maryland-takes-plea-deal-faces-deportation/4098035/.
[81] Andrew Adeolu, *ICE Agent Allegedly Rams Immigrants Vehicle in Maryland, Leaving Him Injured*, CBS News (April 6, 2026), https://www.cbsnews.com/baltimore/news/ice-agent-allegedly-rams-immigrants-vehicle-in-maryland-leaving-him-injured/.
[82] Lekan Oyekanmi et al., *Family Demands an Independent Probe After ICE Officer Fatally Shoots a Man in Houston*, AP News (July 8, 2026), https://apnews.com/article/ice-houston-shooting-lorenzo-salgado-araujo-2d01ba69caf2445f05005096891ba5b2.
[83] Alex Sundby et al., *Man Fatally Shot by ICE in Maine Was Not Intended Target of Warrant, Lawmakers Say*, CBS News (July 14, 2026), https://www.cbsnews.com/news/maine-shooting-ice-biddeford/.

social stability, including by assisting them with public benefits enrollments and providing case management for a variety of needs, such as access to critical health and social services.

99. Before January 2025, We Are CASA's principal priorities in Maryland centered on workers' rights, housing, and healthcare. These priorities reflected the immediate and practical concerns facing We Are CASA members and their families and were focused primarily on improving economic security, housing stability, access to healthcare, and workplace conditions.

100. Based on observed needs in the community, since January 2025 We Are CASA also operates an ICE hotline, through which community members can report ICE enforcement actions that they have witnessed or experienced. The purpose of the ICE hotline is not to interrupt or obstruct active ICE enforcement actions, but rather to provide support to individuals and families who have been impacted by those ICE enforcement actions. Accordingly, calls to We Are CASA's ICE hotline are typically to report an ICE arrest that has recently occurred. Prior to January 2025, We Are CASA received approximately five reports of Maryland ICE enforcement action incidents per year. ICE hotline reports have skyrocketed since then, with 130 ICE detention reports received in July 2026, alone. After a report is submitted to We Are CASA, staff investigate the report and provide legal and humanitarian support to those who have been impacted. The cost of operating We Are CASA's hotline services has increased since the beginning of 2025 due to this increased call traffic from the ICE hotline.

101. The surge in unlawful arrests in Maryland has significantly and negatively impacted We Are CASA's ability to carry out its core mission and provide needed support services, including HHS and long-term legal support. Prior to the increased ICE activities, We Are CASA spent significant time on in-person community outreach, visiting high-trafficked community spaces such as laundromats, grocery stores, food banks and other areas, in order to inform potential

members of the support services available. Beginning in 2025, because of increased ICE presence in the communities served, We Are CASA was forced to change its entire outreach model because community members had stopped visiting these community spaces or if they were there, community members were not willing to speak to We Are CASA employees out of fear.

102. We Are CASA's educational support activities have been curtailed by the unlawful arrests in Maryland. Registrations for adult English for Speakers of Other Languages (ESOL) classes, which lead to increased opportunities for job placement and higher, more stable income, have plummeted. Prior to increased ICE enforcement activities, We Are CASA's Education Services program provided summer learning programs and enrichment for school-age children. These activities involved children visiting local businesses and community locations to learn and also engage in service projects, such as neighborhood cleanups and creation of murals. As a result of the increased ICE presence and families' reluctance to congregate in community spaces, We Are CASA has seen decreased participation in these programs. In addition, We Are CASA was forced to revamp their programs and keep them mainly confined to We Are CASA office locations. The result has been a much more limited offering of summer enrichment activities. As a result of safety concerns arising from ICE activity, many community enrichment activities can no longer be conducted safely, limiting these opportunities.

103. The surge in unlawful arrests in Maryland has caused significant disruption to We Are CASA's functions and activities, shifting We Are CASA away from its core focus of providing services that stabilize and protect its members toward providing rapid, emergency response services to its members affected by recent arrests. These shifts in resources and focus have impaired We Are CASA's ability to carry out its core functions. Specifically, detention

response now comprises a significant portion of work undertaken by We Are CASA's Legal and HHS teams, and it has needed to retrain those teams to do this work.

104. The HHS team, for example, now expends approximately 25 percent of its workload—equivalent to over one-and-a-half full-time employees—on detention response and follow-up. Rather than focusing on their core missions, these staff must now triage calls and requests for detention-related assistance, conduct needs assessments for families impacted by recent ICE detentions, and connect the families of those detained to legal and social assistance.

105. We Are CASA has also had to divert additional resources to a so-called "ICE Watch" in an effort to make its members feel safe enough to attend benefits appointments, legal appointments, and other meetings at certain We Are CASA offices. Given the heavy ICE presence in and around the areas it serves, We Are CASA must station employees in visible outdoor locations prior to meetings and appointments. In addition, We Are CASA is now regularly asked to provide an employee presence at local elementary school pick-up and drop-off locations so that parents feel safe enough to drop their children off at school.

106. Similarly, instead of CASA's immigration legal team being able to focus on securing long-term status for individuals, the team now spends a significant amount of time providing rapid legal response and referrals to the families of detained individuals. Legal clinics run by CASA at which community members could previously receive assistance with immigration applications have now been replaced by rapid legal response phone calls every day to provide family members with post-arrest information and guidance. Naturalization and U-Visa applications have been replaced with assistance locating detained loved ones and referrals to private attorneys, in addition to advocacy for recently detained people with medical conditions. In effect, mass immigration arrests in Maryland—pursuant to Defendants' policy and practice of

making warrantless arrests without probable cause—have turned CASA into an emergency legal advice and referral operation, instead of a long-term legal representation operation.

107. We Are CASA's shift of human resources to detention response and its community members' fear of providing identifying information threatens its ability to comply with grant deliverables specified in existing grant contracts. Many grants require We Are CASA to provide reports on fund distribution, but many of these reports can no longer be completed because its members are not willing to share the information that We Are CASA needs to report back to funders. In addition, its managerial staff who typically draft grant applications and reports have had to shift their work to managing the rising emergency intake needs.

108. For example, in September 2025, We Are CASA was notified that one such county grant was reduced by 50% in part due to delayed progress on grant deliverables. Through this grant, the HHS team had been tasked with significant work, including conducting needs assessments, that directly contributes to the county's dedication to growing clean energy in low-income, working-class neighborhoods. This work is directly tied to We Are CASA's goals of stabilizing and improving the quality of life of its community members. Because of the need to divert HHS team's attention to respond to ICE's expanded, unlawful actions against our community, We are CASA risks continuing to lose such critical funding that supports its mission.

109. Defendants' unlawful policies and practices in Maryland have also impaired We Are CASA's core function of connecting community members to social services by chilling open communication between the organizationand its members. Prior to the surge in immigration activity in Maryland, We Are CASA would regularly connect community members to vital social services through free consultations that help members navigate complex public benefits programs. However, We Are CASA's ability to connect community members to social services depends on

members' willingness to share personal information with staff. Since immigration enforcement activity increased in Maryland, community members have become increasingly reluctant to share personal information, fearful that their immigration status will be weaponized against them even though they are, by law, permitted to access such benefits. We Are CASA has noticed a marked decrease in participation in public benefits programs by immigrant community members. Further, it now takes longer to deliver services because of the additional time that We Are CASA must invest in building trust and providing education to each community member in this environment.

110. These harms to We Are CASA itself are on top of the harms We Are CASA's members are facing as a result of Defendants' unlawful policies and practices, as recounted in the stories of some individual We Are CASA members above. We Are CASA has many members who reside, work, and travel through Maryland, most of whom are Latine. These We Are CASA members include citizens, lawful permanent residents, individuals with a variety of other immigration statuses, and undocumented noncitizens. Many We Are CASA members report shifting their routines and avoiding certain activities to mitigate the risk of arrest, including delaying or foregoing medical care. Some We Are CASA members have already been arrested in Maryland pursuant to Defendants' unlawful policy and practice of warrantless arrests without probable cause. These and other We Are CASA members, who reside, work, and travel through Maryland, are at substantial risk of being subjected to Defendants' policy in the near future.

## CLASS ACTION ALLEGATIONS

111. Plaintiffs Samuel Guzmán, A.G.P., K.M., and J.M.R. ("Individual Plaintiffs") bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

112. Individual Plaintiffs seek to represent the following classes:

**Immigration Status Class:** All persons who, since January 20, 2025, have been or will be arrested in the District of Maryland for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully.

**Escape Risk Class:** All persons who, since January 20, 2025, have been or will be arrested in the District of Maryland for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk.

113. The proposed classes satisfy the prerequisites of Rule 23(a) and 23(b)(2). They satisfy the numerosity requirement of Rule 23(a)(1) because they include anyone who has been or will be subjected to Defendants' policy and practice of making warrantless arrests without the requisite probable cause findings. Publicly available data published by ICE and analyzed by the Deportation Data Project indicates that ICE made nearly 7,000 warrantless arrests in Maryland between January 20, 2025 and August 6, 2026.[84] This number counts only "non-custodial" arrests conducted "at-large" in Maryland,[85] which are typically arrests *without* warrants, and it excludes all arrests in Maryland involving transfers from the criminal justice system, which are typically *with* warrants. In conjunction with the **24** accounts of warrantless arrests without probable cause in Maryland that Plaintiffs will provide in this action, this demonstrates a large class of people who have been subjected to Defendants' unlawful warrantless arrest policy. The number of people who *will be* subjected to the unlawful policy and practice in the future is unknown, but it is likely to grow substantially based on the current trends.

---

[84] DeportationData.org, *Immigration and Customs Enforcement Data*, https://deportationdata.org/data/ice.html (last visited Sept. 4, 2026).

[85] U.S. Immigration & Customs Enforcement, *FY 2017 ICE Enforcement and Removal Operations Report*, ICE.gov, https://www.ice.gov/remove/removal-statistics/2017 (last visited Sept. 4, 2026).

114. The proposed classes satisfy the commonality requirement of Rule 23(a)(2) as they share common issues of fact or law, including but not limited to whether Defendants' policy and practice of warrantless arrests without individualized determinations of probable cause for an immigration law violation and escape risk violates 8 U.S.C. § 1357(a)(2) and/or the Fourth Amendment to the U.S. Constitution.

115. The proposed classes also satisfy the typicality requirement of Rule 23(a)(3). The claims of the proposed class representatives are typical of the claims for that class because Plaintiffs were all arrested without a warrant and without an individualized determination of their immigration status and escape risk.

116. Individual Plaintiffs are adequate class representatives, as required by Rule 23(a)(4), as they have no conflict of interest with the putative class members, will fairly and adequately protect the interests of the class, and understand and accept their responsibilities as class representatives.

117. The proposed classes satisfy the requirements of Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the class, as they have a policy and practice to which everyone in each class is subject. Final injunctive or declaratory relief is therefore appropriate to the classes as a whole.

118. Counsel for Plaintiffs have extensive experience litigating class actions involving civil and constitutional rights generally and the rights of noncitizens specifically. This includes securing a class-wide preliminary injunction in the U.S. District Court for the District of Columbia in a case highly similar to this one, *see Escobar Molina*, 811 F. Supp. at 65, and litigating a class action case through which this Court enjoined unconstitutional conditions of confinement at the

Baltimore ICE office. *D.N.N.*, 822 F. Supp. 3d at 598. Undersigned counsel is therefore qualified to be certified as class counsel for this case pursuant to Rule 23(g).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(i), the *Accardi* doctrine, and/or the Administrative Procedure Act, 5 U.S.C. § 706: Warrantless Arrests Without Individualized Assessment of Immigration Status

119. Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120. Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *See also* 8 C.F.R. § 287.8(c)(2)(i), (ii) (same).

121. Defendants have a policy and practice of conducting warrantless arrests in Maryland without making individualized determinations of probable cause that a person is unlawfully present in the United States, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i).

122. Defendants' policy and practice of conducting warrantless arrests in Maryland without making individualized determinations of immigration status is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C), and violates the elementary principle of administrative law that agencies are required to follow their own regulations, *see United States ex rel. Accardi*, 347 U.S. at 268.

123. This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" Defendants' policy through vacatur of the final agency action. 5 U.S.C. § 706(2).

124. This Court also has inherent equitable authority to enjoin violations of federal law by federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

125. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Immigration Status Class are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued irreparable injury.

## SECOND CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), the *Accardi* doctrine, and/or the Administrative Procedure Act, 5 U.S.C. § 706: Warrantless Arrests Without Individualized Assessment of Escape Risk

126. Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

127. Under 8 U.S.C. § 1357(a)(2), an agent may make an immigration arrest without a warrant only if they have "reason to believe" that (1) the individual "is in the United States in violation of any [immigration] law or regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *See also* 8 C.F.R. § 287.8(c)(2)(i), (ii) (same).

128. Defendants have a policy and practice of conducting warrantless arrests in Maryland without making individualized determinations of probable cause that a person poses an escape risk, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).

129. Defendants' policy and practice of conducting warrantless arrests in Maryland without making individualized determinations of escape risk is a final agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law" and "in excess of statutory

jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A), (C), and violates the elementary principle of administrative law that agencies are required to follow their own regulations, *see United States ex rel. Accardi*, 347 U.S. at 268.

130. This Court has authority under the Administrative Procedure Act to "hold unlawful and set aside" Defendants' policy through vacatur of the final agency action. 5 U.S.C. § 706(2).

131. This Court also has inherent equitable authority to enjoin violations of federal law by federal officers. *See Armstrong, Inc.*, 575 U.S. at 326.

132. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Escape Risk Class are facing irreparable harm and require vacatur of Defendants' unlawful policy, injunctive relief, and/or declaratory relief to prevent continued irreparable injury.

**THIRD CLAIM FOR RELIEF**

**Violation of the Fourth Amendment to the U.S. Constitution.**

133. Plaintiffs reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

134. Except at the border and its functional equivalents, the Fourth Amendment prohibits Defendants from arresting an individual without probable cause that the individual is in the United States in violation of an immigration law. An arrest based on "nothing more than possible removability" violates the Fourth Amendment. *Arizona v. United States,* 567 U.S. 387, 407 (2012).

135. Defendants have a policy and practice of conducting warrantless arrests in Maryland without making individualized determinations of probable cause that a person is unlawfully present in the United States.

136. Defendants' policy and practice of arresting individuals without regard to probable cause of unlawful presence violates the Fourth Amendment to the United States Constitution.

137. This Court has inherent equitable authority to enjoin violations of federal law and the Constitution by federal officers. *See Armstrong*, 575 U.S. at 326.

138. As a result of Defendants' unlawful policy and practice, Plaintiffs and members of the proposed Immigration Status Class are facing irreparable harm and require injunctive relief and/or declaratory relief to prevent continued irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Certify a class of all persons who, since January 20, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully ("**Immigration Status Class**"), and appoint Plaintiffs as class representatives;

B. Certify a class of all persons who, since January 20, 2025, have been or will be arrested in this District for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk ("**Escape Risk Class**"), and appoint Plaintiffs as class representatives;

C. Appoint the undersigned counsel as class counsel for the Immigration Status and Escape Risk Classes;

D. Declare that Defendants' policy and practice of making warrantless immigration arrests without making a pre-arrest, individualized assessment of probable cause that the person is in the United States unlawfully and/or that the person poses an escape risk violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2), and violates the Fourth Amendment with respect to the failure to make an individualized determination of probable cause that a person is unlawfully present in the United States;

E. Vacate and set aside Defendants' policy of making warrantless immigration arrests without an individualized determination of both an immigration law violation and escape risk, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii);

F. Enjoin Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of probable cause of both an immigration law violation and escape risk in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i),(ii), and in violation of the Fourth Amendment with respect to the failure to make an individualized determination of probable cause that a person is unlawfully present in the United States;

G. Order Defendants to remove Plaintiff A.G.P's and Plaintiff K.M.'s ankle monitors and terminate all conditions of their release from ICE custody;

H. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 28 U.S.C. § 2412 and any other applicable source of law; and

I. Award such further relief as the Court deems appropriate.

Respectfully submitted,

/s/ Jerome A. Murphy
Jerome A. Murphy (D. Md. Bar No. 27678)
Jared A. Levine (*pro hac vice forthcoming*)
CROWELL & MORING LLP
600 Fifth Street, NW
Washington, DC 20001
Tel: (202) 624-2500
Fax: (202) 628-5116
JMurphy@crowell.com
jlevine@crowell.com

Shana H. Khader (*Application for admission pending*)
Alice N. Barrett (D. Md. Bar No. 32180)
CASA, Inc. dba We Are CASA
P.O. Box 7277
Hyattsville, MD 20787
Tel: (240) 406-4348 (S. Khader)
Tel: (240) 378-3445 (A. Barrett)
skhader@wearecasa.org
abarrett@wearecasa.org

Sabrina S. Merold (*Application for admission pending*)
Kit A. Pierson (D. Md. Bar No. 11253)
Alison S. Deich (*Application for Admission pending*)

COHEN MILSTEIN SELLERS & TOLL LLP
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
smerold@cohenmilstein.com
kpierson@cohenmilstein.com
adeich@cohenmilstein.com

Ian Austin Rose (D. Md. Bar No. 22079)
Adina Appelbaum (D. Md. Bar No. 32089)
Samantha Hsieh (D. Md. Bar No. 32092)
Lauren Hodges (D. Md. Bar No. 32272)
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW Ste. 701
Washington, DC 20036
Tel. 202-788-2509
Austin.rose@amicacenter.org
Adina@amicacenter.org
Sam@amicacenter.org
Lauren@amicacenter.org

Deborah A. Jeon (D. Md. Bar No. 06905)
David Rocah (D. Md. Bar No. 27315)
Sonia Kumar (D. Md. Bar No. 07196)
Gina Branch Elleby (D. Md. Bar No. 32059)
AMERICAN CIVIL LIBERTIES UNION OF MARYLAND
3600 Clipper Mill Road, Suite 200
Baltimore, Maryland 21211
Tel.: 410-889-8555
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
elleby@aclu-md.org

Yulie Landan*(*Pro hac vice forthcoming)*
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD ("NATIONAL IMMIGRATION PROJECT")
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
(213) 430-5521
yulie@nipnlg.org

*Not admitted in the District of Columbia; working remotely from New York and admitted in California only