**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SAMUEL GUZMÁN, *et al.*, *individually and on behalf of all others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.,*<br><br>*Defendants*. | No. 1:26-cv-3579-BAH |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION AND TO STAY AGENCY ACTION**

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND AND STATUTORY FRAMEWORK..........................................2

I. STATUTORY FRAMEWORK ..........................................................................................2

II. DEFENDANTS EMPLOY WARRANTLESS ARRESTS TO MEET NATIONWIDE ARREST QUOTAS.............................................................................................3

III. IMMIGRATION ENFORCEMENT IN MARYLAND.................................................6

A. Defendants' Agents Have a Policy and Practice of Making Warrantless Immigration Arrests in Maryland Without an Individualized Determination of Probable Cause That the Person is an Escape Risk. .............................................8

B. Plaintiffs and Putative Class Members Have Been and Will Be Arrested, Detained, and Separated From Their Families Under Defendants' Unlawful Policy and Practice.........................................................................................12

IV. ARGUMENT ........................................................................................................16

V. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. 16

A. The INA and DHS Regulations Require Agents to Make an Individualized Determination That the Person Is an Escape Risk Before Arresting That Person Without a Warrant...........................................................................17

B. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without an Individualized Determination of Escape Risk Violates the INA........19

C. Defendants' Warrantless Arrest Policy and Practice Is a Final Agency Action That Violates the APA. ...........................................................................21

1. Defendants' Policy and Practice is Contrary to Law...............................23

2. Defendants' Policy and Practice is Arbitrary and Capricious. .................24

D. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Escape Risk Violates the Accardi Doctrine..........25

VI. PLAINTIFFS AND THE PUTATIVE CLASS WILL CONTINUE FACING IRREPARABLE HARM ABSENT IMMEDIATE INJUNCTIVE RELIEF...................26

VII. THE EQUITIES WEIGH HEAVILY IN PLAINTIFFS' FAVOR AND A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST..................29

CONCLUSION..........................................................................................................30

## INTRODUCTION

Seeking to deliver on President Trump's promise of the "single largest Mass Deportation program in History," Defendants have adopted an "arrest first, ask questions later" policy, indiscriminately stopping and arresting suspected noncitizens without regard for the law. In Maryland, Defendants have honed this policy in a particularly disturbing manner. Each morning, as community members drive to work and take their children to school, masked agents in unmarked cars stalk them like prey, identify drivers they perceive to be Brown or Black immigrants, and stop their vehicles. The agents box in drivers with their own vehicles, smash car windows, and draw their weapons. They arrest everyone in the vicinity, regardless of who they intended to stop, without probable cause, and in many cases without asking any questions at all.

Numerous courts have repudiated this unlawful policy. Yet Defendants brazenly continue the same illegal conduct in Maryland, doubling their arrest "quotas" and pursuing massive detention expansion. Each day this continues, Plaintiffs and putative class members—many of whom have lived here for decades, hold long-term jobs, and have U.S. citizen family members—face ongoing and irreparable harm, dragged from their workplaces and ambushed during daily routines simply because they fit Defendants' targeted demographic profile.

Plaintiffs Samuel Guzmán, A.G.P., K.M., J.M.R., and We are CASA seek a preliminary injunction or, in the alternative, a stay of Defendants' policy and practice, to ensure that agents in Maryland make immigration arrests in accordance with federal law: pursuant to a warrant, or, absent one, upon an individualized probable cause determination that the person is (1) in violation of civil immigration law and (2) likely to escape before a warrant can be obtained. Critically, the escape risk inquiry turns not on whether the individual could leave the scene, but on particularized factors—such as prior evasions of immigration authorities, community ties, or other individualized circumstances—bearing on whether the individual is likely to evade arrest under a future warrant.

## FACTUAL BACKGROUND AND STATUTORY FRAMEWORK

### I. STATUTORY FRAMEWORK

Immigration arrests generally require a warrant. *See Arizona v. United States*, 567 U.S. 387, 408 (2012). Without one, officers have "more limited authority,*" id.*, and may arrest *only if* the agent has "reason to believe that the [noncitizen] so arrested is in the United States in violation of any . . . law or regulation [made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens] *and* is likely to escape before a warrant can be obtained for his arrest," 8 U.S.C. § 1357(a)(2) (emphasis added).

Courts have uniformly held that "reason to believe' is "equivalent to constitutionally required probable cause." *Lopez v. Noem*, No. CV GLR-25--3662, 2025 WL 3496195, at *5 (D. Md. Dec. 5, 2025); *Gomez v. Guadian*, No. GLR-26-3078, 2026 WL 2546049, at *2 (D. Md. Aug. 28, 2026); *see also Au Yi Lau v. U.S. Immigr. & Naturalization Serv.*, 445 F.2d 217, 222 (D.C. Cir. 1971); *Tejeda-Mata v. Immigr. & Naturalization Serv.*, 626 F. 2d 721, 725 (9th Cir. 1980); *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010). Probable cause "must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Accordingly, § 1357(a)(2) requires an individualized determination of probable cause that the person is in the United States unlawfully *and* is an escape risk before an agent may arrest that person without a warrant.

Defendants have previously agreed to be bound by this controlling law. In settling a challenge to Immigration and Custom Enforcement's ("ICE") warrantless arrest practices in the Chicago area, ICE issued a "Broadcast Statement of Policy" conceding that "mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that [a noncitizen] is likely to escape" and identifying factors relevant to escape risk, including

"knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, [and] ties to the community (such as a family, home, or employment) or lack thereof." Declaration of Jerome A. Murphy ("Murphy Decl."), Ex. A-1. Consistent with ICE's concessions, district courts have found that the "arrest first, ask questions later" policy and practice violates § 1357(a)(2). *See M.J.M.A. v. Lyons*, 822 F. Supp. 3d 1147, 1178 (D. Or. 2026); *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 49 (D.D.C. 2025); *Ramirez Ovando v. Noem,* 810 F. Supp. 3d 1209, 1234 (D. Colo. 2025).

## II. DEFENDANTS EMPLOY WARRANTLESS ARRESTS TO MEET NATIONWIDE ARREST QUOTAS

Since January 2025, the administration has pursued "the single largest Mass Deportation Program in History" by imposing escalating daily arrest quotas. Murphy Decl., Ex. A-2. On January 26, 2025, ICE officials were "directed by Trump officials to aggressively ramp up the number of people they arrest, from a few hundred per day to at least 1,200 to 1,500, with each field office assigned 75 arrests per day and managers held accountable for missing those targets. *Id.*, Ex. A-3. By May 2025, White House Deputy Chief of Staff Stephen Miller confirmed the administration was "looking to set a goal of a minimum of 3,000 arrests for ICE every day, and President Trump is going to keep pushing to get that number up higher each and every single day." *Id.*, Ex. A-4. As ICE acting Director Todd Lyons put it, "[w]e need to get better at treating this like a business," and deport immigrants as efficiently as Amazon moves packages: "Like Prime, but with human beings." *Id.*, Ex. A-5.

This pressure translated into policy and predictably into lawlessness. In May 2025, Miller and then-Department of Homeland Security ("DHS") Secretary Kristi Noem "eviscerated" officials, including top Maryland officials, for low arrest numbers, questioning why officers were not stationed outside of Home Depot and 7-Eleven, *id.*, Ex. A-6, and ordering them to "just go out

there and arrest" noncitizens. *Id.*, Ex. A-7. Senior officials then directed agents to "'turn up the creative knob up to 11' when it comes to enforcement," and "think up tactics to 'push the envelope.'" *Id.*, Ex. A-8. As one email put it: "If it involves handcuffs on wrists, it's probably worth pursuing." *Id.* Pre-arrest supervisory approval and documentation requirements—standard safeguards long governing arrests—were abandoned; as one former official explained, "it's hard to fill out a worksheet that just says 'Meet in the Home Depot parking lot.'" *Id.*, Ex. A-9. The "contest of how many deportations could be reported to Stephen Miller" naturally led to racialized stops and unlawful arrests. *Id.*, Ex. A-10. Adam Boyd, an attorney who resigned from ICE's legal department, observed that agents became "focuse[d] on numbers over all else." *Id.*

After ICE agents killed two U.S. citizens in Minnesota in January 2026, ICE "aimed to get the department out of the headlines." *Id.*, Ex. A-11. But arrests never slowed; instead, "2,000 arrests a day [became] the new standard[.]" *Id.*, Ex. A-12. Then in one week in July 2026 alone, ICE shootings during vehicle stops killed two more people. *Id.*, Ex. A-13. Leadership directed agents to pause traffic-stop enforcement, *id.*, Ex. A-13—just as it had after the Minneapolis killings in January. But within two days, President Trump countermanded the pause: "We CANNOT give up one of I.C.E.'s most important and effective Crime Fighting tools, THE TRAFFIC STOP!" *Id.*, Ex. A-14. ICE traffic stops resumed, and in July 2026, ICE arrested nearly 50,000 individuals—the highest monthly total of this administration. *Id.*, Ex. A-15. The pattern is clear: when public backlash mounts, the administration temporarily retreats to the shadows but never slows down. Arrest numbers only climb.

Defendants have not merely violated the law; they have proudly announced their intention to do so. In July 2025, the Department of Justice fired the acting U.S. Attorney for the Eastern District of California after she told a Border Patrol official he could not arrest individuals without

probable cause. *Id.*, Ex. A-16. When a D.C. lawsuit challenged Defendants' warrantless arrest policy and practice, DHS doubled down, declaring that it "uses [the] 'reasonable suspicion'" standard to make warrantless immigration arrests. *Id.*, Ex. A-17. DHS then stated that officers are "trained to ask a series of well-determined questions to determine status and removability," without even mentioning escape risk. *Id.*, Ex. A-18. On January 31, 2026, a DHS spokesperson reiterated that "[l]aw enforcement uses 'reasonable suspicion' to make arrests[.]" *Id.*, Ex. A-19. Former Border Patrol Chief Gregory Bovino was the most explicit: "We need reasonable suspicion to make an immigration arrest . . . I did not say probable cause, nor did I say I need a warrant. We need reasonable suspicion of illegal alienage[.]" *Id.*, Ex. A-20.

On January 28, 2026, after several courts enjoined the administration's warrantless arrest policy, former ICE Director Todd Lyons issued an internal memorandum ("the Lyons Memorandum") to "[a]ll ICE Personnel." *Id.*, Ex. A-21. Though facially acknowledging that § 1357(a)(2) requires probable cause of "escape risk," the Lyons Memorandum gives disproportionate weight to an individual's theoretical ability to flee in a vehicle and entirely fails to address community ties (thereby providing no guidance on how to consider such ties in the escape risk analysis). *Id.* at 3-4. Two district courts held that these deficiencies violate previously issued preliminary injunctions. *See Escobar Molina v. U.S. Dep't of Homeland Sec.*, 832 F. Supp. 3d 22, 50 (D.D.C. 2026) (finding the Lyons Memorandum's "flawed definition of escape risk" and "failure to instruct officers to consider community ties" violated the injunction); Order Enforcing Preliminary Injunction, *Ramirez Ovando v. Mullin*, Case No. 1-25-cv-03183-RBJ, Doc. 112 (filed May 12, 2026).

## III. IMMIGRATION ENFORCEMENT IN MARYLAND

With more than one million foreign-born residents, Murphy Decl., Ex. A-22,—nearly 17% of its population, *id.*, Ex. A-23,—Maryland has been squarely in ICE's crosshairs since the second Trump administration began. ICE has targeted Maryland in pursuit of its arrest quotas. On January 30, 2025, the Deputy Field Office Director of the Baltimore ICE Field Office sought a waiver to hold individuals in temporary hold rooms beyond the allowable 12 hours, citing directives to increase deportation numbers. *D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 561–62 (D. Md. 2026). By February 2025, ICE had accelerated plans for a new detention-capable office in Howard County. Murphy Decl., Ex. A-24. Efforts to block that facility recently stalled, and ICE appears poised to proceed. *Id.*, Ex. A-25. In January 2026, ICE purchased a warehouse in Hagerstown to detain up to 1,500 people at a time, *Id.*, Ex. A-26, with an estimate that the facility would hold "between 78,000 and 180,000 people per year."[1] Though this Court preliminarily enjoined development and use of the property pending adequate environmental review, *Maryland v. Mullin*, 831 F. Supp. 3d 325 (D. Md. 2026), Defendants intend to press forward with it, Murphy Decl., Ex. A-27. Defendants need this expansion to keep pace with their arrest numbers, particularly after this Court enjoined excessive crowding and other unconstitutional conditions at the Baltimore Hold Room on March 6, 2026. *D.N.N.*, 822 F. Supp. 3d at 598–99.

The nationwide surge has hit Maryland with full force. As of July 2025, daily ICE arrests were over double the daily arrests in 2024. Murphy Decl., Ex. A-28. When the neighboring District of Columbia experienced an arrest spike during an operation starting in August 2025, Maryland

[1] Decl. of Dr. David Blythe in Supp. of Pl.'s Mot. for a Prelim. Inj. ¶ 13, *Maryland v. Mullin*, No. 1:26-cv-00733 (D. Md. Mar. 19, 2026), ECF No. 15-18 ("I understand that ICE's plans for this facility involve detention of individuals for short periods of time, purportedly three to seven days, due to this facility's designated status as a 'processing center.' Assuming the accuracy of this estimate, the facility, if at capacity, would host and then transfer between 78,000 and 180,000 people per year."); *see also* Plaintiff's Reply in Support of its Motion for a Preliminary Injunction at 13, *Maryland v. Mullin*, Case No. 1-26-cv-00733-BAH, ECF No. 37 (filed April 9, 2026).

saw a parallel surge that did not slow down. *Id.*, Ex. A-29. And the numbers have only climbed: arrests rose again at the start of 2026, *id.*, Ex. A-30, and ICE is arresting Marylanders at more than *four times* the rate of the Biden administration's final year, *id.*, Ex. A-31. ICE also specifically targeted Marylanders during "Operation Safe Community" which took place from August 1 through August 14, 2026, resulting in 1,328 arrests in Maryland[2] and Virginia. *Id.*, Ex. A-33.

Dr. Graeme Blair, a social scientist with expertise in data analysis, has analyzed ICE arrest data from January 20, 2025, through August 6, 2026. Declaration of Graeme Blair ("Blair Decl."), Ex. B. During this time period, there were nearly 7,000 "non-custodial" arrests in Maryland, which includes arrests that occurred out in the community and excludes transfers from criminal custody or other custodial settings. *Id.* at ¶¶ 7–8. ICE's own data shows that noncustodial arrests in Maryland averaged just under 15 per week in 2024; since the new administration took office, that figure has surged to 86 per week. *Id.* at ¶ 9. The nationwide enforcement surge has played out locally in Maryland: arrest numbers have climbed steadily since January 2025, rising to over 200 arrests in a single month in January 2026. *Id.*, Figure 1.

The data also directly contradict ICE's claim that they are going after the "worst of the worst." Of the individuals subjected to noncustodial ICE arrests in Maryland between January 20, 2025, and August 6, 2026, 71% had *no criminal history whatsoever*, with an additional 9% having only pending charges, but no convictions. *Id.* at ¶ 11. Less than 1% of individuals arrested in this period had convictions the FBI classifies as "violent." *Id.* at ¶ 12. ICE arrests have also

[2] Arrest numbers, which steadily increased *before* this operation, will remain high as Defendants continue their policy and practice. This particular operation's purported end does not negate Plaintiffs' and putative class members' risk of future harm. Indeed, all but two of the submitted declarations describe arrests predating it, and many people have been arrested since. *See, e.g.,* Murphy Decl., Ex. A-32 (describing violent arrest on the Eastern Shore on August 21). *C.f. Hussen v. Noem*, 822 F. Supp. 3d 944, 999 (D. Minn. 2026) (finding there was an unlawful policy and practice, despite the Lyons Memorandum, but no "certainly impending" future injury because of lack of evidence of encounters and arrests after the operation at issue ended).

overwhelmingly targeted Latine Marylanders.[3] Of the nearly 7,000 street arrests since January 20, 2025, 93% of those arrested are originally from Latin America or Caribbean countries. *Id.* at ¶ 13.

### A. Defendants' Agents Have a Policy and Practice of Making Warrantless Immigration Arrests in Maryland Without an Individualized Determination of Probable Cause That the Person is an Escape Risk.

Defendants' immigration enforcement in Maryland follows a consistent pattern. Agents target neighborhoods with significant populations of Brown and Black immigrants. In the early morning, as people drive to work or to drop children at school, agents cruise in unmarked cars. When agents perceive the driver or registered owner of the vehicle to be a Brown or Black immigrant, they initiate a traffic stop, despite lacking authority to enforce traffic laws. Multiple unmarked vehicles then surround the targeted car, flashing sirens or deliberately striking it. Agents—often masked, armed, and wearing civilian clothing with no agency identification—order the driver and all occupants out, at times smashing windows and dragging them out by force. They handcuff everyone, load them into unmarked cars, and leave the targeted vehicle at the scene. Agents conduct these arrests without a warrant and without asking any questions about whether the individual poses an escape risk—inquiring nothing about community ties, family, or employment. Indeed, agents often actively ignore information presented to them that demonstrates the *lack* of escape risk. Arrests outside this vehicle-stop pattern—such as those at stores or workplaces—suffer from the same failure to make the probable cause findings required by § 1357(a)(2).

Plaintiffs' and putative class members' arrests exemplify this policy and practice. Plaintiff Guzmán, a Latino U.S. citizen born in the U.S., was arrested on the morning of June 7, 2026, while getting coffee at a 7-Eleven. Declaration of Samuel Guzmán ("Guzmán Decl."), Ex. C ¶¶ 1–3, 5.

[3] "Latine" is a gender-neutral term referring to individuals of Latin American descent.

As he walked to his car, several unmarked SUVs blocked the parking lot exits. *Id.* ¶ 7. Armed, masked agents approached Mr. Guzmán, shoved him against his car, and seized his phone, wallet, and keys and—after glancing at his ID—handcuffed him and forced him into their truck, without asking about his community ties. *Id.* ¶ 9. When Mr. Guzmán repeatedly told agents he was born in the U.S., one replied, "if you are an American citizen, why don't you speak better English?" *Id.* ¶ 12. ICE reviewed his documentation a second time and returned him to his car without offering an explanation; in total, he was handcuffed for over 90 minutes. *Id.* ¶¶ 14, 16.

Plaintiff A.G.P., a 56-year-old Latino grandfather, was driving to work in Silver Spring on the morning of February 15, 2026, when three unmarked vehicles surrounded his car. Declaration of A.G.P. ("A.G.P. Decl."), Ex. D ¶¶ 1–2, 4, 6. Agents demanded he exit the vehicle and handcuffed him before even asking his name, let alone any questions about his ties to the community, then reached into his pocket to look at his ID. *Id.* ¶¶ 7–8. He spent three months in immigration detention before a federal district court found his detention unlawful. *Id.* ¶ 17. He remains subject to burdensome conditions, including an intrusive ankle monitor that exacerbates his diabetic neuropathy. *Id.* ¶ 20.

Plaintiff K.M., a 38-year-old Latina mother of two young U.S. citizen children, was parking her car on Maryland's Eastern Shore on January 12, 2026, when six unmarked cars surrounded her. Declaration of K.M. ("K.M. Decl."), Ex. E ¶¶ 1–2, 6–9. K.M. handed agents her driver's license, after which the agents threatened to shoot her and handcuffed her. *Id.* ¶¶ 11–14. The agents did not ask her any questions about her community ties—despite her repeated exaltation that she was her children's sole caregiver—and did not have a warrant. *Id.* ¶¶ 14–15. Agents then held her for several hours at the Salisbury ICE office, after which she was released with an ankle monitor, which she continues wearing to this day. *Id.* ¶¶ 16–21.

Plaintiff J.M.R., a Latino man who has been complying with the terms of an immigration bond for more than a decade, was driving his boss's truck in Silver Spring on July 7, 2026, when ICE agents surrounded him in unmarked cars. Declaration of J.M.R. ("J.M.R. Decl."), Ex. F ¶¶ 4–6. Before asking J.M.R. *any* questions, the agents dragged him out of the car, threw him to the ground, and began to handcuff him. *Id.* ¶ 7. After he was partially handcuffed, agents shot him with a Taser gun, causing him extreme pain and requiring him to go to the hospital. *Id.* ¶ 9. ICE did not have a warrant, nor did the agents ask J.M.R. any questions about his ties to the community. *Id.* ¶ 11. He spent two weeks in immigration detention—with minimal medical attention—before a federal district court found his detention unlawful and ordered his release. *Id.* ¶ 18.

Declarant David Aguirre was driving to work with his cousin on the morning of January 24, 2026, when unmarked vehicles surrounded them near Columbia, Maryland. Declaration of David Aguirre ("Aguirre Decl."), Ex. G ¶¶ 2–3. One vehicle braked sharply in front of them; another struck their rear bumper. *Id.* ¶ 3. Plainclothes agents began yelling in English, which Mr. Aguirre did not understand; when he did not immediately open the door, they smashed the window and dragged him out. *Id.* ¶¶ 4–5. The only question agents asked was whether he had identification—nothing about his community ties. *Id.* ¶ 5. He later observed Defendants stop any car whose registered owner appeared Latine, and refrain from stopping cars where the individual did not appear Latine. *Id.* ¶ 8. Mr. Aguirre was detained for two weeks before an immigration judge found he posed no flight risk or danger and ordered his release on bond. ¶ 11. He also wore an ankle monitor for two weeks. *Id.* ¶ 12.

Declarant C.G., who lives in Maryland with his wife, daughter, and granddaughters, was driving home on the morning of April 4, 2026, when three unmarked cars surrounded him. Declaration of C.G. ("C.G. Decl."), Ex. H ¶ 2. Masked agents ordered him to show his ID; after

briefly examining it, an agent told him he "was not allowed in the country" and ordered him out. *Id.* ¶ 3. Agents pushed C.G. against the car and handcuffed him—without a warrant and without asking about his community ties. *Id.* ¶¶ 4–5. C.G. was held in a car while agents continued searching for other Latine drivers, photographing license plates, inputting numbers into a computer, and asking one another, "Spanish?" *Id.* ¶ 6. He spent about one month in ICE custody before an immigration judge found he posed no flight risk or danger and ordered his release on bond. *Id.* ¶ 8.

Declarant E.B.P., a Latino father of three U.S. citizen children, was driving to a predominantly Latine church on the morning of June 7, 2026, when three unmarked cars surrounded him outside a friend's house. Declaration of E.B.P. ("E.B.P. Decl."), Ex. I ¶ 2. Agents exited with guns drawn, threatening to shoot if he resisted. *Id.* ¶ 3. Without another word, they pulled him from the car, handcuffed him, and placed him in an unmarked vehicle—without a warrant and without asking about his community ties. *Id.* Agents then took E.B.P. to a parking lot where they rounded up several other Latine individuals. *Id.* ¶ 5. He spent about one month in ICE custody before an immigration judge found he posted no flight risk or danger and ordered his release on bond. *Id.* ¶ 8.

Declarant C.N.M. was standing outside his vehicle in a 7-Eleven parking lot on October 28, 2025, when several cars drove up and blocked his exit. Declaration of C.N.M. ("C.N.M. Decl."), Ex. J ¶ 3. Masked agents approached C.N.M. and demanded his ID. *Id.* ¶ 4. C.N.M. handed the agents his driver's license, work permit, and Social Security card. *Id.* ¶¶ 4–5. After reviewing these documents and seeing in their records that C.N.M. had a pending asylum application, the agents nonetheless handcuffed C.N.M. without a warrant and without asking about his community

ties. *Id.* ¶ 5. C.N.M. was released on bond a month and a half later after an immigration judge found he posed no flight risk or danger and released him on bond. *Id.* ¶ 12.

Declarant W.M.S. was a passenger in his coworker's work truck headed to a landscaping job on July 7, 2026, when unmarked cars stopped them on Maryland's Eastern Shore. Declaration of W.M.S. ("W.M.S. Decl."), Ex. K ¶¶ 2–4. After handcuffing the work truck's driver, masked agents dragged W.M.S. out of the vehicle and handcuffed him, without a warrant and without asking about his community ties. *Id.* ¶¶ 7, 9.

Other declarants and putative class members have experienced the same sequence: agents stopped them while driving or otherwise simply existing in public and then arrested them without any inquiry into community ties or other factors relevant to assessing escape risk.[4]

### B. Plaintiffs and Putative Class Members Have Been and Will Be Arrested, Detained, and Separated From Their Families Under Defendants' Unlawful Policy and Practice.

Plaintiffs and putative class members have suffered significant trauma as a result of Defendants' policy and practice and face ongoing harms so long as the policy and practice continues. Many were detained in inhumane conditions at the Baltimore ICE office. Plaintiff A.G.P. was denied access to his necessary medications, including insulin, during his six days there. A.G.P. Decl. ¶ 16, Ex. D. Aguirre spent 12 days in a cell holding as many as 100 people. Aguirre Decl. ¶ 9, Ex. G; *see also* J.H.A. Decl. ¶ 9, Ex. V (10 days, roughly 80 people); R.Q.H. Decl. ¶ 6,

---

[4] Declaration of R.Q.H. ("R.Q.H. Decl."), Ex. L ¶¶ 2–4; *Id.* ¶ 5 (observing ICE conducting license plate checks outside a 7-Eleven prior to arresting an individual); Declaration of Manuel ("Manuel Decl."), Ex. M ¶¶ 2–5; Declaration of J.A.G. ("J.A.G. Decl."), Ex. N ¶¶ 2–4; *Id.* ¶ 5 (describing brother's arrest); Declaration of A.L.P. ("A.L.P. Decl.), Ex. O ¶ 9; Declaration of E.A.M. ("E.A.M. Decl."), Ex. P ¶¶ 4–8; Declaration of D.C. ("D.C. Decl."), Ex. Q ¶¶ 3–9; Declaration of W.J. ("W.J. Decl."), Ex. R ¶¶ 3–7; Declaration of Candido Garcia ("Garcia Decl."), Ex. S ¶¶ 2–5; Declaration of S.B.R. ("S.B.R. Decl."), Ex. T ¶¶ 4–7; Declaration of L.C.P. ("L.C.P. Decl."), Ex. U ¶¶ 5–10; Declaration of J.H.A. ("J.H.A. Decl."), Ex. V ¶¶ 2–5; Declaration of E.C.V. ("E.C.V. Decl."), Ex. W ¶¶ 2–3, 5–7; Declaration of Rachael E. Savage ("Savage Decl."), Ex. X ¶¶ 12–14 (describing two clients' warrantless arrests) Declaration of Bryan Avila ("Avila Decl."), Ex. Y ¶¶ 2-6 (describing cousin's arrest).

Ex. L (5 days, roughly 40 people). J.A.G. had no access to medication his brain tumor until the end of his 12-day confinement there. J.A.G. Decl. ¶ 9, Ex. N. C.N.M. was given a rotten burrito as his only meal at the Chantilly ICE office, slept on the floor due to overcrowding, was stripped-searched at the Riverside Regional Jail, and was taunted by agents at both locations. C.N.M. Decl. ¶¶ 8–9, 1, Ex. J. Plaintiff J.M.R. was violently assaulted by agents, remained handcuffed for most of his hospital stay, and received inadequate medical care while in detention. J.M.R. Decl. ¶¶ 14–17, Ex. F.

Plaintiffs and putative class members have also suffered the pain of separating from their families. Some individuals have been shipped to ICE facilities across the country, far away from their families and attorneys in Maryland.[5] The children and families of unlawfully arrested individuals experience trauma from these arrests and struggle to make ends meet, further compounding the trauma.[6] Plaintiffs and putative class members spend weeks to months in inhumane conditions, with some still detained to this day.[7] Many Plaintiffs and putative class members who were released after their unlawful arrests are still forced to wear burdensome ankle monitors and abide by restrictive conditions.[8]

Plaintiffs and putative class members also suffer ongoing distress from their unlawful arrests and live in fear of being arrested again under Defendants' unlawful policy, leading many

---

[5] A.G.P. Decl. ¶ 14, Ex. D (California); S.B.R. Decl. ¶ 15, Ex. T (Louisiana); Garcia Decl. ¶ 8, Ex. S (Mississippi, then Texas); J.A.G. Decl. ¶ 11, Ex. N (Texas); J.H.A. Decl. ¶ 7, Ex. V.(Arizona, then California); E.C.V. Decl. ¶ 9, Ex. W (Louisiana).

[6] A.G.P. Decl. ¶¶ 18-20, Ex. D (detailing, among other harms, loss of family home resulting from Plaintiff's detention); J.M.R. Decl. ¶ 19, Ex. F; R.Q.H. Decl. ¶ 8, Ex. L; J.A.G. Decl. ¶ 13, Ex. N; E.B.P. Decl. ¶ 9, Ex. I; S.B.R. Decl. ¶ 17, Ex. T; E.A.M. Decl. ¶ 12, Ex. P.

[7] A.G.P. Decl. ¶ 17, Ex. D (3 months); A.L.P. Decl. ¶ 18, Ex. O (4 months); C.G. Decl. ¶ 8, Ex. H (1 month); J.H.A. Decl. ¶ 10, Ex. V (7 months and counting); Garcia Decl. ¶ 2 Ex. S (3 months and counting); S.B.R. Decl. ¶ 3, Ex. T (4 months and counting); E.C.V. Decl. ¶ 2, Ex. W (6 months and counting); L.C.P. Decl. ¶ 15, Ex. U (3 months); C.N.M. Decl. ¶¶ 3, 12, Ex. J (1.5 months); R.Q.H. Decl. ¶¶ 2, 7, Ex. L (4.5 months); J.A.G. Decl. ¶¶ 2, 12, Ex. N (nearly 5 months); E.A.M. Decl. ¶¶ 4, 11, Ex. P (3 months and counting).

[8] A.G.P. Decl. ¶ 20, Ex. D; K.M. Decl. ¶¶ 21–22, Ex. E; R.Q.H. Decl. ¶ 9, Ex. L; Manuel Decl. ¶¶ 7–9, Ex. M.

to dramatically alter their daily routines. Plaintiff A.G.P. has witnessed multiple arrests outside his workplace, all while wearing an ankle monitor as a constant physical reminder of his trauma. A.G.P. Decl. ¶¶ 20–24, Ex. D. Plaintiff K.M. has tried to reroute her daily commute to avoid the site of her arrest in Salisbury but must travel near active enforcement areas to critical destinations, including her lawyer's office, and for family errands. K.M. Decl. ¶¶ 32–33, Ex. E. W.M.S. has heard of, and witnessed, numerous arrests of fellow churchgoers in recent months. W.M.S. Decl. ¶ 18, Ex. K; *see also* A.L.P. Decl. ¶ 22, Ex. O. C.G. changed his route to work and morning routine to avoid another traumatic arrest and no longer leaves his home except out of necessity, yet still witnesses arrests mirroring his own. C.G. Decl. ¶¶ 9, 11, Ex. H; *see also* J.M.R. Decl. ¶¶ 19–21, Ex. F. E.B.P. now leaves for work before dawn and his entire family rarely goes out, limiting outings to essential errands at day's end. E.B.P. Decl. ¶ 9, Ex. I. J.A.G. has stopped leaving the house for errands entirely, relying on his son, instead. J.A.G. Decl. ¶ 13, Ex. N. Plaintiffs and putative class members also fear arrests of their family members, including U.S. citizens, given the sweep of Defendants' policy and practice.[9]

As explained by one faith leader in Prince George's County, "People are no longer scared. They're terrified. Our community feels vulnerable, they feel like they're being hunted." Murphy Decl., Ex. A-34. Across Maryland, immigrant students have stopped going to school, contributing to a decline in high school graduation rates for Latine students. *Id.*, Ex. A-35. Responding to widespread fear about ICE on campuses, school systems have established policies for how to interact with ICE, *id.*, Ex. A-36, and the Maryland government has taken several measures to prevent ICE activity on school grounds, *id.*, Ex. A-37. But ICE remains undeterred.

---

[9] Guzmán Decl. ¶ 20, Ex. C; C.G. Decl. ¶ 11, Ex. H; A.G.P. Decl. ¶¶ 23–24, Ex. D; E.B.P. Decl. ¶ 9, Ex. I; L.C.P. Decl. ¶ 17, Ex. U.

Given the violent tactics in these arrests, Plaintiffs and putative class members remain fearful of violence. This fear is born out of reality, given ICE's dangerous tactics like ramming into vehicles to effectuate stops and firing into moving cars in Maryland and across the country. *Id.*, Ex. A-38. At least 23 people have been shot by ICE officers since the beginning of the second Trump administration. *Id.*, Ex. A-39. Plaintiffs' and declarants' arrests exemplify this pattern of threats and violence.[10]

Members of Plaintiff We Are CASA are among the many individuals recently arrested in Maryland without a warrant and without probable cause pursuant to Defendants' unlawful policy and practice. Declaration of We Are CASA ("We are CASA Decl."), Ex. Z ¶¶ 47–55. Defendants' unlawful policy and practice has also caused significant harm to We Are CASA, forcing it to divert staff and resources from its core mission—providing social, health, employment, and legal services to immigrant communities—to emergency response work. Where it once provided legal clinics offering consultations and assistance with immigration applications, it now prioritizes daily rapid-response calls to families of arrested individuals, consuming resources otherwise devoted to asylum cases, affirmative relief, and other long-term services. *Id.* ¶ 29. We Are CASA also faces increased hotline costs while losing grant funding because diverted staff cannot meet deliverables. *Id.* ¶ 31. Defendants' policy and practice has also chilled open communication between We Are CASA and its members, discouraged sharing of personal information, and impaired its core mission of connecting individuals to social services. *Id.* ¶¶ 28–29. Given the likelihood that its members will continue to be arrested and detained under Defendants' unlawful policy, We Are CASA's resources, effectiveness, and entire service model remain in jeopardy. *Id.* ¶¶ 17–42.

[10] Guzmán Decl. ¶ 9, Ex. C; J.M.R. Decl. ¶¶ 7, 9, Ex. F; K.M. Decl. ¶ 13, Ex. E; Aguirre Decl. ¶¶ 4–5, Ex. G; E.B.P. Decl. ¶ 3, Ex. I; J.H.A. Decl. ¶ 3, Ex. V; E.C.V. Decl. ¶¶ 5–6, Ex. W; W.M.S. Decl. ¶ 7, Ex. K.

## IV. ARGUMENT

This Court may issue a preliminary injunction "to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted). "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." *Id.* (citation omitted); *see also D.N.N.*, 822 F. Supp. 3d at 584–85. A party seeking a preliminary injunction must establish four factors: (1) likelihood of success on the merits, (2) irreparable harm if an injunction is not issued, (3) the equities lie in their favor, and (4) the injunction is in the public interest. *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024) (citing *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 20 (2008)).[11]

As set forth below, Plaintiffs satisfy all four factors and therefore are entitled to preliminary injunctive relief, as well as, or alternatively, a stay of Defendants' policy and practice of conducting warrantless immigration arrests without an individualized determination of probable cause. Plaintiffs seek preliminary injunctive relief on behalf of the proposed Escape Risk Class, as defined in their concurrently filed motion for class certification.

## V. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

"To secure a preliminary injunction, a plaintiff must 'make a clear showing that [it is] likely to succeed at trial, [but it] need not show a certainty of success." *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 388 (D. Md. 2022) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th

[11] "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016), *vacated and remanded on other grounds*, 580 U.S. 1168 (2017).

Cir. 2013)). Here, Plaintiffs are likely to succeed on the merits of their claims that Defendants' policy and practice of making warrantless arrests without an individualized determination of probable cause for escape risk, ECF 1, Compl., Second Claim for Relief, violates 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(i)-(ii), the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C), and the *Accardi* doctrine.

### A. The INA and DHS Regulations Require Agents to Make an Individualized Determination That the Person Is an Escape Risk Before Arresting That Person Without a Warrant.

Section 1357(a)(2) permits a warrantless immigration arrest only if the agent "has reason to believe that the [noncitizen] so arrested is in the United States in violation of any . . . [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see also* 8 C.F.R. § 287.8(c)(2)(i)-(ii) (describing same standard).

The "reason to believe" standard in § 1357(a)(2) is the "equivalent to constitutionally required probable cause." *Lopez*, 2025 WL 3496195, at *5; *see also Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) (collecting cases). Probable cause "must be particularized with respect to the person to be searched or seized." *Pringle*, 540 U.S. at 371; *see also Merchant v. Bauer*, 677 F.3d 656, 666 (4th Cir. 2012). It is an "objective standard," *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555–56 (4th Cir. 2017), *as amended* (Aug. 22, 2017), measured by whether the facts and circumstances within the officer's knowledge at the time of arrest "were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense," *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Probable cause requires "more than a mere suspicion." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) (citing *Wong Sun v. United States*, 371 U.S. 471, 479 (1963)); *see also Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017). And "a person's mere propinquity to others

independently suspected of criminal activity, without more," does not suffice. *Taylor*, 81 F.3d at 434 (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)); *see also United States v. Flores-Reyes*, No. 8:17-CR-00382-PX, 2019 WL 7281951, at *3 (D. Md. Dec. 27, 2019).

Section 1357(a)(2) requires an individualized determination that the person being arrested without a warrant is *both* (1) in the United States unlawfully *and* (2) likely to escape before a warrant can be obtained. *United States v. Harrison*, 1999 WL 26921, at *4 (4th Cir. 1999) (per curiam) (rejecting the government's argument that deportable status alone establishes escape risk because "[t]hat interpretation is contrary to the statute itself, which requires that the INS must have reasonable belief both that the alien is in the country illegally *and* that the alien is likely to escape before a warrant can be obtained"); *see also Quintana*, 623 F.3d at 1241 (similar). These requirements must be independently satisfied. *See* 8 U.S.C. § 1357(a)(2); *Harrison*, 1999 WL 26921, at *4; *De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015) ("[E]ven if an agent has reasonable belief [that an individual is unlawfully present in the United States], before making an arrest, there must also be a likelihood of the person escaping before a warrant can be obtained[.]"). The government bears the burden of establishing probable cause for both prongs. *Lopez*, 2025 WL 3496195, at *5.

The escape risk prong is "a statutory limitation" on warrantless arrest authority that "is always seriously applied." *Cantu*, 519 F.2d at 496–97. Even where probable cause exists as to immigration status, agents act "in direct violation of the statute" absent evidence that the person "was likely to escape before a warrant could be obtained." *Westover v. Reno*, 202 F.3d 475, 479–80 (1st Cir. 2000); *see also Orellana v. Nobles Cnty.*, 230 F. Supp. 3d 934, 945 (D. Minn. 2017) (warrantless arrest unlawful where unlawful status was established but "no evidence" supported

escape risk); *Harrison*, 1999 WL 26921, at *4 (deportability status alone does not authorize a warrantless arrest).

Relevant factors—including identity, attempted flight, prior compliance with authorities, and community ties such as family, residence, employment, and length of stay—"must be considered as a whole." *Ramirez Ovando*, 810 F. Supp. 3d at 1241; *see also Escobar Molina*, 811 F. Supp. 3d at 47.

### B. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without an Individualized Determination of Escape Risk Violates the INA.

Defendants' policy and practice violates § 1357(a)(2)'s requirement that agents make an individualized determination of escape risk before arresting anyone without a warrant. Since early 2025, Defendants have instituted a policy and practice of arresting as many people as possible without any individualized inquiry into whether the person poses an escape risk. Defendants have codified that new policy with the Lyons Memorandum, which instructs agents to consider overly broad, non-individualized, and irrelevant factors to establish escape risk, at the expense of particularized, relevant factors that may establish that someone is *not* an escape risk. Murphy Decl., Ex. A-21.

Before arresting each Plaintiff and Declarant in this action, the arresting agents made no apparent effort to obtain facts relevant to any legitimate escape risk factors. In none of the arrests did the agents ask *any* questions about where the person they arrested lives, how long the person has lived in the United States, who the person lives with, the person's family members, the person's

work history, or anything else about the person's community ties[12]—factors that courts have found central to the escape risk analysis. *See, e.g.*, *United States v. Abdi*, No. 2:04-CR-88, 2005 WL 6119695, at *6 (S.D. Ohio Sept. 12, 2005), *rev'd on other grounds*, 463 F.3d 547 (6th Cir. 2006) (holding no probable cause for flight risk where facts suggested that defendant had strong community ties, including his ownership of a business and an apartment rental where he lived with his family; defendant additionally had neither moved nor traveled despite being the subject of an FBI investigation); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 890 (S.D. Ohio 2016) (finding no probable cause of flight risk where defendant held a job, lived with his fiancée and her two children, and paid rent); *United States v. Khan*, 324 F. Supp. 2d 1177, 1187 (D. Colo. 2004) (facts that defendant held two local jobs and helped pay rent made flight risk unlikely even though he lacked specific familial ties in the United States).

Only in some arrests did the agents review the person's ID before arresting them; for many, the agents handcuffed the person without even establishing the identity of who they were arresting. *See, e.g.*, J.M.R. Decl. ¶ 11, Ex. F; A.G.P. Decl. ¶ 7, Ex. D; Aguirre Decl. ¶ 5, Ex. G; E.C.V Decl. ¶ 6, Ex. V. In several cases, agents actively *ignored* information presented to them that demonstrated the lack of escape risk. *See, e.g.*, K.M. Decl. ¶ 14, Ex. E (ongoing immigration case and sole caregiver to her children); C.N.M. Decl. ¶ 5, Ex. J (pending asylum application, work permit, and Social Security card); W.J. Decl. ¶ 5, Ex. R (work permit through pending asylum application). The fact that many putative class members were later granted bond by an immigration

[12] Guzmán Decl. ¶ 9, Ex. C; A.G.P. Decl. ¶ 8, Ex. D; K.M. Decl. ¶¶ 11–15, Ex. E; J.M.R. Decl. ¶¶ 7, 11, Ex. F; Aguirre Decl. ¶ 5, Ex. G; C.G. Decl. ¶ 4–5, Ex. H; E.B.P. Decl. ¶ 3, Ex. I; J.H.A. Decl. ¶¶ 3–5, Ex. V; E.C.V. Decl. ¶¶ 6–7, Ex. W; W.M.S. Decl. ¶ 9, Ex. K; C.N.M. Decl. ¶ 5, Ex. J; R.Q.H. Decl. ¶¶ 2–4, Ex. L; Manuel Decl. ¶¶ 2–5, Ex. M; J.A.G. Decl. ¶¶ 2–4, Ex. N; *Id.* ¶ 5 (describing brother's arrest); E.A.M. Decl. ¶¶ 4–8, Ex. P; D.C. Decl. ¶¶ 3–9, Ex. Q; W.J. Decl. ¶¶ 3–7, Ex. R; Garcia Decl. ¶¶ 2–5, Ex. S; S.B.R. Decl. ¶¶ 4–7, Ex. T; L.C.P. Decl. ¶¶ 5–10, Ex. U; J.H.A. Decl. ¶¶ 2–5, Ex. V; E.C.V. Decl. ¶¶ 2–3, 5–7, Ex. W; Savage Decl. ¶¶ 12–14, Ex. X (describing two clients' warrantless arrests); Avila Decl., Ex. Y ¶¶ 2-6 (describing cousin's arrest).

judge, which requires a finding that the person is not a flight risk,[13] further illustrates Defendants' failure to meaningfully evaluate escape risk at the scene of the arrest. *See, e.g.*, E.B.P. Decl. ¶ 8, Ex. I; Aguirre Decl. ¶ 11, Ex. G; C.N.M. Decl. ¶ 12, Ex. J; L.C.P. Decl. ¶ 15, Ex. U; C.G. Decl. ¶ 8, Ex. H.

Moreover, none of the Plaintiffs or Declarants displayed any furtive conduct suggesting they were likely to escape, and none of them made any effort to resist or to drive or walk away. *Cf. Cantu*, 519 F.2d at 497 (finding probable cause where arrestee was speeding cross-country). Indeed, most of them were arrested while going about daily and routine life activities.

### C. Defendants' Warrantless Arrest Policy and Practice Is a Final Agency Action That Violates the APA.

The APA "establishes a 'basic presumption of judicial review' of agency action." *Lovo v. Miller*, 107 F.4th 199, 205 (4th Cir. 2024) (citation omitted). It directs courts to "hold unlawful and set aside" final agency actions that are (1) arbitrary, capricious, or contrary to law or (2) in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C). Defendants' policy and practice is independently unlawful for all these reasons and should be stayed and enjoined.

Defendants' policy and practice of making warrantless immigration arrests without making the probable cause findings required by § 1357(a)(2) is a final agency action. A final agency action is one that "mark[s] the consummation of the agency's decisionmaking process and . . . one by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citation omitted). It is "meant to cover comprehensively every manner in which an agency may exercise its power." *D.N.N. v. Bacon*, No. 1:25-CV-01613-JRR, 2025 WL 3525042, at *7 (D. Md. Dec. 9,

[13] *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021) (discussing the required findings).

2025) (citation omitted). Courts take a "pragmatic" approach to finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

An unwritten policy can readily meet the APA's finality requirement. *Mayor & City Council of Baltimore v. Consumer Fin. Prot. Bureau*, 775 F. Supp. 3d 921, 939 (D. Md. 2025) ("Agency action . . . need not be in writing to be final and judicially reviewable.") (internal quotations omitted); *Am. Fed'n of Tchrs. v. Bessent*, 765 F. Supp. 3d 482, 497 (D. Md. 2025); *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) ("[T]he absence of a written memorialization by the agency does not defeat finality."); *see also Garcia v. Unknown Parties*, No. 23-468-TUC-CKJ, 2024 WL 1619370, at *6 (D. Ariz. Apr. 15, 2024). There need only "be some discrete, final, and effective agency decision for a court to review." *Mayor & City Council of Baltimore*, 775 F. Supp. 3d at 938.

For good reason, courts have already held that Defendants' policy and practice satisfies both prongs of the final agency action test. *See Ramirez Ovando*, 810 F. Supp. 3d at 1236–37 (holding that ICE's "policy, pattern, or practice of . . . failing to conduct individualized flight risk assessments during immigration operations" constituted a "final agency action"); *Escobar Molina*, 811 F. Supp. 3d at 48–49 (same).[14]

First, the policy reflects a final decision by ICE as to how to conduct warrantless immigration arrests in Maryland in pursuit of mass immigration arrests and deportations. It is not an action of "merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Second, it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc.*, 603 U.S. at 808 (citation omitted). The policy has resulted and will continue to result in the unlawful arrest and detention of thousands of individuals

[14] *See also Peralta v. DHS*, No. 2:26-cv-337, 2026 WL 2069917, at *18 (S.D. Ohio July 17, 2026) ("Plaintiffs have shown that Defendants authorized a widespread and persistent pattern of illegal warrantless arrests in Ohio[.]").

across Maryland.

### 1. Defendants' Policy and Practice is Contrary to Law.

Defendants' policy and practice is contrary to law and in excess of statutory authority by directly violating the express requirements of § 1357(a)(2). *Escobar Molina*, 811 F. Supp. 3d at 50. "The APA provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specified reasons, including whenever the challenged act is . . . 'not in accordance with law.'" *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 586–87 (4th Cir. 2012) (first citing 5 U.S.C. § 706(2)(A) and then citing *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.,* 556 F.3d 177, 192 (4th Cir. 2009)). The plain terms and purpose of § 1357(a)(2)'s "likely to escape" prong require an individualized, fact-specific inquiry. *See supra* Argument § I.A. Defendants' policy and practice systematically ignores this requirement, arresting Marylanders without any inquiry into their circumstances. *See supra* Argument § I.B. What is plain from "the total absence of questions" on community, employment, and familial ties is that "officers did not seek what they did not wish to find." *Ramirez Ovando*, 810 F. Supp. 3d at 1231.

Courts across the country have agreed. *See, e.g., Gomez*, 2026 WL 2546049, at *4 (finding that ICE violated § 1357(a)(2) where record "strongly suggest[ed] that officers did not have probable cause to believe that [Petitioner] was likely to escape before a warrant could issue"); *Escobar Molina*, 811 F. Supp. 3d at 49 (finding failure to inquire into escape risk amounting to a "systemic failure to apply the probable cause standard" in § 1357(a)(2)); *Sanchez Alfaro v. Almodovar*, 2026 WL 734348, at *5 (E.D.N.Y. Mar. 16, 2026) (failure to inquire into escape risk rendered warrantless arrest "plainly illegal"); *Ramirez Ovando*, 810 F. Supp. 3d at 1231 (noting "officers asked no questions—until after [plaintiffs'] arrests—bearing

on flight risk”). This Court should similarly find Defendants’ warrantless arrest policy and practice exceeds statutory authority and is contrary to law under 5 U.S.C. § 706(2)(A) and (C).

### 2. Defendants’ Policy and Practice is Arbitrary and Capricious.

The policy is also arbitrary and capricious under 5 U.S.C. § 706(2)(A) because Defendants offer no explanation for abandoning the statutorily required probable cause findings. For decades, ICE conducted individualized, prearrest escape risk assessments. *See supra* Factual Background § I. Its Broadcast Statement reinforced these requirements, specifying the relevant factors and clarifying that unlawful presence alone is insufficient. Murphy Decl., Ex. A-1. Yet Defendants have abandoned that practice, routinely effectuating warrantless arrests without developing the facts the agency deemed relevant to escape risk.

An agency must “display awareness that it is changing position” and “show that there are good reasons for the new policy.” *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016). An action is arbitrary and capricious where the agency relied on impermissible factors, failed to consider important aspects of the problem, or offered a contradicted explanation—and courts “must ensure that the agency has . . . articulated a satisfactory explanation for its action.” *Mountain Valley Pipeline*, 990 F.3d at 826; *Defs. of Wildlife*, 931 F.3d at 345.

Defendants have done none of this. They have not acknowledged the departure from prior practice, explained the change, or engaged with the cases applying the statutory standard they now abandon. The only arguable explanation provided by the agency—the Lyons Memorandum, issued *a year* after the policy and practice’s rollout—acknowledges that ICE previously equated “likely to escape” with “flight risk” and declares that interpretation incorrect. Murphy Decl., Ex. A-21 at 5. But “so conclusory a statement cannot substitute for

reasoned explanation." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 241 (D.C. Cir. 2008). The Memorandum redefines "likely to escape" to mean only that a person is "unlikely to be located at the scene of the encounter or another clearly identifiable location once an administrative warrant is obtained," without analyzing the statutory text or regulation, addressing the decisions requiring individualized community-ties assessments, or explaining why the community ties factors ICE itself previously identified as central to the inquiry no longer apply. *See* Murphy Decl., Ex. A-21 at 4. Where the agency "sa[ys] almost nothing" about its reasons and "d[oes] not analyze or explain why the statute should be interpreted" as it does, its changed position "cannot carry the force of law." *Encino Motorcars*, 579 U.S. at 223–24; *see Escobar Molina*, 811 F. Supp. 3d at 50 (holding policy and practice of warrantless arrest without probable cause of flight risk violated the APA for being arbitrary and capricious).

### D. Defendants' Policy and Practice of Making Warrantless Immigration Arrests Without Probable Cause as to Escape Risk Violates the Accardi Doctrine.

Defendants' policy and practice also violates DHS's own regulations. Under the *Accardi* doctrine, "when an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid." *Orellana v. Bondi*, 141 F.4th 560, 566 (4th Cir. 2025) (quoting *Nader v. Blair*, 549 F.3d 953, 962 (4th Cir. 2008)). The doctrine holds agencies accountable to their own policies and "prevent[s] the arbitrariness which is inherently characteristic of an agency's violation of its own procedures." *United States v. Heffner*, 420 F.2d 809, 812 (4th Cir. 1969); *see Bacon*, 2025 WL 3525042, at *10; *Damus v. Nielsen*, 313 F. Supp. 3d 317, 337 (D.D.C. 2018) (citing cases). "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).

8 C.F.R. § 287.8(c)(2)(ii) expressly requires that a "warrant of arrest shall be obtained

except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained." Defendants' policy and practice directly violates 8 C.F.R. § 287.8(c)(2)(ii), and Defendants' systemic failure to follow their own regulation significantly prejudices Plaintiffs and putative class members. The analysis is straightforward: the probable cause regulation remains on the book, and Defendants are not following it. *Escobar Molina*, 811 F. Supp. 3d at 49 ("Defendants' systemic failure to apply the probable cause standard, including the failure to consider escape risk, directly violates . . . DHS's implementing regulations, *see* 8 C.F.R. § 287.8(c)(2)(ii).").

## VI. PLAINTIFFS AND THE PUTATIVE CLASS WILL CONTINUE FACING IRREPARABLE HARM ABSENT IMMEDIATE INJUNCTIVE RELIEF.

For the second *Winter* factor, "the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citation omitted). Irreparable harm "cannot be fully rectified by the final judgment after trial," *id.*, or through money damages, *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)).

Plaintiffs and putative class members face irreparable injury under Defendants' policy and practice. Plaintiffs have been arrested and detained for periods ranging from hours to months. Guzmán Decl., ¶ 14, Ex. C (1.5 hours); A.G.P. Decl. ¶ 17, Ex. D (3 months); J.M.R. Decl. ¶ 18, Ex. F (2 weeks); K.M. Decl., ¶ 21, Ex. E (at least 7 hours).[15] "[D]eprivations of physical liberty . . . are the sort of actual and imminent injuries that constitute irreparable harm." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) (collecting cases). Being handcuffed, detained,

[15] Putative class members have faced such irreparable injury, as well. E.B.P. Decl. ¶ 8, Ex. I (almost 1 month); C.G. Decl. ¶ 8, Ex. H (1 month); J.H.A. Decl. ¶ 2, Ex. V (7 months and counting); Garcia Decl.¶ 2, Ex. S (3 months and counting); S.B.R. Decl. ¶ 3, Ex. T (4 months and counting); E.C.V. Decl. ¶ 2, Ex. W (6 months and counting); L.C.P. Decl. ¶ 15, Ex. U (3 months); C.N.M. Decl. ¶¶ 3, 12, Ex. J (1.5 months); R.Q.H. Decl. ¶¶ 2, 7, Ex. L (4.5 months); J.A.G. Decl. ¶¶ 2, 12, Ex. N (nearly 5 months); E.A.M. Decl. ¶¶ 4, 11, Ex. P (3 months and counting).

transported, and held in custody is quintessential irreparable harm. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment … lies at the heart of the liberty [interest protected by the Due Process Clause]."). Even brief unlawful detention qualifies because time spent in custody cannot be undone or restored. See D.N.N., 822 F. Supp. 3d at 596-97 ("[A] deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury'"); N.S. v. Hughes, 335 F.R.D. 337, 351-52 (D.D.C. 2020), injunction vacated on other grounds sub nom. N.S. v. Dixon, 141 F.4th 279 (D.C. Cir. 2025)..

In addition, the conditions Plaintiffs and putative class members face while being arrested and detained are inhumane and devastating, including agents smashing windows and dragging individuals out of cars, *see e.g.*, Aguirre Decl. ¶ 4, Ex. G; E.C.V. Decl. ¶¶ 5–6, Ex. W; J.M.R. Decl. ¶¶ 7, 9, Ex. F; and agents openly brandishing firearms and pointing them at people, *see, e.g.*, E.B.P. Decl. ¶ 3, Ex. I; J.H.A. Decl. ¶ 3, Ex. V. Individuals are painfully shackled, *see, e.g.*, J.M.R. Decl. ¶¶ 7–10, Ex. F; E.C.V. Decl. ¶ 6, Ex. W; screamed at, abused, and demeaned by federal officials, *see, e.g.*, C.N.M. Decl. ¶ 8, Ex. J; K.M. Decl. ¶ 16, Ex. E; held in overcrowded cells, *see, e.g.*, Aguirre Decl. ¶ 9, Ex. G; J.H.A. Decl. ¶ 6, Ex. V; C.N.M. Decl. ¶ 9, Ex. J; denied adequate medical care, *see, e.g.*, J.M.R. Decl. ¶ 16–17, Ex. F; A.G.P. Decl. ¶ 16, Ex. D; J.A.G. Decl. ¶ 9, Ex. N; C.G. Decl. ¶ 7, Ex. H; and moved constantly between different locations, *see, e.g.*, Garcia Decl. ¶ 8, Ex. S; J.H.A. Decl. ¶ 10, Ex. V. Some continue to face injuries stemming from their unlawful detentions, such as ankle monitors and reporting requirements.[16] *See, e.g.*, A.G.P. Decl. ¶ 20, Ex. D; K.M. Decl. ¶¶ 21–22, Ex. E; R.Q.H. Decl. ¶ 9, Ex. L; Manuel Decl. ¶¶ 7–9, Ex. M. In sum, "because the harm is loss of liberty, it is quintessentially the kind of harm that cannot be

[16] *Ramirez Ovando*, 810 F. Supp. 3d at 1227 (finding plaintiffs' ankle monitors and reporting requirements are continuing injuries sufficient to confer standing). *C.f. Peralta*, 2026 WL 2069917, at *29 (holding plaintiffs did not experience "ongoing unlawful treatment by Defendants" because, for instance, they did not have ankle monitors).

undone or totally remedied through monetary relief." *Jarpa v. Mumford*, 211 F. Supp. 3d 706, 711 (D. Md. 2016).

These liberty harms are compounded by other cascading consequences. Unlawful arrests and detention predictably destabilize employment and family life—harms that cannot be repaired after the fact. *See Ramirez Ovando*, 810 F. Supp. 3d at 1237 (finding irreparable harm where "even after they were released, the harms stemming from their warrantless arrests have reverberated"). Plaintiffs and putative class members report fear, anxiety, sleeplessness, and an inability to feel safe engaging in ordinary daily activities such as commuting to work, attending school functions, or seeking medical care. *See, e.g.*, A.G.P. Decl. ¶¶ 20–24, Ex. D; K.M. Decl. ¶ 34, Ex. E; W.M.S. Decl. ¶ 19, Ex. K; J.M.R. Decl. ¶¶ 19–21, Ex. F; E.B.P. Decl. ¶ 9, Ex. I; J.A.G. Decl. ¶ 13, Ex. N.

Defendants' policy and practice also irreparably harms Plaintiffs and putative class members by separating them from their families, including young children. *See Int'l Refugee Assistance Project v. Trump,* 883 F.3d 233, 270 (4th Cir. 2017 (finding irreparable harm from "[p]rolonged and indefinite separation of parents, children, siblings, and partners"), *as amended* (Feb. 28, 2018), *cert. granted, judgment vacated on other grounds,* 585 U.S. 1028 (2018); *de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) ("Separation irreparably harms plaintiffs *every minute* it persists") (emphasis added); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011); *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (recognizing that immigration detention yields "economic burdens [that are] imposed on detainees and their families [and] … collateral harms to children of detainees"); *Abdi v. Duke*, 280 F. Supp. 3d 373, 404–06 (W.D.N.Y. 2017). Multiple Plaintiffs and We Are CASA's members have been separated from their children following their unlawful arrests, *see, e.g.*, E.C.V. Decl. ¶ 1, Ex. W; R.Q.H. Decl. ¶ 1, Ex. L; A.G.P. Decl. ¶ 2, Ex. D; E.B.P. Decl. ¶ 9, Ex. I; K.M. Decl. ¶¶ 14, 21,

Ex. E, and suffered economic harms such as unemployment, lost homes, and increased debt, *see, e.g.*, A.G.P. Decl. ¶¶ 18–19, Ex. D; K.M. Decl. ¶ 31, Ex. E; A.L.P. Decl. ¶ 20, Ex. O.[17]

We Are CASA and its members also face irreparable harm. In addition to the current and imminent harms to its members,[18] Defendants' policy and practice has forced We Are CASA to "terminate or scale back activities that are central to [its] primary missions." *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 804 F. Supp. 3d 524, 565 (D. Md. 2025). Defendants' unlawful policy and practice has caused We Are CASA to increase expenditure on its hotline for people who have been arrested by ICE, to shift staff from other programs to address arrests and detentions, and to lose grant funding due to being unable to meet deliverables as a result of shifting staff around. We are CASA Decl. ¶¶ 27–28, Ex. Z. It has also impaired We Are CASA's ability to conduct its core functions of assisting members with securing long-term status and connecting community members to social services. *Id.* ¶¶ 29–32. Because Defendants' policy and practice has caused and will continue to cause We Are CASA to "divert[] resources away from its core activities," We Are CASA faces irreparable harm. *Elev8 Baltimore*, 804 F. Supp. 3d at 566.

## VII. THE EQUITIES WEIGH HEAVILY IN PLAINTIFFS' FAVOR AND A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST.

Finally, the balance of equities and public interest favor Plaintiffs—factors that merge when the government opposes the motion. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022). "Plaintiffs must show 'that the balance of equities *tips* in [their] favor' and 'that an injunction is in the public interest.'" *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024)

[17] Several courts have found that arrests stemming from substantially similar policies and practices constitute irreparable harm. *Ramirez Ovando*, 810 F. Supp. 3d at 1237–40; *Escobar Molina*, 811 F. Supp. 3d at 50–52; *M.J.M.A.*, 822 F. Supp. 3d at 1183–84.

[18] Under associational standing, courts examine the irreparable harm to the organization's members. *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 170–71 (citing *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 310 n.9 (4th Cir. 2020)).

(emphasis added) (quoting *Winter*, 555 U.S. at 20). "[U]pholding constitutional rights surely serves the public interest." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 429 (D. Md. 2020) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)).

The injuries to Plaintiffs and putative class members are significant. *See supra* Argument § II. Yet the government has no legitimate interest in flouting its own regulations and statutory obligations. There is "no public interest in the perpetuation of unlawful agency action." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F. Supp. 3d 717, 808 (D. Md. 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). And "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). *See, e.g.*, *M.J.M.A.*, 822 F. Supp. 3d at 1183–84 ("The government 'cannot suffer harm from an injunction that merely ends an unlawful practice.' Further, when the government's alleged action violates federal law, the combined balance of equities and public interest generally weigh in favor of the plaintiffs.") (citations omitted). The equities and public interest therefore strongly favor Plaintiffs.[19]

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' request for preliminary injunctive relief and enjoin or stay Defendants' policy and practice of making warrantless immigration arrests in Maryland without the required probable cause finding concerning escape risk.

[19] The Court should set a nominal bond of zero or one dollar under Federal Rule of Civil Procedure 65(c) as the court "retains the discretion to set the bond amount as it sees fit or [even] waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013), *abrogated on other grounds by Stinnie v. Holcomb*, 37 F.4th 977, 981 (4th Cir. 2022). *See, e.g.*, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 291 (D. Md. 2025) (setting "a nominal bond of zero dollars"); *Maryland v. United States Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025); *D.N.N.*, 822 F. Supp. 3d at 598 (same); *Coreas*, 458 F. Supp. 3d at 362 (same).

Respectfully submitted,

/s/ Jerome A. Murphy
Jerome A. Murphy (D. Md. Bar No. 27678)
Jared A. Levine (*pro hac vice forthcoming*)
CROWELL & MORING LLP
600 Fifth Street, NW
Washington, DC 20001
Tel: (202) 624-2500
Fax: (202) 628-5116
JMurphy@crowell.com
jlevine@crowell.com

Shana H. Khader (*Application for admission pending*)
Alice N. Barrett (D. Md. Bar No. 32180)
CASA, Inc. dba We Are CASA
P.O. Box 7277
Hyattsville, MD 20787
Tel: (240) 406-4348 (S. Khader)
Tel: (240) 378-3445 (A. Barrett)
skhader@wearecasa.org
abarrett@wearecasa.org

Sabrina S. Merold (*Application for admission pending*)
Kit A. Pierson (D. Md. Bar No. 11253)
Alison S. Deich (*Application for Admission pending*)
COHEN MILSTEIN SELLERS & TOLL LLP
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
smerold@cohenmilstein.com
kpierson@cohenmilstein.com
adeich@cohenmilstein.com

Ian Austin Rose (D. Md. Bar No. 22079)
Adina Appelbaum (D. Md. Bar No. 32089)
Samantha Hsieh (D. Md. Bar No. 32092)
Lauren Hodges (D. Md. Bar No. 32272)
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW Ste. 701
Washington, DC 20036

Tel. 202-788-2509
Austin.rose@amicacenter.org
Adina@amicacenter.org
Sam@amicacenter.org
Lauren@amicacenter.org

Deborah A. Jeon (D. Md. Bar No. 06905)
David Rocah (D. Md. Bar No. 27315)
Sonia Kumar (D. Md. Bar No. 07196)
Gina Branch Elleby (D. Md. Bar No. 32059)
AMERICAN CIVIL LIBERTIES UNION OF MARYLAND
3600 Clipper Mill Road, Suite 200
Baltimore, Maryland 21211
Tel.: 410-889-8555
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
elleby@aclu-md.org

Yulie Landan*(*Pro hac vice forthcoming)*
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD ("NATIONAL IMMIGRATION PROJECT")
1763 Columbia Road NW
Suite 175 #896645
Washington, DC 20009
Tel.: (213) 430-5521
yulie@nipnlg.org

*Not admitted in the District of Columbia; working remotely from New York and admitted in California only

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2026 I electronically filed this Memorandum in Support of Motion for Preliminary Injunction and to Stay Agency Action, via the CM/ECF system.

September 9, 2026

/s/Jerome A. Murphy

*Pro bono counsel for Plaintiffs*