# EXHIBIT Z

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SAMUEL GUZMÁN, *et al.*, *individually and on behalf of all others similarly situated*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants*.

No. 1:26-cv-3579-BAH

**DECLARATION OF AMA S. FRIMPONG**

I, Ama S. Frimpong, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Chief of Services of CASA, Inc. ("We Are CASA"). We Are CASA is a national nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia. Founded in 1985, We Are CASA has more than 190,000 lifetime members from across the United States.

2. Maryland, where We Are CASA was founded about 40 years ago, is the state where we have our largest membership base by far, with over 165,000 lifetime members in Maryland. We Are CASA's members are predominantly noncitizens in a variety of immigration statuses.

3. I have been We Are CASA's Chief of Services since March 2026. In my role, I oversee We Are CASA's portfolio of community-facing direct services, including our health, legal, and educational services; employment and workforce development programs; and financial literacy and tax programs. An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address

those needs. I therefore speak frequently with community members and receive feedback from my staff regarding We Are CASA members' fears, concerns, and decisions.

4. I served as We Are CASA's Legal Director from November 2022 until I was promoted to Chief of Services in March 2026. As Legal Director, I oversaw We Are CASA's legal service delivery program, including immigration legal services, as well as other legal advocacy.

5. In both roles, starting in January 2025, an important part of my work has been developing, implementing, and overseeing our ICE Rapid Response program, described further below. Our ICE Rapid Response program is a cross-departmental effort We Are CASA developed to provide emergency community support in the face of the rampant, violent immigration enforcement activity tearing apart our communities in Maryland, the other states where We Are CASA has offices, and across the nation.

6. I make this statement based upon personal knowledge; files and documents of We Are CASA that I have reviewed (such as case files, reports, and collected case metrics); as well as information supplied to me by employees of We Are CASA whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting We Are CASA business.

## I. <u>We Are CASA's Mission and Activities</u>

7. We Are CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendant, Indigenous, and Immigrant communities. From We Are CASA's beginnings in a church basement, we have envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

8. In furtherance of this mission, We Are CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. We Are CASA also offers a more limited suite of services remotely to our members across the United States. Those individuals who are not geographically close to a physical We Are CASA office are offered the opportunity to join a national organizing committee, whose members are entitled to vote on We Are CASA's organizational priorities and are integrated into our member-led system of internal democratic governance. We Are CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of government benefits if they are eligible. In addition, We Are CASA provides our members with free legal assistance, including free legal consultations on immigration issues.

9. In keeping with our mission, We Are CASA's Services Division (which includes Health and Human Services ("HHS") and Education Services, amongst others) focuses on increasing community members' social stability. To do so, our Services staff has historically provided a number of services and programs, including vocational and ESOL skills training, assistance with tax return preparation, and summer internship and service programs with local businesses for community youth. HHS staff assists eligible community members with public and private benefits enrollments, such as, SNAP, Care for Kids, emergency Medicaid, school enrollment, free and reduced-cost lunch enrollment and more; as well as provides case management for a variety of needs, such as Social Security Administration disability and retirement, Medicare, Medicaid, and charitable financial assistance from hospitals. In sum, our HHS staff members provide essential health and social services to community members and families to keep them healthy and stabilized. Core components of these functions include

comprehensive needs assessments; conversations with community members; application completion and submission; visits to schools, clinics, and other essential spaces; and conversations with various essential service providers, as required to secure benefits and protections for community members.

10. In addition, We Are CASA also provides support to members who would like to obtain a Maryland drivers' license. Since 2013, We Are CASA has assisted several thousand members with the process of obtaining driver's licenses in Maryland. In many cases, our support begins by helping members obtain an Individual Taxpayer Identification Number (ITIN) so they can file federal taxes and, subsequently, a Maryland Form 502 income tax return—a requirement for obtaining a noncompliant driver's license. After members have filed Maryland tax returns for two years, we help them navigate the Maryland Comptroller's process to obtain the certification confirming their tax-filing history. We then help them gather the documentation required to establish their identity and Maryland residency. Finally, we assist them in navigating the Maryland Motor Vehicle Administration's website and scheduling an appointment. We Are CASA has many members in Maryland who hold drivers' licenses issued by the Maryland Motor Vehicle Administration that are not compliant with the REAL ID Act, so-called "noncompliant" licenses.

11. Historically in Maryland, We Are CASA has provided legal services relating to housing, employment and affirmative immigration issues. We Are CASA has historically held a large portfolio of affirmative relief cases such as Temporary Protected Status (TPS), Deferred Action for Childhood Arrivals (DACA), U Visas for survivors of crime, and naturalization, with the goal of securing status for individuals that allows them to live and work in the United States without fear of deportation.

12. This work typically begins with a legal consultation with the individual, during which we obtain comprehensive information about the individual's background and history. Thereafter, we determine what immigration relief, if any, the individual might have, and then decide whether we can extend legal assistance (in the form of pro se assistance or representation) to the individual, to help them secure that immigration relief. Core components of this extended legal assistance include client interviews and meetings, preparation of applications and evidentiary filings, legal research and writing, appearances before adjudicative bodies, and other relevant duties as required for ethical and competent legal assistance.

13. There are various ways through which community members have historically been able to seek out We Are CASA's services. First, We Are CASA has historically organized community outreach initiatives, visiting local grocery stores, laundromats, and food banks (among other locations) to publicize We Are CASA's services and initiate contact with potential members. In addition, We Are CASA instituted a general services hotline, operated by a third party call answering service, in which callers can seek services. The third party call answering service bills We Are CASA based on the amount of time that it spends receiving and fielding calls, under one account.

## II. <u>We Are CASA Membership</u>

14. A We Are CASA member is a person who shares We Are CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in working-class Black, Latine, Indigenous, Afro-descendant and Immigrant communities. We Are CASA members play an important role in deciding what campaigns we work on and how We Are CASA serves the community.

15. We Are CASA membership is voluntary. In order to become a member, an individual must apply for membership, pay dues (unless dues are waived), and subscribe to the principles of We Are CASA. We Are CASA members also must self-identify as working-class Black, Latine, Indigenous, Afro-descendant, or Immigrant.

16. Currently, the annual fee for We Are CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived for individuals who experience financial hardship or are otherwise unable to pay. Members are also offered the opportunity, for an additional $5, to obtain a We Are CASA ID. This is a physical, picture identification card that contains basic information about the member. For many of our immigrant members, this card may be the only type of picture identification they have, other than documents from their country of origin. In certain jurisdictions, We Are CASA IDs are recognized for the purposes of engaging with certain government agencies, including the police.

## III. Harm to We Are CASA From ICE's Unlawful Arrests

17. The skyrocketing of ICE arrests in Maryland–many of them violent and many resulting in the detention of a family's sole or primary income earner–has caused a significant disruption to our functions and activities, pulling us away from our core focus of providing services that stabilize and protect our members to instead providing rapid, emergency response to unlawful ICE detentions affecting our members and the broader community in Maryland. These emergency response efforts were not historically part of We Are CASA's core mission, and the time and funding needed to assist with these efforts has diverted resources away from We Are CASA's mission.

**A. Need for Emergency Response Hotline**

18. Beginning in January 2025, based on observed need in the community, We Are CASA began operating an additional call line through our answering service, our ICE Rapid Response hotline, through which community members can report ICE enforcement actions that they have witnessed or experienced, and seek help if a loved one has been detained. The purpose of the hotline is not to interrupt or obstruct active ICE enforcement actions, but rather, to provide emergency support to individuals and families who have been impacted by those ICE enforcement actions. Accordingly, calls to our hotline are typically to report an ICE arrest that has recently occurred. After a report is submitted to We Are CASA, We Are CASA investigates the report and provides legal and humanitarian support to those who have been impacted.

19. We Are CASA's practice is to log every incident of ICE enforcement action that is reported to us, whether through our ICE Rapid Response hotline, or through other avenues. Among other data points, we collect and log the date, time, and location of the enforcement action as indicated by the reporter. Prior to January 2025, We Are CASA's legal team received approximately five reports of Maryland ICE enforcement action incidents per year. That number began to increase significantly starting in January 2025, during which month we received reports of 11 ICE detentions. We received about twice as many in February 2025, and by the summer of 2025 we were receiving multiple reports daily. High numbers have held: We Are CASA responded to over 130 ICE detention reports in July 2026. The vast majority of these reports were based on ICE activity in Maryland.

20. The increased ICE detentions and enforcement activity have significantly and negatively impacted We Are CASA's ability to carry out our core mission and provide needed support services, including HHS and long-term legal support. Prior to the increased ICE activities,

We Are CASA spent significant time on in-person community outreach, visiting high-trafficked community spaces such as laundromats, grocery stores, food banks and other areas, in order to inform potential members of the support services available. Beginning in 2025, because of increased ICE presence in the communities served, We Are CASA was forced to change our entire outreach model because community members had stopped visiting these community spaces or if they were there, community members were not willing to speak to We Are CASA employees out of fear.

**B. Impact to Health & Human Services and Education Services Outreach**

21. Prior to the surge in ICE activity in Maryland, We Are CASA would regularly connect community members to vital social services through free consultations that help members navigate complex public benefits programs. However, We Are CASA's ability to connect eligible community members to social services depends on members' willingness to share personal information with staff. With the increased ICE enforcement in Maryland, community members have told We Are CASA employees that they are reluctant to share personal information, fearful that their immigrant status will be weaponized against them. We Are CASA has noticed a marked decrease in participation in public benefits programs by immigrant community members, despite eligibility. Further, cases that We Are CASA manages and services that we deliver now take longer to carry out because of the additional time that We Are CASA must invest in building trust and providing education to each community member in this environment.

22. ICE's unlawful arrest practices have contributed to the additional investment needed to build trust and complete needs assessments and public benefits applications for our members. For example, HHS staff members have had to adopt new protocols to build trust, such as always displaying their We Are CASA Staff ID badge while in the field, and also sharing

pictures of their Staff ID via text when conducting intakes over the phone. It is now common for Community Resource Navigators and Community Health Workers on our HHS team to report that an activity or application that once took a single engagement to complete now requires two to three follow-ups with the individual, so that trust is assured and the community member feels safe providing confidential information.

23. We Are CASA has also been forced to switch to remote outreach, typically by phone, which has resulted in a significant reduction in the number of people We Are CASA has been able to assist.

24. Registrations for adult ESOL classes, which leads to increased opportunities for job placement and higher, more stable income, have plummeted.

25. Prior to increased ICE enforcement activities, We Are CASA's Education Services program provided summer learning programs and enrichment for school-age children. These activities involved children visiting local businesses and community locations to learn and also engage in service projects, such as neighborhood cleanups and creation of murals. As a result of the increased ICE presence and families' reluctance to congregate in community spaces, we have seen decreased participation in these programs. In addition, We Are CASA was forced to revamp our programs and keep them mainly confined to We Are CASA office locations. The result has been a much more limited offering of summer enrichment activities. For example, historically, We Are CASA places youth with community organizations for summer internships, supporting outreach and gaining hands-on professional experience. Safety concerns arising from ICE activity have significantly limited our ability to place youth in these settings. Similarly, We Are CASA connects youth with volunteer and service opportunities during the summer. Youth previously volunteered at food distribution sites, neighborhood cleanups, community events, and other

services projects. As a result of safety concerns arising from ICE activity, many of these activities can no longer be conducted safely, limiting these opportunities.

**C. Significant Diversion of Financial & Human Resources**

26. Individuals and families in Maryland that are impacted by ICE detention are understandably immediately focused on receiving only assistance that can potentially lead to their own or a loved one's release or can otherwise reduce the harmful impacts of the detention. As a result, We Are CASA has been forced to divert resources away from our core mission activities focused on longer term stability in favor of our community members' immediate, detention-related needs through rapid, emergency response in an attempt to clear the path for them to receive other services for which they might be eligible.

27. The staff shift to emergency ICE detention response has impaired We Are CASA's ability to carry out our core functions because we must divert significant financial resources and employee time to detention response and follow up. The HHS team, for example, now expends approximately 25 percent of its workload—equivalent to over one-and-a-half full-time employees—on detention response and follow-up. Rather than focusing on their core missions and activities, these staff members must now triage calls and field requests for emergency detention-related assistance. Because this type of intake/triage is more specialized, We Are CASA has also had to take significant time to retrain these employees.

28. We Are CASA has also had to divert additional resources to a so-called "ICE Watch" in an effort to make our members feel safe enough to attend benefits appointments, legal appointments and other meetings at certain We Are CASA offices. Given the heavy ICE presence in and around the areas we serve, We Are CASA must station our employees in visible outdoor locations prior to meetings and appointments. In addition, We Are CASA is now regularly asked

to provide an employee presence at local elementary school pick up and drop off locations so that parents feel safe enough to drop their children off at school.

29. Similarly, instead of our immigration legal team being able to focus on securing long-term status for individuals, the team has now had to divert its resources to providing rapid legal response and referrals to the families of detained individuals. We Are CASA legal clinics, at which community members could receive consultations and assistance with immigration applications, have now been replaced by rapid legal response phone calls every day to provide family members with post-arrest information and guidance. Applications for long-term relief, including naturalization and U-Visa applications, have been replaced with assistance locating detained loved ones, referrals to private attorneys, and advocating for individuals experiencing urgent medical needs in detention, such as J.G.C., described below, who was being denied medication for his brain tumor and diabetes while held for days in a purportedly temporary holding cell in Baltimore, Maryland. In effect, ICE's enforcement activities in Maryland have impaired our legal team's ability to engage in stabilizing our community members through substantive, extended legal assistance, turning us largely into a brief legal advice and referral operation related to ICE detention, instead of a legal representation operation.

30. The threats and effects of rampant warrantless immigration arrests in Maryland are so deeply and urgently felt throughout our membership base and community that we have trained all staff on the basics of rapid ICE response to meet our community's needs. In summer 2026, in recognition of the urgent and ongoing community need, we redesigned various administrative aspects of our Rapid Response program, and we are continuously shifting our protocols to meet community needs.

31. We Are CASA also faces increased costs due to ICE's unlawful arrests, especially in funding our call answering service. Since January 2025, our costs for this call answering service have increased. For example, our bills for the period from May 27, 2025 through August 26, 2025 were approximately 24% higher than our bills for the same period in 2024. Our bills for the period from May 27, 2026 through August 26, 2026 were approximately 11% higher than for the same period in 2024.

32. Our average bill during 2025 was approximately 15% higher than during 2024. Our average bill during 2026 to date is approximately 5% higher than during 2024.

**D. Impact to We Are CASA Organizing Activities**

33. Prior to January 2025, We Are CASA's Community Organizing Department in Maryland consisted of 13 community organizers dedicated to building collective power and advancing the interests and priorities of immigrant and working-class communities. We Are CASA maintained an active organizing presence in six jurisdictions: Baltimore County, Baltimore City, Howard County, Anne Arundel County, Prince George's County, and Montgomery County.

34. We Are CASA's organizing model was grounded in member participation, democratic decision-making, and the development of leadership within immigrant and working-class communities. Each June, We Are CASA members participated in Annual General Member Assemblies, where members reviewed prior-year priorities, evaluated ongoing campaigns, identified emerging community needs, and established strategic priorities for the year ahead. These assemblies served as forums for reflection, accountability, and collective decision-making. Members also nominated and elected leaders to We Are CASA's Leadership Council and CASA in Action Board. Through these elected bodies, members played a direct role in determining the

organization's priorities and guiding our work throughout Maryland and across We Are CASA's broader four-state footprint.

35. Before January 2025, the principal priorities identified by nearly 500 member leaders in Maryland centered on workers' rights, housing, and healthcare. These priorities reflected the immediate and practical concerns facing We Are CASA members and their families and were focused primarily on improving economic security, housing stability, access to healthcare, and workplace conditions.

36. On housing, We Are CASA and our members achieved significant legislative and organizing victories during 2023 and 2024. Several jurisdictions where We Are CASA members lived and organized enacted measures to strengthen tenant protections, including permanent rent stabilization intended to protect thousands of renters from significant, potentially unaffordable rent increases. We Are CASA also supported efforts to strengthen tenant protections and mechanisms for holding negligent or abusive landlords accountable through local housing authorities and the courts. In addition, We Are CASA members organized nearly a dozen tenant associations, which pursued collective action to address housing conditions and contributed to legal victories benefiting hundreds of tenants.

37. We Are CASA's healthcare advocacy likewise produced significant results. Working at the state level, We Are CASA members and allies successfully advocated for the passage of the Access to Care Act, expanding access to health insurance for nearly 300,000 Maryland residents, predominantly from immigrant and working-class communities. This effort reflected We Are CASA's broader commitment to ensuring that members and their families could obtain essential healthcare regardless of immigration status or economic circumstances.

38. Workers' rights constituted another central organizing priority. In partnership with We Are CASA's workforce and employment department, the Organizing Department supported workers confronting workplace abuses, including retaliation, nonpayment of wages, and other violations of workers' rights. These efforts focused on helping workers understand and assert their rights, develop collective power, and pursue remedies when employers violated applicable labor protections.

39. We Are CASA also continued to support national efforts to secure a pathway to citizenship for our members through comprehensive immigration reform. However, prior to January 2025, We Are CASA's organizing priorities in Maryland were not limited to federal immigration policy. At the state and local levels, the organization's work was principally directed toward addressing the immediate needs of immigrant and working-class communities and improving the conditions in which members lived and worked. The overarching objective was to help members and their families achieve greater economic security, stability, access to essential services, and predictability in their daily lives.

40. Beginning in January 2025, We Are CASA's Community Organizing Department in Maryland experienced a profound shift in our priorities, day-to-day operations, and ability to carry out our mission. The department's work moved from a broad organizing agenda focused on advancing housing, healthcare, workers' rights, and other community priorities to an urgent and sustained focus on community defense in response to the unprecedented escalation of immigration enforcement. Organizers were increasingly called upon to respond to the immediate consequences of immigration detention and enforcement actions affecting thousands of community members and their families. Rather than being able to devote the majority of their time and resources to proactive campaigns designed to achieve long-term policy and systemic change, organizers were required to

redirect substantial portions of their capacity toward responding to detention, supporting affected families, connecting members with legal and emergency resources, coordinating rapid-response efforts, and addressing the cascading economic, emotional, and practical consequences of immigration enforcement. This represented not simply a change in emphasis, but a fundamental transformation in the nature of the department's work, as community defense became an immediate and necessary priority for protecting members, families, and communities from the consequences of immigration enforcement.

41. The impact of this transformation has extended beyond the communities We Are CASA serves and has taken a significant mental and physical toll on the organizers themselves. Many of We Are CASA's organizers are veteran community leaders who have spent years building relationships and trust within the communities they serve. Since January 2025, these organizers have been repeatedly confronted with traumatic circumstances involving the detention, separation, and displacement of community members and their families. In some instances, organizers have personally known or had close relationships with individuals and families directly affected by immigration enforcement, including experiences involving the disappearance or detention of loved ones and, in some cases, deaths allegedly connected to enforcement actions. As a result, organizers have been asked not only to provide support to traumatized community members but, at the same time, to process their own grief, fear, and trauma while continuing to report to work and respond to new crises. The cumulative effect has been profound: the department's personnel have been operating under sustained emotional and physical strain, often confronting traumatic events on a daily basis while carrying the responsibility of supporting large numbers of community members experiencing fear, uncertainty, family separation, and loss.

### E. Potential Loss of Third-Party Funding

42. We Are CASA's funding to provide services to our community is jeopardized as a consequence of shifting resources to respond to ICE's unlawful arrests. We Are CASA's shift of human resources to detention response and our community members' fear of providing identifying information threatens our ability to comply with grant deliverables specified in existing grant contracts. Many grants require We Are CASA to provide reports on fund distribution, but many of these reports can no longer be completed because our members will not allow us to collect or report back the necessary information. In addition, our managerial staff who typically draft grant applications and reports have had to shift their work to managing the rising emergency intake needs.

43. For example, in September 2025, we were notified that one such county grant was reduced by 50% in part due to delayed progress on grant deliverables. Through this grant, our HHS team had been tasked with significant work, including conducting needs assessments, that directly contributes to the county's dedication to growing clean energy in low-income, working class neighborhoods. This work is directly tied to our goals of stabilizing and improving the quality of life of our community members. Because of the need to divert HHS team's attention to respond to ICE's expanded, unlawful actions against our community, we risk continuing to lose such critical funding that supports our mission.

## IV. Harm to We Are CASA's Members From ICE's Unlawful Arrests

44. Because of the services that we provide our members, we are acutely aware of the harms that ICE's unlawful arrests have caused and will continue to cause many of We Are CASA's members. Specifically, as demonstrated by the individual circumstances described below, ICE's unlawful seizures irreparably harm the communities and members that We Are CASA serves by

separating and traumatizing families, jeopardizing livelihoods, and cutting off access to essential healthcare and services. Further, ICE's unlawful seizures have instilled so much fear in We Are CASA's members, regardless of their immigration status, that many are deprived of the basic dignity of participating in public life in Maryland, including taking kids to school, or going to work and church.

45. Many We Are CASA members have altered their daily and weekly routines because they live under threat of warrantless arrest, and have reported changing where they shop—including avoiding large grocery stores and other locations where immigration-enforcement activity has been reported or suspected—delaying or postponing urgent medical visits, avoiding major roadways, and otherwise restricting ordinary activities that they would previously undertake without fear. Thus, activities that were previously routine—such as commuting to work, taking children to school, purchasing groceries, or seeking medical care—have become decisions that members must weigh against the possibility of detention or family separation. As a result, for many We Are CASA members, the threat of being subjected to an illegal ICE arrest has jeopardized their ability to maintain stable employment and provide for their families. Moreover, when We Are CASA members have been detained, we have seen the devastating impacts on their families. For example, children may suddenly confront the loss of a primary caregiver and breadwinner, uncertainty regarding rent and food, changes in transportation and childcare, and the possibility of displacement from their homes.

46. Based on We Are CASA's records, I am aware of several members who have been harmed by ICE's unlawful seizures. These include:

47. J.A.G. is a We Are CASA member who entered the United States in 2001. He is 56 years old and lives in Hyattsville, MD. He is currently undergoing treatment for a brain tumor. On

January 19, 2026, J.A.G. was driving to his wife's workplace with his brother and granddaughter in the car when three unmarked cars suddenly turned their lights on behind them. J.A.G. pulled over to the side of the road and the three cars surrounded his vehicle. Agents walked over to J.A.G.'s car and knocked on his window. He told them he would get out of the car. After he got out of the car, an agent asked for his driver's license and if the car was his. He replied that it was and handed them his ID. The officer immediately handcuffed him. At no time prior to J.A.G.'s arrest did the agents provide a warrant or explain why he had been stopped or was being arrested. The agents also did not ask J.A.G. any questions about his family members, where he lived or how long he had lived there, his work history, or anything else about his ties to the community. J.A.G.'s brother was also arrested, and the two were driven to the Baltimore ICE office. J.A.G. was held there for 12 days and he was unable to access his medications for most of that time. After 12 days in Baltimore, J.A.G. was transferred to New Jersey and then to Houston, Texas. In New Jersey, he was shackled at the waist, hands, and feet in a van during a severe winter storm. In Houston, he once again was unable to access his medications and conditions were so unsanitary that he acquired multiple severe infections and had to be taken to a hospital for emergency surgery. J.A.G. was finally released from detention on a habeas petition after spending five months in detention in Texas, where he described detained people were treated "like animals." He continues to be affected by the health complications he experienced while detained, and struggles to leave his house for fear of being stopped while going about daily errands.

48. E.B.P. is a We Are CASA member who has lived in the U.S. since 2012 and in Annapolis, MD since 2020. He works as a supervisor for a concrete manufacturer. On Sunday, June 7, 2026, he was driving to church, where he volunteers as an usher every week, when he stopped to pick up a friend who would be attending E.B.P.'s church for the first time. He was

driving his own car, and had just parked in his friend's driveway when two unmarked cars turned on flashing lights behind him and pulled into the driveway, blocking him in. A third unmarked car quickly followed. Agents wearing masks and vests that said "ICE" got out of their cars and rushed over to E.B.P.'s car with their guns drawn, yelling "don't move!" in English, and that if someone moved, they would shoot. Agents opened the car's doors and pulled them out of the car without talking to them or explaining why they had stopped them. The agent who had pulled E.B.P. out of his seat took E.B.P.'s wallet out of his pants pocket and went through its contents. E.B.P. asked the agents in Spanish what they wanted, and whether they had a warrant. He told them he had a valid driver's license and was complying with the law. The agents responded in English that it didn't matter, and to "shut up." They handcuffed E.B.P. and took him to one of their cars without asking any questions about where E.B.P. lives or his connections to the community and without showing or otherwise indicating that they had a warrant. E.B.P. was placed in the back of a car with two other individuals who had been arrested prior. The whole encounter took only about two minutes. He was brought to a parking lot where agents put chains on his ankles and around his waist, and in the parking lot he recognized other members of his community who had also been arrested and chained. He was finally brought to the ICE office in Baltimore, where he was held for a day and a half before being transferred to Pennsylvania. E.B.P.'s lawyer filed a habeas petition for him, which was granted, and he was given a bond hearing. On June 24, 2024, he had a bond hearing, and was finally released on July 2, 2026. Since returning home to his family, E.B.P. feels frequently anxious, and his kids worry about him.

49. R.Q.H. is a We Are CASA member who entered the United States in 2013. He is 39 years old and lives in Hyattsville, MD with his wife and their five children. On December 30, 2025, he was a passenger in his brother-in-law's van as they drove to a construction site in

Frederick, MD when they were suddenly blocked in by three cars as they turned into a parking lot. His brother-in-law stopped the van and officials asked for their IDs. R.Q.H. and the other passenger provided their IDs, and the officers asked if they had documents. The officials handcuffed them without asking any further questions. At no time prior to R.Q.H.'s arrest did the agents provide a warrant or explain why he was being stopped and arrested. The agents also did not ask R.Q.H. any questions about his family members, where he lived or how long he had lived there, his work history, or anything else about his ties to the community. They were then driven around as the officers looked for other individuals to arrest, and after arresting one other person near a 7-Eleven store, R.Q.H., his brother-in-law, and the third arrestee were taken to the ICE office in Baltimore. R.Q.H. was held at the Baltimore ICE office for about five days, kept in a room with 30 or 40 other people, before being transferred to the Rio Grande Processing Center in Laredo, TX before he was finally released on habeas on May 13, 2026. His arrest meant that his wife was unable to afford the rent by herself and had to move their children out of their home and in with other family members. His children have suffered from anxiety and separation anxiety, necessitating therapy. R.Q.H. has been afraid to leave his house to go about daily activities since his release, and has been unable to work, meaning that the financial strain on the family has continued.

50. "Manuel" is a We Are CASA member who entered the United States in 2023 and lives in Baltimore County, Maryland. He is 42 years old and works in construction to support his family. In early March 2026, he was performing construction work on a home in the Eastern Shore region of Maryland, when multiple black unmarked cars pulled onto the street where he and his coworkers were working, and ten to 15 ICE agents got out. One of the officials, a woman, spoke Spanish, and explained to Manuel and the five others with whom he was working that they were looking for a specific person who worked for the company and had a removal order. She told them

that if it wasn't them, they didn't need to worry, and they would let them go. The agents were spread out around the property and Manuel and his coworkers felt trapped on the property. They felt they had no choice but to cooperate. The agents asked for their IDs, which Manuel handed over, and he was immediately placed in handcuffs. The same happened for each of Manuel's coworkers. At no time prior to Manuel's arrest did the agents provide a warrant or explain why he was being stopped and arrested. The agents also did not ask Manuel any questions about his family members, where he lived or how long he had lived there, his work history, or anything else about his ties to the community. Manuel was driven to an ICE office where he was questioned, told he had to pay a fine for being in the United States unlawfully, and fitted with an ankle monitor before he was released. Manuel is afraid of how he will be treated in public wearing an ankle monitor, and always wears jeans to cover it, even when it is hot out. The ankle monitor has also affected his ability to obtain work, as many seem to be afraid that it means that ICE will come to his workplace. This has affected his wife and three children, who live in their country of birth, but who depend on him for income. He also lives with uncertainty and fear because of other arrests in his region he is aware of.

51. A.G.P. is a We Are CASA member who has lived in Hyattsville, MD since he arrived in the United States in 2008. He has maintained a job at a restaurant in Silver Spring since 2008 and uses his income to support his family. He was driving his car near his work on February 15, 2026 when an unmarked vehicle turned on flashing lights behind him. He immediately pulled over to the side of the street and the car with lights, as well as two other vehicles (all of which looked like regular vehicles) stopped behind him. Officers walked over to his vehicle, told him they were with ICE, and told him to get out of his car, then handcuffed him. After doing so, the officers reached into his pocket to retrieve his wallet and driver's license, which they collected in

a bag with his cell phone. At no time prior to A.G.P.'s arrest did the agents provide a warrant or explain why he was being stopped and arrested. The agents also did not ask A.G.P. any questions about his family members, where he lived or how long he had lived there, his work history, or anything else about his ties to the community. The officials took A.G.P. to a nearby parking lot where he was restrained with several other people who had been arrested by ICE. Following his arrest, A.G.P. was transported to the ICE office in Baltimore with all the other arrested individuals where he was then held for six days. While held there, A.G.P.'s boss brought A.G.P.'s medication to the office, but A.G.P. was unable to access the insulin for his diabetes at all and was not able to take his high blood pressure medication daily. During his time in the Baltimore ICE office, there were about 90 to 95 people in the same room, and he had to sleep sitting up because there was not enough room to lie down. After about six days in Baltimore, A.G.P. was handcuffed and driven to New Jersey by van where he remained for about one night before being handcuffed again and brought to an airplane. He was flown to Arizona and spent about one night in a facility there. The next morning, he was put on another plane to Los Angeles. He spent one night in a facility there before being transferred to the Mesa Verde Detention Center in another part of California. By the time of his arrival there, A.G.P.'s blood sugar level was around 600mg/dL, which is extremely dangerous. A normal, controlled level for him is 100-150mg/dL. A.G.P. was finally released from Mesa Verde on a habeas petition about three months after he was arrested. A.G.P.'s arrest created serious hardship for his family. Before his arrest, A.G.P. helped to support his daughter and her children, and after his arrest she was not able to cover all of the bills on her own and was forced to move. Since his release, A.G.P. has also been forced to wear an ankle monitor, which with his diabetic neuropathy has caused increased pain in his legs and feet, and has caused him to trip and hurt himself while at work. A.G.P. now feels frequently like he's being followed and worries

intensely about being re-detained, or his family members experiencing arrest and detention as he did.

52. E.C.V. is a We Are CASA member who has lived in Baltimore, MD, with his wife and their four children since 2019. Three of his children are U.S. citizens and one has a pending asylum application. On February 24, 2026, E.C.V. was driving a friend's car in Baltimore City to pick up trash to bring to a dump when an unmarked gray Nissan began following him and, after a few minutes, turned on flashing lights to signal for him to pull over. E.C.V. immediately did so and turned off the car's engine and put his hands up with his keys visible. Agents approached the car and asked if his name was Cesar, which was the name of his friend who owned the car. E.C.V. replied that it wasn't. He asked if he could make a phone call, saying "please, I'm not trying to run away, I just want to call my family," but the agents refused. As he sat with his hands up, the agents broke the car window, pulled him out of the car, and handcuffed him aggressively. At this point, the officers knew nothing about E.C.V., not even his name. At no time prior to E.C.V.'s arrest did the agents provide a warrant or explain why he was being stopped and arrested. The agents also did not ask E.C.V. any questions about his family members, where he lived or how long he had lived there, his work history, or anything else about his ties to the community. E.C.V. was brought to the Baltimore ICE office after his arrest where he was held for four days in a cell in inhumane conditions with about 60 other people. E.C.V. was then transported to a detention facility in Jena, Louisiana, where he remained for months.

53. J.M.R. is a We Are CASA member who lives with his partner in Silver Spring, Maryland. He is a 40-year-old Latino man who has lived in Maryland since 2014. When he first entered the United States in 2014, he was detained for almost two months, then released after a judge granted him bond. He applied for asylum and attended all of his court hearings after being

released, and in 2022 an immigration judge dismissed the deportation proceedings pending against him. On July 7, 2026, J.M.R. was driving his boss's truck to a work site, as he works in construction. The truck was registered in his boss's name, and he drove within the speed limit. Around 10:00 a.m., while driving through Silver Spring, J.M.R. noticed that an unmarked car had begun following him. Suddenly, another unmarked car pulled in front of his truck, the car he'd seen behind him turned on flashing lights, the car in front followed suit, and a third unmarked car approaching from behind did the same. J.M.R. pulled over to the side of the road and pulled out his phone and tried to call his boss so that someone would know what was happening to him. Several agents exited the cars. One approached the driver's side door of the truck and pulled J.M.R. out by his arms. Agents forced his hands behind his back and threw him to the ground; one agent put his leg on J.M.R.'s head. They began handcuffing him and with one wrist handcuffed, the agent removed his leg from J.M.R.'s head. J.M.R. was in pain and did not understand why he'd been thrown to the ground. Without the leg on his head, J.M.R. tried to stand up, but as he tried to do so he felt an electric shock in his chest and stomach, realizing that he'd been shot with a Taser. The weapon broke through his shirt and drew blood. Agents grabbed J.M.R.'s legs and threw him back on the ground, cuffing his other wrist. He was in terrible pain. One of the officials began speaking to J.M.R. for the first time. He asked for J.M.R.'s ID, and then said something like, "why did you resist arrest?" J.M.R. explained that he had not been trying to resist but that the agents had hurt him, and told the agent that his license was in his wallet in his pants. The agent took his wallet out of his pants pocket and looked at it. At no time prior to J.M.R.'s arrest did the agents provide a warrant or explain why he was being stopped and arrested. The agents also did not ask J.M.R. any questions about his family members, where he lived or how long he had lived there, his work history, or anything else about his ties to the community. J.M.R. was put into the backseat of one

of the agent's cars. J.M.R. told them he was in a lot of pain and that the handcuffs were too tight. He was driven to a field and taken out of the car. J.M.R. was in so much pain that he vomited immediately once outside the car. The agents loosened his handcuffs slightly and gave him water, then drove to a Silver Spring fire station. J.M.R. vomited a second time from the pain when they parked the car. Paramedics examined him at the fire station, examining the wounds left by the Taser. There was blood on his stomach and chest, and while the barb which had hit his stomach had fallen out, the barb that hit his chest was still there, and the paramedics could not remove it, so they took him to Holy Cross Hospital, chained to a stretcher. After treatment, he was ultimately transported to the ICE office in Virginia, where he was fingerprinted and questioned. He asked for help cleaning his wounds while he was there, but staff at the facility told him he would be moved soon and could ask then. He was moved to the Farmville Detention Center around July 9, where he saw a medical provider who told him that he'd be given a paste to clean his wounds. He never received the supplies mentioned, and continued to experience a lot of pain. His chest wound looked inflamed, and he worried about infection. On July 20, 2026, a federal judge found his detention to be unlawful and he was returned home to his partner and family. He and his partner are now both very afraid to leave their home, and J.M.R. feels constantly nervous when he leaves his house, fearing that he is being followed any time he sees a car with dark windows. He sees videos of similar arrests near his home online and fears he will be arrested again.

54. W.M.S. is a We Are CASA member who is a 21-year-old Latino man and works in landscaping. On July 7, 2026, his co-worker picked him up to go to work and just after arriving in Preston, Maryland, an unmarked car suddenly cut in front of their truck, forcing them to stop, and two more unmarked cars stopped alongside and behind their truck. Masked agents shouted at them in English not to move, and one ran up to W.M.S.'s door to hold it shut. An agent told W.M.S.'s

coworker to get out, which he did, and was immediately handcuffed. The agent at W.M.S.'s side of the truck pulled his door open and then pulled W.M.S. out of the vehicle by his arm and pushed him up against the side of the truck before searching him and handcuffing him. The agent then asked him where he was from and if he had an ID, but W.M.S. was scared and in shock, and unable to respond. They did not show W.M.S. a warrant or say they had one before arresting him, nor did they ask him any questions about whether he has family in the U.S. or community ties before handcuffing him. They put him in the back of their truck. The handcuffs were very tight, and W.M.S. told them the handcuffs hurt and he could not move, but the agents ignored him. W.M.S. was brought to the Salisbury ICE office to be processed. He was detained until his lawyer filed a habeas petition and secured his release. He was released from detention around July 30, 2026.

55. C.G. is a We Are CASA member who has lived in the United States since 2005. He is a 48-year-old Latino man and works at a fish market as a fishmonger's assistant. He has lived in Brooklyn Park, Maryland since 2019. On April 4, 2026, he was driving home from work when he was suddenly boxed in by three or four normal-looking vehicles. The vehicles did not have lights on, and C.G. was afraid he was going to be hurt or robbed. An agent came up to his window and C.G. lowered it slightly. The agent asked for his ID and C.G. handed him his driver's license. After looking at the license, the agent told him that he was "not allowed in the country" and ordered him out of the vehicle. C.G. complied and the agent pushed him against the side of his car, handcuffed him, and put him in one of their cars. The agents did not tell C.G. why they had stopped him, and did not ask any questions about where he lives, if he has family in the U.S., or anything else about his ties to the community in Maryland. The agents drove C.G. around for about 40 minutes while looking for more people to arrest, targeting Latino people. Agents took C.G. to the Baltimore ICE office, where he told the staff that he had Type 1 diabetes and other conditions that

he was taking medication for, but was not able to access his medication for a few days. He was held in a cell with 30 or 40 other men in a room so cold it's called the "icebox," with barely enough room to sit. He was transferred from Baltimore to Caroline Detention Center in Virginia. While in detention, lack of access to his regular medications meant his medical conditions worsened. He was held in Virginia until his lawyer filed a habeas petition for him and C.G. was granted a bond hearing, where he was then granted bond. He was finally released on May 7, 2026 and returned home to his family. He now struggles with anxiety, worries that he is being watched and becomes afraid when he sees cars like those that stopped him. He wakes up earlier in the morning to make sure ICE agents are not waiting for him outside, and does not leave his home once he has returned from work unless he has to. C.G. sees similar arrests in his area happen online, and he feels afraid that he will be arrested again, or that his wife will be stopped while their granddaughters, who are U.S. citizens, are with her.

56. We Are CASA members and their families, like those detailed above, continue to live with intense fear of family separation, prolonged detention, abuse, loss of livelihood, and other profound traumas as a result of ICE's pattern and practice of conducting warrantless arrests in Maryland. This fear is further intensified by continued efforts to strip We Are CASA members of protections, such as the recent termination of TPS for many countries, including the likely imminent termination of TPS for individuals from El Salvador. We Are CASA members of all immigration statuses fear that they too will be targeted and illegally arrested by ICE, losing their freedom, their families, and all that they have built in this country.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: September 9, 2026

Respectfully submitted,

Ama S. Frimpong

Ama S. Frimpong