**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SAMUEL GUZMÁN, *et al.*, *individually and on behalf of all others similarly situated*<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.,*<br><br>*Defendants*. | No. 1:26-cv-3579 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 3

A. Defendants Are Employing Warrantless Arrests to Meet Nationwide Arrest Quotas. ..... 3

B. Defendants Have a Policy and Practice of Making Warrantless Immigration Arrests in Maryland Without a Pre-Arrest, Individualized Assessment of Escape Risk. ..... 6

LEGAL STANDARD ..... 11

ARGUMENT ..... 12

A. The Proposed Class Satisfies the Requirements of Rule 23(a). ..... 12

1. The Proposed Class Satisfies the Numerosity Requirement. ..... 12

2. The Proposed Class Satisfies the Commonality Requirement. ..... 16

3. The Proposed Class Satisfies the Typicality Requirement. ..... 18

4. Class Representatives and Class Counsel Will Adequately Represent the Class. ..... 20

B. The Proposed Class Satisfies the Requirements of Rule 23(b)(2). ..... 22

C. The Court Should Appoint Counsel for Plaintiffs as Class Counsel. ..... 24

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*,
28 F.4th 513 (4th Cir. 2022) ....22

*Amaya v. DGS Constr., LLC*,
326 F.R.D. 439 (D. Md. 2018)....19

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....20

*Arizona v. United States*,
567 U.S. 387 (2012)....3

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015) ....23

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ....17, 19

*Calderon v. GEICO Gen. Ins. Co.*,
279 F.R.D. 337 (D. Md. 2012)....13

*CASA, Inc. v. Trump*,
793 F. Supp. 3d 703 (D. Md. 2025)....11, 19–21

*Coreas v. Bounds*,
2020 WL 5593338 (D. Md. Sep. 18, 2020) ....13

*Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*,
375 F.2d 648 (4th Cir. 1967) ....12

*D.N.N. v. Liggins*,
822 F. Supp. 3d 543 (D. Md. 2026).... *passim*

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) ....18, 19

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ....16

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
811 F. Supp. 3d 1 (D.D.C. 2025).... *passim*

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982)....18

*J.O.P. v. U.S. Dep't of Homeland Sec.*,
338 F.R.D. 33 (D. Md. 2020)....................23

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024)....................11

*Kidd v. Mayorkas*,
343 F.R.D. 428 (C.D. Cal. 2023)....................19

*Lopez v. Noem*,
2025 WL 3496195 (D. Md. Dec. 5, 2025)....................4

*M.J.M.A. v. Hermosillo*,
822 F. Supp. 3d 1147 (D. Or. 2026).................... *passim*

*Maryland v. Mullin*,
831 F. Supp. 3d 325 (D. Md. 2026)....................16

*Maryland v. Mullin*,
No. 1:26-cv-00733 (D. Md. Mar. 19, 2026)....................16

*Ramirez Ovando v. Noem*,
810 F. Supp. 3d 1209 (D. Colo. 2025)....................2, 17, 20, 23

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).................... *passim*

*Ward v. Dixie Nat'l Life Ins. Co.*,
595 F.3d 164 (4th Cir. 2010)....................20, 21

*Wilson v. Eagle Nat'l Bank*,
2023 WL 2478933 (D. Md. Mar. 13, 2023)....................16, 17, 19, 21

*Yates v. NewRez LLC*,
686 F. Supp. 3d 397 (D. Md. 2023)....................12

*In re Zetia (Ezetimibe) Antitrust Litig.*,
7 F.4th 227 (4th Cir. 2021)....................12

**Statutes, Regulations, and Rules**

8 C.F.R. § 287.8(c)(2)(ii)....................17, 20

8 U.S.C. § 1357(a)(2).................... *passim*

Fed. R. Civ. P. 23.................... *passim*

**Other Authorities**

1 William B. Rubenstein, Newberg & Rubenstein on Class Actions § 3:72
(6th ed. 2026) ........................................................................................................12, 19, 22

# INTRODUCTION

Plaintiffs, Samuel Guzmán, A.G.P., K.M., and J.M.R. ("Proposed Class Representatives"), bring this class action to end Defendants' unlawful "arrest first, ask questions later" policy for immigration enforcement in Maryland. Plaintiffs and all putative class members have been injured by Defendants' policy and practice of making warrantless immigration arrests without first conducting the probable cause assessment required by 8 U.S.C. § 1357(a)(2). To protect their own rights and the rights of others who are similarly situated, Plaintiffs seek to certify the following class under Federal Rule of Civil Procedure 23(b)(2) (the "Escape Risk Class"):[1]

> All persons who, since January 20, 2025, have been or will be arrested in the District of Maryland for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk.

Plaintiffs' proposed class readily satisfies Rule 23(a)'s four requirements: numerosity, commonality, typicality, and adequacy. *First*, the class is numerous, consisting of thousands of individuals, including those who may be in immigration detention facilities across the country and unnamed future class members who will be arrested by Immigration and Customs Enforcement ("ICE"). Plaintiffs have provided evidence of at least 24 warrantless arrests in Maryland pursuant to the unlawful policy at issue here, and public reporting makes clear that the number of Maryland residents subject to unlawful immigration arrests is increasing. Joinder for this large and growing group of plaintiffs would be impractical. *Second*, there are questions of law and fact common to the class as Plaintiffs' and class members' injuries result from the same unlawful policy and practice. *Third*, Plaintiffs' claims are typical of the class as each Plaintiff (and member of the putative class) was arrested in Maryland pursuant to the same unlawful policy, without a warrant

[1] Plaintiffs are not presently moving to certify the Immigration Status Class pled in Plaintiffs' Complaint, ECF No. 1, but reserve their right to do so in the future.

and without the required pre-arrest escape risk assessment. *Fourth*, the Proposed Class Representatives do not have any conflicts of interest with unnamed class members and will vigorously pursue the case on behalf of the class. And the undersigned counsel for Plaintiffs and the proposed class satisfy the requirements of Rule 23(g) and should be appointed as class counsel, given their robust experience litigating class actions, complex litigation, and immigration matters.

Lastly, certification of an injunctive relief class is appropriate under Rule 23(b)(2) because Defendants' policy and practice of conducting warrantless arrests in Maryland without making the requisite escape risk findings applies generally *across the class* and enjoining such a policy would provide relief to *each class member*. Defendants brashly continue to carry out their warrantless arrest policy in Maryland, without signs of slowing down. Each day that Defendants' policy remains in effect, Plaintiffs and putative class members face ongoing harm, including the risk of rearrest.

Defendants have employed virtually the same unlawful warrantless arrest policy across the country, leading courts in multiple jurisdictions to certify classes and enjoin their conduct class-wide. *See, e.g.*, *M.J.M.A. v. Hermosillo*, 822 F. Supp. 3d 1147, 1175–77 (D. Or. 2026), *appeal docketed sub nom. Cruz Gamez v. Lyons*, No. 26-4343 (9th Cir. July 8, 2026) (provisionally certifying Rule 23(b)(2) class challenging warrantless arrests without an assessment of escape risk); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 60–61 (D.D.C. 2025), *appeal docketed*, No. 26-5045 (D.C. Cir. Feb. 5, 2026) (provisionally certifying Rule 23(b)(2) class challenging warrantless arrests without an escape risk assessment); *Ramirez Ovando v. Noem*, 810 F. Supp. 3d 1209, 1229–30 (D. Colo. 2025), *appeal docketed*, No. 26-1027 (10th Cir. Jan. 26, 2026) (same). As explained below, the same result is appropriate here.

## BACKGROUND

### A. Defendants Are Employing Warrantless Arrests to Meet Nationwide Arrest Quotas.

Since January 2025, indiscriminate detention and deportation has been at the forefront of the Trump Administration's priorities.[2] To deliver on the President's "very important goal of delivering the single largest Mass Deportation program in History," the Trump Administration imposed daily arrest quotas.[3] On January 26, 2025, less than a week into the Trump Administration, ICE officials were "directed by Trump officials to aggressively ramp up the number of people they arrest, from a few hundred per day to at least 1,200 to 1,500, because the president has been disappointed with the results of his mass deportation campaign so far[.]"[4] Senior ICE officials were told "that each of the agency's field offices should make 75 arrests per day and managers would be held accountable for missing those targets."[5] By May 2025, White House Deputy Chief of Staff Stephen Miller confirmed publicly that the Trump Administration was "looking to set a goal of a minimum of 3,000 arrests for ICE every day and President Trump is going to keep pushing to get that number up higher each and every day[.]"[6] The goal is clear: the ruthless execution of the Trump Administration's immigration agenda. As ICE Acting Director Todd Lyons put it, "[w]e need to get better at treating this like a business" —like "Prime, but with human beings."[7] This pressure translated into policy and predictably into lawlessness.[8]

---

[2] *See* Declaration of Jerome A. Murphy in Support of Plaintiffs' Motion for a Preliminary Injunction ("Murphy Decl.") ECF No. 5-3, Exs. A-2–A-3.

[3] *M.J.M.A.*, 822 F. Supp. 3d at 1173 (citations omitted); Murphy Decl., Ex. A-2.

[4] Murphy Decl., Ex. A-3.

[5] *Id.*

[6] *Id.*, Ex. A-4.

[7] *Id.*, Ex. A-5.

[8] Officers' "limited authority" to make a warrantless arrest, *see Arizona v. United States*, 567 U.S. 387, 408 (2012), is codified in 8 U.S.C. § 1357(a)(2) and only permits such an arrest if the agent has "reason to

The Trump Administration has continued to demand that ICE meet unrealistic arrest quotas and arrest numbers are at an all-time high. Despite strategies to keep ICE "out of the headlines"[9] following fatal shootings by ICE agents in Minnesota, "ICE officials were told that the White House wanted an increase in arrests" from the approximately one thousand daily arrests ICE had reached, and were recently instructed "that 2,000 arrests a day was the new standard for enforcement."[10] Defendants and their agents are following that command—daily arrests have doubled, and in the last five days of June 2026, ICE arrested 10,000 individuals throughout the country, including in Maryland.[11] Arrests accelerated further in July, when ICE arrested nearly 50,000 individuals, making it the month with the highest number of arrests during this administration.[12]

Under 8 U.S.C. § 1357(a)(2), immigration agents may not conduct warrantless arrests unless they have probable cause to believe that: (1) an individual is in the United States unlawfully; and (2) the individual "is likely to escape before a warrant can be obtained for his arrest[.]" 8 U.S.C. § 1357(a)(2); *Lopez v. Noem*, 2025 WL 3496195, at *5 (D. Md. Dec. 5, 2025). But considerable evidence indicates that Defendants have stopped complying with these requirements.

As Defendants have worked to "turn the creative knob up to 11," "push the envelope," and "just go out there and arrest[,]" Defendants have in fact repeatedly acknowledged that they are

---

believe that the [noncitizen] so arrested is in the United States in violation of any . . . law or regulation [made in pursuance of law regulating the admission, exclusion, expulsion or removal of noncitizens] and is likely to escape before a warrant can be obtained for his arrest." Plaintiffs incorporate by reference their examination of the relevant statutory framework set forth in their Memorandum in Support of Motion for Preliminary Injunction and to Stay Agency Action filed concurrently. *See* ECF No. 5-1 at 2–3.

[9] Murphy Decl., Ex. A-11.

[10] *Id.*, Ex. A-12.

[11] *Id.*

[12] *Id.*, Ex. A-15.

making warrantless arrests without the required probable cause findings.[13] For instance, in July 2025, the Department of Justice fired the acting U.S. Attorney for the Eastern District of California after she told a Border Patrol official that he could not arrest individuals without probable cause.[14] In response to a lawsuit challenging Defendants' practice of conducting warrantless arrests without assessing probable cause in the District of Columbia, Department of Homeland Security ("DHS") asserted in a September 25, 2025 public statement that it "uses [the] '*reasonable suspicion*'" standard to make immigration arrests—openly conceding it applies a lower standard than the probable cause required by law.[15] DHS then stated that officers are "trained to ask a series of well-determined questions to determine status and removability," without any mention of escape risk.[16] On January 31, 2026, a DHS spokesperson reiterated that "[l]aw enforcement uses 'reasonable suspicion' to make arrests[.]"[17] And former Border Patrol Chief Gregory Bovino was the most explicit of all: "We need reasonable suspicion to make an immigration arrest . . . You notice I did not say probable cause, nor did I say I need a warrant. We need reasonable suspicion of illegal alienage[.]" *Escobar Molina*, 811 F. Supp. 3d at 45 (quoting Bovino).

Defendants have persisted in their policy and practice of making warrantless arrests without conducting adequate escape risk assessments even after courts have repeatedly concluded that the policy is unlawful. And, indeed, two district courts have held that Defendants' continued

---

[13] *Id.*, Exs. A-7–A-8.

[14] *Id.*, Ex. A-16.

[15] *Id.*, Ex. A-17 (emphasis added).

[16] *Id.*, Ex. A-18.

[17] *Id.*, Ex. A-19.

conduct violated the courts' preliminary injunctions mandating compliance with 8 U.S.C. § 1357(a)(2)'s requirements.[18]

### B. Defendants Have a Policy and Practice of Making Warrantless Immigration Arrests in Maryland Without a Pre-Arrest, Individualized Assessment of Escape Risk.

Defendants' immigration enforcement in Maryland follows a remarkably consistent pattern. *First*, agents target neighborhoods with significant populations of Brown and Black immigrants or those where they have previously encountered undocumented individuals. *Second*, overwhelmingly in the early morning, as people are going to work or dropping children off at school, agents cruise in unmarked cars. When agents perceive the driver of a car to be a Brown or Black immigrant, they initiate a traffic stop—even though ICE officers have no authority to enforce traffic laws. *Third*, multiple unmarked vehicles surround the targeted car, flashing sirens or deliberately striking it. Agents—often masked, armed, and wearing civilian clothing with no agency identification—order the driver and any other occupants out, at times smashing windows and dragging them out by force. The agents handcuff everyone, load them into unmarked cars, and leave the targeted vehicle at the scene. Agents do so without a warrant and without asking a single question about whether the person poses an escape risk. Agents do not inquire into whether the individual is likely to flee before a warrant can be obtained—asking nothing about the person's community ties, address, family, or employment.

Immigration agents employ the same "arrest first, ask questions later" practice for pedestrians. As with vehicle stops, agents stop individuals perceived to be Brown or Black

---

[18] Plaintiffs incorporate by reference the discussion of the Lyons Memorandum set forth in their Memorandum in Support of Motion for Preliminary Injunction and to Stay Agency Action. *See* ECF No. 5-1 at 5.

immigrants outside of stores or workplaces. Then, they make warrantless arrests without the requisite inquiries to determine whether the individuals present an escape risk.

Plaintiffs' and putative class members' arrests exemplify this policy and practice. Plaintiff Samuel Guzmán, a Latino U.S. citizen, was arrested in a 7-Eleven parking lot in Annapolis while walking back to his car on the morning of June 7, 2026, after buying coffee on his way to work. Declaration of Samuel Guzmán ("Guzmán Decl."), PI Ex. C, ¶¶ 1–2, 5, 7–11.[19] Armed, masked ICE agents approached Mr. Guzmán and without asking any questions, handcuffed him and seized his phone, wallet, and car keys. *Id.* ¶¶ 7–11. Agents did not show a warrant for his arrest or ever state they had one. *Id.* ¶ 11. Mr. Guzmán repeatedly told the agents that he was a U.S. citizen; the agent who handcuffed Mr. Guzmán said to him: "if you are an American citizen, why don't you speak better English?" *Id.* ¶¶ 11–12, 15, 17. After being driven to a separate parking lot and held for approximately ninety minutes, the agents returned him to his car—no agent ever explained why Mr. Guzmán had been arrested. *Id.* ¶¶ 12–16. Mr. Guzmán continues to drive the same car and route to his work, and he fears that ICE will arrest him again because of the way he looks and speaks. *Id.* ¶¶ 21–22.

While Plaintiff A.G.P., a Latino grandfather, was driving to work in Silver Spring on the morning of February 15, 2026, three unmarked vehicles surrounded his car, and one turned on flashing emergency lights, signaling A.G.P. to pull over. Declaration of A.G.P. ("A.G.P. Decl."), PI Ex. D, ¶¶ 1–2, 4, 6. After he pulled over, three agents with the word "ICE" on the backs of their clothing demanded he exit the vehicle and handcuffed him before asking his name—let alone any questions about his ties to the community. *Id.* ¶¶ 6–8. A.G.P. spent approximately three months in

[19] The declarations of Plaintiffs and other putative class members cited herein were filed as exhibits to Plaintiffs' Motion for Preliminary Injunction and to Stay Agency Action.

immigration detention on the other side of the country before a federal district court found his detention unlawful and ordered his release. *Id.* ¶¶ 9–17. When A.G.P. was released, ICE placed a GPS ankle monitor on him, which has exacerbated the pain in his legs and feet caused by his diabetic neuropathy. *Id.* ¶ 20. A.G.P. is also required to attend in-person check-ins and home visits. *Id*. Personally witnessing ICE arrests in his community since his release from detention and constantly hearing about ICE arrests around his home, where he works, and on routes he takes to work, A.G.P. fears that he will be arrested by ICE again. *Id.* ¶¶ 21–23.

Plaintiff J.M.R., a Latino man who has lived in the U.S. and been complying with the terms of an immigration bond for more than a decade, was also arrested on his way to work in Silver Spring. Declaration of J.M.R. ("J.M.R. Decl."), PI Ex. F, ¶¶ 1, 3, 5, 11. On the morning of July 7, 2026, while driving his boss's truck to a job site, J.M.R. noticed three unmarked cars following him. *Id.* ¶¶ 4–5. Suddenly, one of the cars pulled in front of him, and another turned on emergency lights. *Id*. J.M.R. pulled over, and several agents wearing vests that said "ICE" or "Police" on the backs got out and approached the truck. *Id.* ¶¶ 5–6. Then, an agent opened J.M.R.'s unlocked door, pulled him out by his arms, forced his hands behind his back, and threw him to the ground. *Id.* ¶ 7. An agent held J.M.R.'s head down with the agent's leg while other agents began to handcuff him. *Id.* Disoriented and in pain, J.M.R. tried to get to his feet when the agent removed the agent's leg from J.M.R.'s head. *Id.* ¶ 8. As J.M.R. attempted to stand up, after he was already partially handcuffed, agents shot him with a taser in his stomach and chest. *Id.* ¶ 8–9. J.M.R. required emergency medical attention; after being treated at a hospital, he was taken to a Virginia detention center, where he was not provided with supplies to clean the wounds caused by the taser. *Id.* ¶¶ 12–17. ICE handcuffed, tased, and arrested J.M.R. without a warrant, and without even asking his name, let alone any questions about his community ties. *Id.* ¶¶ 7–11. J.M.R. was ordered released

by a federal district court after the court found his detention was unlawful. *Id.* ¶ 18. J.M.R. and his family have been deeply affected by his violent arrest and detention. *Id.* ¶¶ 19–20. J.M.R. fears that he could be stopped and arrested again by ICE as he must continue to drive himself or catch rides with co-workers to travel to and from worksites, including on the same roads where he was arrested, and he continues to see and hear about ICE activity on those same roads in his community. *Id.* ¶¶ 20–21.

Early in the morning of January 12, 2026, Plaintiff K.M., a Latina woman, was driving in Salisbury, where she has resided for nearly 20 years and is raising her two young U.S. citizen children. Declaration of K.M. ("K.M. Decl."), PI Ex. E, ¶¶ 1–3, 6. K.M. noticed an unmarked sedan make a U-turn and begin to follow her. *Id.* ¶ 7. Another vehicle, an unmarked truck, began to follow her shortly thereafter. *Id*. K.M., aware of ICE arrests in her Eastern Shore community, realized that she was likely being followed by ICE agents. *Id*. To ensure that she could stop in a safe place, K.M. pulled over before the vehicles put on emergency lights or attempted to stop her car by force. *Id.* ¶¶ 6–8. After she stopped, about six unmarked cars suddenly surrounded her. *Id.* ¶ 9. Officers approached K.M.'s car, ordered her to lower her window, and demanded to see her and her passenger's identification. *Id.* ¶¶ 9–10. K.M. handed over to the agents her Maryland driver's license, after which the agents ordered her out of the car, threatened to shoot her, and handcuffed her. *Id.* ¶¶ 10–15. ICE did not have a warrant for K.M.'s arrest, and although K.M. tried to explain to the arresting agents that she had a pending immigration court case and young children at home for whom she is the sole caregiver, ICE told her that this information "didn't matter[.]" *Id.* ¶¶ 14–15. K.M. was driven to an ICE facility in Salisbury, where she was searched, fingerprinted, and had her belongings confiscated. *Id.* ¶ 16. K.M. was released from the ICE facility with an ankle monitor after approximately seven hours of detention and interrogation. *Id.* ¶¶ 16–

21. K.M. continues to be subjected to 24/7 GPS monitoring by ICE, including frequent check-in appointments and limitations on the geographic area in which she can travel. *Id.* ¶¶ 20, 22. Her ankle monitor causes her physical discomfort and embarrassment in public. *Id.* ¶ 22. K.M. has changed jobs and tried to avoid driving in certain parts of Salisbury out of fear of being stopped and arrested again, but she continues to see ICE activity all over her community. *Id.* ¶¶ 31–33. She has suffered from sleeplessness and panic attacks for which she sought mental health treatment after her arrest. *Id.* ¶ 34.

Declarants described the same sequence of events in their arrests. Agents stopped and arrested them without a warrant and without any inquiry into community ties or escape risk.[20] Some declarants remain in detention centers far from where their unlawful warrantless arrests took place in Maryland, *see, e.g.*, Candido Garcia Decl. ¶¶ 2–5, 8; S.B.R. Decl. ¶¶ 4–8, 16; E.C.V. Decl. ¶¶ 2–6, 9; J.H.A. Decl. ¶¶ 2–5, 10; W.J. Decl. ¶¶ 3–7, 10, and others are subjected to continued surveillance by ICE via GPS ankle monitors following their release from detention, *see, e.g.*, R.Q.H. Decl. ¶ 9; Manuel Decl. ¶¶ 7–9. Since returning to Maryland following their arrests and release from detention, many declarants have witnessed ICE's aggressive and violent presence in their communities, including arrests of their community members, and they live in fear of being re-arrested while traveling the same routes to work or doing basic errands. *See, e.g.*, A.L.P. Decl. ¶¶ 21–23; C.G. Decl. ¶ 11; J.A.G. Decl. ¶ 13; L.C.P. Decl. ¶ 17.

---

[20] *See* Declaration of C.G. ("C.G. Decl."), PI Ex. H, ¶ 5; Declaration of E.B.P. ("E.B.P. Decl."), PI Ex. I, ¶ 3; Declaration of A.L.P. ("A.L.P. Decl."), PI Ex. O, ¶ 9; Declaration of L.C.P. ("L.C.P. Decl."), PI Ex. U, ¶¶ 10–11; Declaration of J.H.A. ("J.H.A. Decl."), PI Ex. V, ¶ 5; Declaration of David Aguirre, PI Ex. G, ¶ 5; Declaration of Candido Garcia ("Candido Garcia Decl."), PI Ex. S, ¶ 5; Declaration of C.N.M. ("C.N.M. Decl."), PI Ex. J, ¶ 5; Declaration of D.C. ("D.C. Decl."), PI Ex. Q, ¶¶ 8–9; Declaration of E.A.M. ("E.A.M. Decl."), PI Ex. P, ¶ 6; Declaration of E.C.V. ("E.C.V. Decl."), PI Ex. W, ¶ 6; Declaration of J.A.G. ("J.A.G. Decl."), PI Ex. N, ¶ 7; Declaration of Manuel ("Manuel Decl."), PI Ex. M, ¶ 5; Declaration of R.Q.H. ("R.Q.H. Decl."), PI Ex. L, ¶ 4; Declaration of S.B.R. ("S.B.R. Decl."), PI Ex. T, ¶¶ 7–8; Declaration of W.J. ("W.J. Decl."), PI Ex. R, ¶¶ 6–7; Declaration of W.M.S. ("W.M.S. Decl."), PI Ex. K, ¶¶ 7, 9.

Plaintiffs' and declarants' arrests are part of the ongoing, *and escalating*, implementation of Defendants' unlawful warrantless arrest policy and practice in Maryland to meet their ever-increasing arrest objectives. Dr. Graeme Blair, a social scientist with expertise in data analysis, has analyzed ICE arrest data from January 20, 2025 through August 6, 2026. Declaration of Dr. Graeme Blair ("Blair Decl.") ¶¶ 1–4, 8.[21] During this time period, there were 6,999 non-custodial civil immigration arrests in Maryland, *i.e.*, arrests that occurred within the community rather than transfers from criminal custody or other custodial settings. *Id*. ¶¶ 7–8 & n.3. ICE's own data shows that while there was an average of 14.6 non-custodial arrests in Maryland a week in 2024, that has risen by 491% to an average of 86.4 per week since the Trump Administration began on January 20, 2025. *Id*. ¶ 9.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 23, "[a]t an early practicable time after a person sues . . . as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A).[22] To certify a class, Plaintiffs must show that the class they propose complies with the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345–46, 350 (2011).[23]

[21] The declaration of Dr. Graeme Blair cited herein was filed as Exhibit B to Plaintiffs' Motion for Preliminary Injunction and to Stay Agency Action. ECF No. 5-43.

[22] Courts in the Fourth Circuit have not generally adopted the term "provisional certification." *See, e.g.*, *D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 573–599 (D. Md. 2026) (granting plaintiffs' request for injunctive relief and certifying Rule 23(b)(2) class seeking to enjoin ICE from subjecting class members to the illegal and unconstitutional acts, policies, and practices created by ICE's operation of the Baltimore Hold Rooms). But "[p]rovisional certification does not lessen the rigor of Rule 23[.]" *Escobar Molina*, 811 F. Supp. 3d at 55 (quoting *L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 117 (D.D.C. 2025)). And regardless of the nomenclature, "the court proceeds with the understanding that '[a]n order that grants . . . class certification may be altered or amended before final judgment[.]'" *Id.* (quoting Fed. R. Civ. P. 23(c)(1)(C)).

[23] The Fourth Circuit has held that "[t]here is no threshold ascertainability requirement in [a] Rule 23(b)(2) case, which seeks only declaratory and injunctive relief from a discriminatory policy." *Kadel v. Folwell*, 100 F.4th 122, 160–61 (4th Cir. 2024), *judgment vacated on other grounds*, 145 S.Ct. 2838 (2025); *see also CASA, Inc. v. Trump*, 793 F. Supp. 3d 703, 717 n.3 (D. Md. 2025). As Plaintiffs seek to certify a Rule

"[I]f Rule 23(a) is satisfied," Plaintiffs then must show that their case meets the requirements of one of the three types of class actions under Rule 23(b). Fed. R. Civ. P. 23(b). Class certification under Rule 23(b)(2) is appropriate where the Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see Wal-Mart*, 564 U.S. at 360.

## ARGUMENT

### A. The Proposed Class Satisfies the Requirements of Rule 23(a).

#### 1. The Proposed Class Satisfies the Numerosity Requirement.

The proposed class satisfies Rule 23's requirement that it be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While "'[n]o specified number is needed to maintain a class action,' *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967)," "a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone[.]" *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:12 (5th ed. 2021)). The Fourth Circuit "has stated that 74 members is 'well within the range appropriate for class certification,'. . . and has upheld the certification with as few as 18 members[.]" *Yates v. NewRez LLC*, 686 F. Supp. 3d 397, 404 (D. Md. 2023) (quoting *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984)). "Plaintiffs need not establish the precise number of class members at the certification stage to satisfy the numerosity requirement so long as they provide a reasonable estimate of the number of class members." *D.N.N.*, 822 F. Supp. 3d at 574 (citation modified).

---

23(b)(2) class and only declaratory and injunctive relief from Defendants' unlawful policy and practice, no threshold ascertainability requirement applies here.

"The numerosity requirement mandates only difficulty or impracticability of joinder, not impossibility." *Calderon v. GEICO Gen. Ins. Co.*, 279 F.R.D. 337, 346 (D. Md. 2012).

Here, the proposed class readily meets this requirement as joinder would be impractical with proposed class members in the thousands—many of whom may be in immigration detention throughout the country (even though their arrests occurred in Maryland). *See, e.g.*, A.G.P. Decl. ¶¶ 12–17 (describing detention); J.M.R. Decl. ¶¶ 16–18 (describing detention); R.Q.H. Decl. ¶¶ 6–7 (describing detention); J.H.A. Decl. ¶ 10 (currently detained); Candido Garcia Decl. ¶ 8 (same); S.B.R. Decl. ¶ 16 (same); E.C.V. Decl. ¶ 9 (same); E.A.M. Decl. ¶ 17 (same); D.C. Decl. ¶ 10 (same); W.J. Decl. ¶ 10 (same). Courts have recognized that there are "special characteristics of noncitizen detainees" that "further support the impracticability of joinder." *D.N.N.*, 822 F. Supp. 3d at 574 (citation modified); *see also Coreas v. Bounds*, 2020 WL 5593338, at *11 (D. Md. Sep. 18, 2020) (citing cases finding joinder impractical where the class included individuals in immigration detention).

Recent arrest data confirm the large scope of the class. From January 20, 2025 through August 6, 2026, there have been approximately 7,000 non-custodial civil immigration arrests by ICE in Maryland—arrests that occurred within the community and excluding transfers from criminal custody or other custodial settings. Blair Decl. ¶¶ 7–8 & n.3. ICE's own data shows that while there was an average of 14.6 non-custodial arrests in Maryland a week in 2024, that has risen by 491% to an average of 86.4 per week since the Trump Administration took office on January 20, 2025. *Id.* ¶ 9. These statistics align with the experiences of Plaintiffs and declarants in this action who recount the continued, increasing presence of ICE in their communities in Maryland. *See, e.g.*, Guzmán Decl. ¶¶ 5, 13, 22; A.G.P. Decl. ¶¶ 21–22; K.M. Decl. ¶¶ 7, 32–33; J.M.R. Decl. ¶ 21; L.C.P. Decl. ¶ 17; A.L.P. Decl. ¶ 21; C.G. Decl. ¶ 11; J.A.G. Decl. ¶ 13; W.M.S. Decl. ¶ 18.

Moreover, Plaintiffs have provided evidence of at least 24 putative class members who Defendants arrested without a warrant and without making a pre-arrest, individualized determination of escape risk as required under 8 U.S.C. § 1357(a)(2).[24] *See also* Declaration of Rachael E. Savage ("Savage Decl."), PI Ex. X, ¶¶ 4–5 (an immigration attorney describing the changing practice in immigration enforcement in Maryland since the start of President Trump's second term where "many . . . clients detained since the spring of 2025 were detained as they were driving to work in the morning or while they were working at their job sites" or "while they were just running errands for their families").

Further, the proposed class includes unnamed future class members who will be arrested by ICE without a warrant or individualized determination of escape risk as required under 8 U.S.C. § 1357(a)(2)—a factor that courts have routinely recognized makes joinder impractical. *See, e.g.*, *D.N.N.*, 822 F. Supp. 3d at 574 ("[T]he fact that the class includes unknown, unnamed future members . . . weighs in favor of certification." (quoting *Coreas*, 2020 WL 5593338, at *10)); *Escobar Molina*, 811 F. Supp. 3d at 57–58 (D.D.C. 2025) (finding numerosity satisfied for a proposed class that included future individuals who would be arrested, recognizing that "classes including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them'" (quoting *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019))).

Here, the number of class members is guaranteed to continue growing, likely at an increasing pace, further making joinder impractical. The federal government deployed a new wave

[24] *See generally* A.G.P. Decl.; A.L.P. Decl.; C.G. Decl.; C.N.M. Decl.; Candido Garcia Decl.; D.C. Decl.; David Aguirre Decl.; E.A.M. Decl.; E.B.P. Decl.; E.C.V. Decl.; J.A.G. Decl.; J.H.A. Decl.; J.M.R. Decl.; K.M. Decl.; L.C.P. Decl.; Manuel Decl.; R.Q.H. Decl.; S.B.R. Decl.; Guzmán Decl.; W.J. Decl.; W.M.S. Decl.; Savage Decl. (describing two warrantless arrests in Maryland); Declaration of Bryan Avila, PI Ex. Y (describing cousin's arrest).

of ICE officers across the country in May 2026, including sending additional officers to Baltimore,[25] and maintains an ongoing quota targeting 2,000 arrests per day.[26] Through July 12, 2026, "ICE had arrested more than 200,000 people [in the United States] in 2026, a more than 40 percent increase compared with the same period last year."[27] This summer has seen an acceleration of already-increasing arrests over the course of the year: in July 2026 alone, ICE arrested nearly 50,000 individuals, making it the month with the highest number of arrests during this administration.[28] In two weeks in August 2026 alone, ICE arrested more than 1,300 people in Maryland and Virginia.[29]

ICE is also increasing its detention capacity in Maryland so that it can arrest more people. In February 2025, ICE accelerated plans for a new detention-capable office in Howard County,[30] and after efforts to block that facility recently stalled, ICE appears poised to proceed with its plans.[31] Further, while this Court has preliminarily enjoined Defendants from the development and use of a "mega warehouse" in Hagerstown, Maryland pending an adequate environmental review, Defendants are continuing forward with their plan to transform the warehouse into a detention center that according to the Maryland Attorney General and Maryland Department of Health,

---

[25] Declaration of Sabrina S. Merold ("Merold Decl."), Ex. A.

[26] Murphy Decl., Ex. A-12.

[27] Merold Decl., Ex. B; *see also* Murphy Decl. Exs. A-29–A-32 (detailing ICE's ongoing, and escalating, arrests in Maryland since the start of the Trump Administration in January 2025 and how ICE has arrested Marylanders at more than *four times* the arrest rate during the final year of the Biden Administration).

[28] Murphy Decl., Ex. A-15.

[29] *Id.*, Ex. A-33; *see also* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. & to Stay Agency Action at 6–8 & n.2, ECF No. 5-1.

[30] Murphy Decl., Ex. A-24.

[31] *Id.*, Ex. A-25.

"would host and then transfer between 78,000 and 180,000 people per year."[32] As such, the proposed class meets the numerosity requirement of 23(a)(1).

**2. The Proposed Class Satisfies the Commonality Requirement.**

Under Rule 23(a)(2), class certification is appropriate where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires that the "claims must depend upon a common contention" that "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350; *see also EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014) ("A single common question will suffice . . . but it must be of such a nature that its determination will resolve an issue that is central to the validity of each one of the claims in one stroke . . . ." (citation modified)). "Where the injuries complained of by named plaintiffs allegedly result from the same unlawful pattern, practice, or policy of the defendants, the commonality requirement is usually satisfied." *Wilson v. Eagle Nat'l Bank*, 2023 WL 2478933, at *11 (D. Md. Mar. 13, 2023) (quoting *Parker v. Asbestos Processing, LLC*, 2015 WL 128930, at *7 (D.S.C. Jan. 8, 2015)).

---

[32] *Maryland v. Mullin*, 831 F. Supp. 3d 325, 343 (D. Md. 2026) ("[T]he property is a 'mega warehouse' covering 53.74 acres and including an above-grade area of 825,620 square feet. . . . Public statements made by ICE suggest that facilities of this scale will be used to 'house[] an average daily population of 1,000 to 1,500 detainees for average stays of 3-7 days."); *id.* at 346 ("Although the project description … states that the facility would be 'designed to accommodate up to 542 detainees,' . . . under the 'Comments' section of the Decision Support Document, a comment from Gabrielle Fernandez [a DHS environmental protection specialist] made on [February 6, 2026] states that the 'facility will be designed to accommodate 500 to 1,000 detainees, with scalability to accommodate up to 2,000 individuals.'"); Decl. of Dr. David Blythe in Supp. of Pl.'s Mot. for a Prelim. Inj. ¶ 13, *Maryland v. Mullin*, No. 1:26-cv-00733 (D. Md. Mar. 19, 2026), ECF No. 15-18 ("I understand that ICE's plans for this facility involve detention of individuals for short periods of time, purportedly three to seven days, due to this facility's designated status as a 'processing center.' Assuming the accuracy of this estimate, the facility, if at capacity, would host and then transfer between 78,000 and 180,000 people per year."); Joint Status Report at 1, *Maryland v. Mullin*, No. 1:26-cv-00733 (D. Md. Aug. 26, 2026), ECF No. 64 (noting that the government has been "performing various security and maintenance activities" at the warehouse); *see also* Murphy Decl., Ex. A-27.

Here, the commonality requirement is satisfied as the proposed class seeks to challenge Defendants' policy and practice of conducting warrantless immigration arrests in Maryland without making the required pre-arrest probable cause determination of escape risk in violation of 8 U.S.C. § 1357(a)(2). Plaintiffs' claims rest on injuries they have suffered as a result of Defendants' specific, discrete unlawful policy and practice.

As *M.J.M.A.*, *Escobar Molina*, and *Ovando* all recognized, proposed class members' claims present common questions of law or fact, where, as here, such class members allege that they are subject to the same unlawful practice of warrantless immigration arrests. These common questions include but are not limited to: (1) whether Defendants have a policy and practice of conducting warrantless arrests without making an individualized determination of probable cause that an individual is likely to escape before a warrant can be obtained for the arrest; and (2) whether this policy and practice violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii). The determination of these questions will resolve "in one stroke" issues "central to the validity" of the claims of the class. *Wal-Mart*, 564 U.S. at 350.

*M.J.M.A.*, *Escobar Molina*, and *Ovando* all found commonality despite minor, immaterial differences in individual plaintiffs' circumstances. *See, e.g.*, *M.J.M.A.*, 822 F. Supp. 3d at 1176; *Escobar Molina*, 811 F. Supp. 3d at 58–59; *Ovando*, 810 F. Supp. 3d at 1228–29. This Court should follow suit.

Under Fourth Circuit law, individual factual differences among the proposed class members present no obstacle to class certification. "Minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law." *Wilson*, 2023 WL 2478933, at *11 (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997)); *see also Broussard v. Meineke Disc. Muffler Shops,*

*Inc.*, 155 F.3d 331, 334 (4th Cir. 1998) ("We . . . do not suggest that the commonality and typicality elements of Rule 23 require that members of the class have identical factual and legal claims in all respects."); *D.N.N.*, 822 F. Supp. 3d at 577–78 ("[A]ny factual differences at issue here do not preclude certification because the class members share the same legal theory, and that theory is the basis for the common questions of law at issue." (citation modified)). Here, any factual differences among proposed class members, including the specific circumstances of each Plaintiff's and proposed class member's warrantless arrest, are immaterial because their claims turn on the same legal theory—Defendants unlawfully arrested them without a warrant and without conducting the required escape risk assessment.

Accordingly, the proposed class satisfies the commonality requirement of Rule 23(a)(2).

**3. The Proposed Class Satisfies the Typicality Requirement.**

Typicality requires that "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To satisfy the typicality requirement, a "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466–67 (4th Cir. 2006). The analysis of typicality "tend[s] to merge" with the analysis of commonality as both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

Typicality does not "require[] that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned[,]" but "the variation in claims [cannot] strike[] at the heart

of the respective causes of actions . . . ." *Deiter*, 436 F.3d at 467; *see also Wilson*, 2023 WL 2478933, at *12 (concluding that typicality was met where defendants "pursued the same course of conduct as to all class members"). The claims of the class representative "must 'arise[] from the same event, practice, or course of conduct that gives rise to the claims of other class members' and be 'based on the same legal theory.'" *CASA*, 793 F. Supp. 3d at 722 (quoting 1 William B. Rubenstein, Newberg & Rubenstein on Class Actions § 3:29 (6th ed. 2026)); *see also Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 447 (D. Md. 2018) (the claims of the named plaintiffs and those of the class members "do not have to be factually or legal[ly] identical, but the class claims should be fairly encompassed by those of the named plaintiffs" (citing *Broussard*, 155 F.3d at 334)).

Here, the Proposed Class Representatives' claims are typical of those of the proposed class. Each named Plaintiff was arrested in Maryland without a warrant and without Defendants making the required probable cause determination of escape risk. *See* Guzmán Decl. ¶¶ 7–17; A.G.P. Decl. ¶¶ 6–8; J.M.R. Decl. ¶¶ 6–11; K.M. Decl. ¶¶ 6–15. To the extent that any individual class members may have minor differences in the specific circumstances of their arrest, Rule 23's typicality requirement does not require that the named plaintiff's claims be "perfectly identical" to the claims of other class members and any such differences here do not "strike[] at the heart" of the proposed class claims. *Deiter*, 436 F.3d at 467; *see Kidd v. Mayorkas*, 343 F.R.D. 428, 439 (C.D. Cal. 2023) (finding any "factual differences across various ICE encounters" did not "defeat typicality" because plaintiffs did not "seek a declaration or injunction directed at any individual ICE encounter" but "challenge[d] ICE's policies or practices on a systemwide basis" and "all members of the proposed classes would benefit from a declaration that a particular ICE policy or practice is unconstitutional (or an injunction prohibiting ICE from maintaining a policy or practice)").

Each named Plaintiff's claims are based on the "same legal theory" and arise from the same specific "practice, or course of conduct that gives rise to the claims of other class members"—Defendants' policy and practice of conducting warrantless arrests in Maryland without making the individualized probable cause determination of escape risk required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii). *CASA*, 793 F. Supp. 3d at 722; *see also Escobar Molina*, 811 F. Supp. 3d at 59–60 (finding typicality satisfied as the individual plaintiffs "at bottom 'suffered a similar injury from the same course of conduct'" that the class is challenging (quoting *Bynum v. District of Columbia*, 214 F.R.D. 27, 34 (D.D.C. 2003)); *M.J.M.A.*, 822 F. Supp. 3d at 1176 (finding typicality satisfied as the named plaintiffs and class "each challenge ICE's practice of arrests without a probable cause determination of escape risk"); *Ovando*, 810 F. Supp. 3d at 1228–29 (finding typicality satisfied as "[t]he harm suffered by the named plaintiffs has been shared by all class members who have similarly been arrested without a valid warrant or a particularized finding of probable cause that they are likely to escape").

Accordingly, Plaintiffs have satisfied the typicality requirement of Rule 23(a)(3).

#### 4. Class Representatives and Class Counsel Will Adequately Represent the Class.

The last Rule 23(a) requirement, adequacy, requires plaintiffs to establish that the class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy analysis "serves to uncover conflicts of interest between named parties and the class they seek to represent," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997), and focuses on whether there are any "fundamental" conflicts, *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179–80 (4th Cir. 2010). "A conflict is not fundamental when . . . all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].'" *Id.* at 180 (quoting *Gunnells v. Healthplan Servs., Inc.*,

348 F.3d 417, 431 (4th Cir. 2003)). The adequacy analysis also examines whether the named plaintiffs are "of a character to vigorously pursue the case." *CASA*, 793 F. Supp. 3d at 723 (quoting *D.N.N. v. Baker*, 2025 WL 2098633, at *11 (D. Md. July 25, 2025)).

Both prongs of the adequacy analysis are readily met here. *First,* the Proposed Class Representatives do not have any conflicts of interest with the unnamed class members. As detailed above, Plaintiffs and the unnamed class members are all subject to Defendants' unlawful policy and practice of making warrantless immigration arrests in Maryland without the necessary individualized probable cause determination of escape risk and seek the same declaratory and injunctive relief. Plaintiffs are motivated to pursue this action on behalf of themselves and others who have been or will be subject to the same unlawful policy and practice at the hands of Defendants. *See* Guzmán Decl. ¶¶ 20, 23; A.G.P. Decl. ¶¶ 24, 26; J.M.R. Decl. ¶ 23; K.M. Decl. ¶ 35. As a result, Plaintiffs and the putative class "share common objectives" and "have the same interest in establishing the liability" of Defendants. *Ward*, 595 F.3d at 180 (quoting *Gunnells*, 348 F.3d at 431); *see also Escobar Molina*, 811 F. Supp. 3d at 60 (finding adequacy satisfied in similar challenge to Defendants' warrantless arrest policy and practice where plaintiffs and putative class members were all subjected to Defendants' policy and practice and attested that they understood "the responsibility of being a class representative" and were "willing to protect the class's interests").

*Second*, the Proposed Class Representatives will "vigorously pursue the case" on behalf of the class. "Rule 23 does not require the representative plaintiffs to have extensive knowledge of the intricacies of litigation, rather, the named plaintiffs must have a general knowledge of what the action involves and a desire to prosecute the action vigorously." *Wilson*, 2023 WL 2478933, at *16 (quoting *Benway v. Res. Real Est. Servs., LLC*, 239 F.R.D. 419, 425 (D. Md. 2006)). Courts

are concerned about adequacy where a named plaintiff "lacks *any* understanding of the class representative's role in litigation[.]" *D.N.N.*, 822 F. Supp. 3d at 580 (emphasis in original). Here, Plaintiffs' declarations make clear that they understand the claims asserted and their responsibilities as class representatives, and they are willing to protect the interest of the class. *See* Guzmán Decl. ¶¶ 23–30; A.G.P. Decl. ¶¶ 26–33; J.M.R. Decl. ¶¶ 23–30; K.M. Decl. ¶¶ 35–42. This is sufficient to be adequate representatives for the class.

Under Rule 23(a)(4), courts also examine whether counsel are "qualified, experienced, and generally able to conduct the litigation." 1 William B. Rubenstein, Newberg & Rubenstein on Class Actions § 3:72 (6th ed. 2026). Following the addition of Rule 23(g), the "majority of courts now recognize that Rule 23(g) alone governs the analysis of class counsel's adequacy." *Id.* § 3:80. Plaintiffs briefly address class counsel's adequacy here—the requirements of "lack of conflicts *and* class counsel's competency"—and further address how the undersigned counsel amply meet the criteria of Rule 23(g) in Section III below. *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 523–24 (4th Cir. 2022). Here, no conflict of interest exists between counsel and the class, and as discussed in Section C, *infra*, counsel has adequately represented the class and will continue to do so and has robust experience litigating class actions, complex litigation, and immigration matters.

**B. The Proposed Class Satisfies the Requirements of Rule 23(b)(2).**

Class certification under Rule 23(b)(2) is appropriate where the defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see also Wal-Mart*, 564 U.S. at 360 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."). "The key to the (b)(2)

class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (citation modified).

This is precisely the type of case for which Rule 23(b)(2) is designed. Defendants' actions—conducting warrantless arrests in Maryland without the required pre-arrest, individualized assessment of probable cause—impact *all* members of the proposed class, and an injunction that enjoins such a policy and practice "would provide relief to each member of the class." *Id.* at 360; *see Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015) ("[T]his is a paradigmatic Rule 23(b)(2) case: The meaningful, valuable injunctive relief . . . is indivisible, benefiting all [] members of the (b)(2) Class at once.") (citation modified).

Thus, this Court and courts across the country have repeatedly certified injunctive relief classes in the immigration context challenging specific policies and practices of DHS and ICE, including unlawful warrantless immigration arrests. *See, e.g.*, *D.N.N.*, 822 F. Supp. 3d at 581–82 (certifying (b)(2) class seeking to enjoin ICE from subjecting class members to the illegal and unconstitutional acts, policies, and practices created by ICE's operation of the Baltimore Hold Rooms); *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 40 (D. Md. 2020) (certifying (b)(2) class challenging a 2019 DHS policy "governing treatment of asylum applications by unaccompanied immigrant children"); *Escobar Molina*, 811 F. Supp. 3d at 60–61 (provisionally certifying (b)(2) class challenging warrantless arrests without an escape risk assessment).[33]

[33] *See also M.J.M.A.*, 822 F. Supp. 3d at 1175–77 (provisionally certifying a (b)(2) class of all individuals who "have been arrested or will be arrested in the District of Oregon for alleged immigration violations without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses an escape risk"); *Ovando*, 810 F. Supp. 3d at 1228–30 (provisionally certifying a (b)(2) class of individuals "who have been arrested, or will be arrested in [the District of Colorado] by ICE without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk").

Accordingly, the proposed class satisfies Rule 23(b)(2).

### C. The Court Should Appoint Counsel for Plaintiffs as Class Counsel.

Upon certifying a class, the court must appoint class counsel. Fed. R. Civ. P. 23(g)(1). Under Rule 23(g), the Court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Plaintiffs' counsel meet all four factors. Plaintiffs are jointly represented by attorneys from several organizations with significant experience litigating class actions in federal court; representing clients in complex litigation in federal court; litigating immigration matters; working alongside noncitizens; and working alongside civil rights plaintiffs—Amica Center for Immigrant Rights ("Amica Center"), the National Immigration Project, the American Civil Liberties Union of Maryland ("ACLU MD"), Crowell & Moring LLP ("Crowell"), and Cohen Milstein Sellers & Toll LLP ("Cohen Milstein"). *See* Declaration of Ian Austin Rose ¶¶ 2–11 ("Amica Center Decl."); Declaration of Yulie Landan ¶¶ 2–6 ("National Immigration Project Decl."); Declaration of Deborah A. Jeon ¶¶ 2–8 ("ACLU MD Decl."); Declaration of Jerome A. Murphy ¶¶ 4–12 ("Crowell Decl."); Declaration of Kit A. Pierson ¶¶ 2–7 ("Cohen Milstein Decl."). Counsel have devoted substantial time and resources to developing the claims in this action and will continue to do so, and counsel are well-versed in the intricacies of immigration law, federal law governing immigration enforcement, civil rights law, and law governing class action proceedings. *See* Amica Center Decl. ¶¶ 3–4, 6–12; National Immigration Project Decl. ¶¶ 2–7; ACLU MD Decl. ¶¶ 2–3,

5–9; Crowell Decl. ¶¶ 4–6, 10–12, 14; Cohen Milstein Decl. ¶¶ 4–7, 9. Together, these five legal organizations have ample resources that they are prepared to commit to representing the class. *See* Amica Center Decl. ¶ 13; National Immigration Project Decl. ¶ 8; ACLU MD Decl. ¶ 10; Crowell Decl. ¶ 13; Cohen Milstein Decl. ¶¶ 8, 10.

Therefore, the Court should appoint Amica Center for Immigrant Rights, National Immigration Project, American Civil Liberties Union of Maryland, Crowell & Moring LLP, and Cohen Milstein Sellers & Toll LLP as counsel for the class in this case.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion for Class Certification; appoint Plaintiffs Samuel Guzmán, A.G.P., K.M., and J.M.R. as class representatives for the Escape Risk Class; and appoint the undersigned as class counsel.

Dated: September 9, 2026

Respectfully submitted,

*/s/ Kit A. Pierson*

Kit A. Pierson (D. Md. Bar No. 11253)
Sabrina S. Merold (*Application for Admission pending*)
Alison S. Deich (*Application for Admission pending*)
COHEN MILSTEIN SELLERS & TOLL LLP
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
kpierson@cohenmilstein.com
smerold@cohenmilstein.com
adeich@cohenmilstein.com

Jerome A. Murphy (D. Md. Bar No. 27678)
Jared A. Levine (*Pro hac vice forthcoming*)
CROWELL & MORING LLP
600 Fifth Street, NW

Washington, DC 20001
Tel: (202) 624-2500
Fax: (202) 628-5116
JMurphy@crowell.com
jlevine@crowell.com

Ian Austin Rose (D. Md. Bar No. 22079)
Adina Appelbaum (D. Md. Bar No. 32089)
Samantha Hsieh (D. Md. Bar No. 32092)
Lauren Hodges (D. Md. Bar No. 32272)
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Ave. NW Ste. 701
Washington, DC 20036
Tel. 202-788-2509
Austin.rose@amicacenter.org
Adina@amicacenter.org
Sam@amicacenter.org
Lauren@amicacenter.org

Deborah A. Jeon (D. Md. Bar No. 06905)
David Rocah (D. Md. Bar No. 27315)
Sonia Kumar (D. Md. Bar No. 07196)
Gina Branch Elleby (D. Md. Bar No. 32059)
AMERICAN CIVIL LIBERTIES UNION OF MARYLAND
3600 Clipper Mill Road, Suite 200
Baltimore, Maryland 21211
Tel.: 410-889-8555
jeon@aclu-md.org
rocah@aclu-md.org
kumar@aclu-md.org
elleby@aclu-md.org

Yulie Landan*(*Pro hac vice forthcoming)*
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD ("NATIONAL IMMIGRATION PROJECT")
1763 Columbia Road NW, Suite 175 #896645
Washington, DC 20009
(213) 430-5521
yulie@nipnlg.org

*Not admitted in the District of Columbia; working remotely from New York and admitted in California only

*Attorneys for Plaintiffs*